**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Oil-Dri Corporation of America | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:15-cv-01067 |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Nestlé Purina Petcare Company | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMAND |

**PLAINTIFF OIL-DRI'S MOTION FOR SANCTIONS
REGARDING THE DEPOSITION OF THIRD-PARTY WITNESS JERRY GLYNN**

**TABLE OF CONTENTS**

**Page**

*Table of Authorities*……………………………………………………………………..............ii

I. INTRODUCTION AND FACTUAL BACKGROUND…………………………………..1

    A. Summary of Argument……………………………………………………….1

    B. The Salient Facts……………………………………………………………..2

II. NESTLE'S CONDUCT SURROUNDING THE DEPOSITION OF
JERRY GLYNN IS SANCTIONABLE…………………………………………………..3

    A. Nestle's Attorneys Improperly Solicited The Representation Of Mr. Glynn………3

        1. Nestle's Impermissible Solicitation of Mr. Glynn…………………….3
        2. Nestle's Attorneys Carefully Prepared Mr. Glynn For His Deposition…...4
        3. Nestle's Attorneys violated MRPC 3.4(a) and IRPC 3.4(a)…………………5
        4. Nestle's Position On The Solicitation Issue Is Untenable………………8

    B. Nestle Withheld Producing the Glynn Documents, Further Impeding
       Effective Cross-Examination by Oil-Dri……………………………………..9

    C. Nestle's Attorneys Repeatedly Did Not Tell the Truth Here……………………10

III. SANCTIONS ARE APPROPRIATE IN THESE CIRCUMSTANCES………………13

IV. CONCLUSION……………………………………………………………………….15

# TABLE OF AUTHORITIES

**Cases**                                                                                                          *Page(s)*

*Adams v. Attorney Registration & Disciplinary Comm'n of Supreme Court of Illinois*,
801 F.2d 968 (7th Cir. 1986)..........................................................................................7

*Aspgren v. Montgomery Ward & Co.*,
1984 U.S. Dist. LEXIS 21892 (N.D. Ill. Nov. 19, 1984).........................................6, 7, 8

*Bates v. State Bar of Arizona,*
433 U.S. 350 (1977).........................................................................................................6

*First Wisconsin Mortgage Trust v. First Wisconsin Corp.*,
571 F.2d 390, *rev'd on other grounds*, 584 F.2d 201 (7th Cir. 1978) (en banc)............5

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
529 F.3d 371 (7th Cir. 2008)....................................................................................13, 14

*Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*,
196 F.R.D. 220 (W.D.N.Y. 2000)..................................................................................14

*Ohralik v. Ohio State Bar Association*,
436 U.S. 447 (1978)......................................................................................................6, 8

**Rules**

Fed.R.Civ.P. 45……………………………………………………………………………1

MRPC 3.4……………………………………………………………………………………5

MRPC 7.3……………………………………………………………………………………5

CO. R. Professional Conduct 3.4 ...................................................................................5

CO. R. Professional Conduct 7.3....................................................................................5

Ill. R. Professional Conduct 3.4......................................................................................5

Ill. R. Professional Conduct 7.3......................................................................................5

MO. R. Professional Conduct 4-3.4................................................................................5

MO. R. Professional Conduct 4-7.3.................................................................................................5

N.D. Ill. LR 83.50……………………………………….................………...…...…5

I.    **INTRODUCTION AND FACTUAL BACKGROUND**

    A.    **Summary Of Argument**

Nestle served a subpoena on a third-party witness, Jerry Glynn, which "Commanded" his presence at a deposition, and to produce documents, and which promised "contempt" for failing "without adequate excuse to obey the subpoena…." (Glynn subpoena, Ex. 1, cover, and reciting Fed.R.Civ.P. 45(g)). Mr. Glynn is not a lawyer. Faced with this, it is small wonder that when Nestle's counsel violated the rules of professional conduct by soliciting the representation of Mr. Glynn, he accepted. Nestle's attorneys then prepared him for the deposition, which almost certainly resulted in Mr. Glynn providing far more Nestle-friendly testimony than he would have had he had a truly independent lawyer – depriving Oil-Dri of its right to Mr. Glynn's unvarnished testimony.

Nestle's counsel also undermined Oil-Dri's examination of Mr. Glynn by improperly withholding and failing to produce to Oil-Dri's attorneys before the Glynn deposition, *1697* documents that had earlier been provided by Mr. Glynn to Nestle's attorneys nearly one full week prior to the April 16 deposition. *1,424* of those 1697 documents had never before been produced by either side in this case. Nestle's attorneys had these documents six days before the Glynn deposition, but did not provide them to Oil-Dri's attorneys until April 23, 2018, a week after the Glynn deposition; *during the Glynn deposition*, Oil-Dri's attorneys received only copies of marked exhibits as the deposition progressed. Further, when asked about these facts, Nestle's attorneys repeatedly did not tell the truth either to Oil-Dri's attorneys during the deposition, or later to the Court.

As a sanction due to its attorneys' conduct, Nestle should not be permitted to call Mr. Glynn to trial, or to use any documents he produced.

1

B.     **The Facts**

The Glynn deposition was important because Jerry Glynn is listed as a co-inventor on the Pattengill patent, a principal prior art patent which Nestle used in the IPR it filed at the Patent Office in March, 2015, and which Nestle relies upon for its invalidity contentions in this case. Mr. Glynn was a former salesman for Western Aggregates, a Boulder, Colorado-based company that also employed Maurice Pattengill in the same (1990s) time period.

Nestle subpoenaed Mr. Glynn on February 20, 2018 (Ex. 1). About 4 weeks before the Glynn deposition, on March 22, 2018, Oil-Dri's counsel briefly spoke by phone with Mr. Glynn, in an effort to determine his knowledge of relevant events. Mr. Glynn advised that he had, or planned to, retain independent counsel, *and that he did not wish to speak to either side on any substantive matter before the deposition*. Oil-Dri's counsel immediately ended the call, and then notified Nestle's counsel of this fact (Ex. 2, Mike Mazza 3/22/18, at 10:27 a.m.). Mr. Glynn's testimony shows that Nestle's attorneys then improperly solicited Mr. Glynn's representation, apparently "free of charge," as shown below, unfairly prejudicing Oil-Dri and interfering with Oil-Dri's access to important, untainted, third-party testimony.

As shown below, Nestle's attorneys: (1) knew by the end of March that Mr. Glynn had possession of the 1700 subpoenaed documents; (2) took physical possession of these documents during a face-to-face meeting with Mr. Glynn on April 10, 2017, 6 days before the April 16, 2017 deposition – yet Nestle's attorneys failed to provide Oil-Dri with a copy of the documents before, *or even during*, the deposition; and (3) improperly solicited representation of Mr. Glynn. Further, while Nestle provided copies of the 1700 documents after the deposition, Nestle *only recently* (August 8, 2018) produced bates-stamped copies of the documents. *Id.*

2

Oil-Dri warned Nestle during the deposition that it might move to strike the entire deposition because of Nestle's failure to provide copies of the documents prior to the deposition (Ex. 4, Glynn Dep., at 39:10-13), but Nestle's attorneys chose to proceed with the deposition without doing so.

## II. NESTLE'S CONDUCT SURROUNDING THE DEPOSITION OF JERRY GLYNN IS SANCTIONABLE

### A. Nestle's Attorneys Improperly Solicited The Representation Of Mr. Glynn

#### 1. Nestle's Impermissible Solicitation of Mr. Glynn

Mr. Glynn, a third-party witness who is not a former employee of Nestle, unequivocally testified during his deposition that he was solicited for representation by Nestle's Bryan, Cave attorneys, even though Mr. Glynn *did not desire that representation*:

> Q. (BY MR. MAZZA) Before you and Bryan Cave entered into this engagement and -- and your position is that they represent you in this case; is that right?
> A. Yes.
> Q. *Okay. Before that happened, did you ask them or did they ask you to represent you?*
> A. *They offered to represent me.*
> Q. Okay. And did -- at the time, before there was an engagement, did they say why they wanted to represent you or why they felt like you needed representation?
> A. No. *They just offered to say, you know, most people, when they come to a deposition, have an attorney. We could do that.*
> Q. *And before the engagement occurred, did you feel like you needed them to be representing you for some reason?*
> A. No.

(Ex. 4, Glynn Dep., at 90:7-23, emphasis added). Nestle's attorneys never sought to "correct" this testimony during the deposition, or said anything to suggest that Mr. Glynn might be incorrect in this aspect of his testimony. Further, a few weeks before his deposition, Mr. Glynn advised Oil-Dri's counsel that he did not wish to speak to either side on any substantive matter before the deposition. *Id.* at 86:4-13; 86:25-87:1, 12-13; and 89:7-14; *see also* Ex. 2 ("he (Mr. Glynn) advised that he has retained counsel, and does not wish to speak to either side on any substantive matter

before the deposition."). But, contrary to Mr. Glynn's stated desire, Nestle's counsel approached Mr. Glynn and solicited his representation anyway. *See* Ex. 4, Glynn Dep., at 90:7-23.

Mr. Glynn's testimony clearly shows that the idea to enter into an attorney-client engagement with Nestle's counsel arose from their coercive suggestion that "[m]ost people, when they come to a deposition, have an attorney. We could do that." (Ex. 4, Glynn Dep., at 90:17-20.) It cannot be ignored that the context in this solicitation was that Nestle had served non-lawyer Glynn with a jarring subpoena from a federal court, "Command[ing]" his presence, and threatening "contempt" for disobedience of the subpoena. Absent Nestle's solicitation, Mr. Glynn would not have considered hiring Nestle's counsel (*id.* at 90:20-23: "Q. And before the engagement occurred, did you feel like you needed them to be representing you for some reason? A. No.").

### 2. Nestle's Attorneys Carefully Prepared Mr. Glynn For His Deposition

Mr. Glynn was clearly prepared by Nestle's lawyers for the deposition. For example, even though many documents show that Oil-Dri approached Western Aggregates for a reason entirely unrelated to the facts of this case – to use a foam of Western Aggregates as a de-dusting agent for its cat litters (*see* e.g., Ex. 3, ODC 3735 – ODC 3774, ODC 7118 and ODC 7646) – Mr. Glynn testified that he somehow knew that this was not Oil-Dri's primary interest, and instead Oil-Dri's "primary interest was to be able to get into the market with a clumping cat litter" (*see* Ex. 4, Glynn Dep., at 104:22-105:7). Of course, Oil-Dri already had clumping cat litters in the market years before this, called Lasting Pride and Lasting Pride Plus (*see* Ex. 5, ODC 2605 – ODC 2606 and ODC 3290 – ODC 3295), so the impartiality of Mr. Glynn's testimony here is highly suspect.

Further, the Glynn deposition appeared carefully scripted: Mr. Glynn was familiar with the 20-plus-year-old documents he was handed, and recalled dates, locations and people present during long-ago meetings and presentations (*see* Ex. 4, Glynn Dep., e.g., at 19:6-25 (allegedly

recalling names, documents and facts from 1993 meeting), 23:15 – 25:3 (same), 25:7 – 27:3 (same), 27:10-19 (allegedly recalling aspects of clay litter formulas) and 30:3 – 32:23)– all from 20+ years ago -- with remarkable precision.

Nestle's attorneys also acted in fact like Mr. Glynn's attorneys during the deposition, freely instructing him not to answer questions on the basis of privilege, such as, e.g.: why he needed representation (Ex. 4, Glynn Dep., at 86:14-19; 86:25-87:13); the timing of that representation (*id.* at 89:15-25); and who had possession when, of the 1700 documents (*id.* at 96:5-23).

Under all of these circumstances, the inference is inescapable that Mr. Glynn believed his job was to testify favorably for the lawyers who had rescued him from the federal subpoena.

### 3. Nestle's Attorneys violated MRPC 3.4(a) and IRPC 3.4(a)

Model Rule of Professional Conduct (MRPC) 3.4(a) and Illinois Rule of Professional Conduct (IRPC) 3.4(a) both state: "A lawyer shall not: (a) unlawfully obstruct another party's access to evidence…."[1]

Additionally, MRPC 7.3(a) and IRPC 7.3(a) both state:

> A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain….

---

[1] Per N.D. Ill. LR 83.50, the applicable disciplinary rules for attorneys admitted to practice in the N.D. Ill. are the Model Rules promulgated by the ABA — state professional rules only apply when the Model Rules are 1) silent or 2) inconsistent with state professional conduct rules. Neither exception applies here. In any event, the applicable Missouri (Bryan, Cave is a Missouri lawfirm) and Colorado (the deposition took place in Colorado) Rules of Professional Conduct ("MRPC" and "CRPC") are similar to Model Rules 3.4(a) and 7.3(a). MRPC 4-3.4(a) and CRPC 3.4(a) are identical. CRPC 7.3(a) adds "from a prospective client" after "solicit professional employment," while MRPC 4-7.3(a) states that "[a] lawyer may not initiate the in-person, telephone, or real time electronic solicitation of legal business under any circumstance, other than with an existing or former client, lawyer, close friend, or relative." *See* Ex. 12. *See also Aspgren v. Montgomery Ward & Co.*, 1984 U.S. Dist. LEXIS 21892, at *4 (N.D. Ill. Nov. 19, 1984) ("[a] federal district court has responsibility for controlling the conduct of attorneys who practice before it"), citing *First Wisconsin Mortgage Trust v. First Wisconsin Corp.*, 571 F.2d 390, 396, *rev'd on other grounds*, 584 F.2d 201 (7th Cir. 1978) (en banc).

Here, Nestle's attorneys retained Mr. Glynn to further their pecuniary interests, and that of their client Nestle. Aside from the potential harm to Mr. Glynn that solicitation of this kind inherently invites[2], Oil-Dri has been unfairly prejudiced by Nestle's impermissible solicitation of Mr. Glynn because it created a barrier to Oil-Dri's effective examination of Mr. Glynn. Nestle's attorneys "prepared" Mr. Glynn before his deposition: Mr. Glynn admitted that he met with Nestle's attorneys, for hours, at Mr. Glynn's Arlington, Texas employer on April 10, 2018, as well as again in the morning before the April 16, 2018 deposition (Ex. 4, Glynn Dep., at 91:2-92:12).

In *Aspgren v. Montgomery Ward & Co.*, *supra*, this Court entered an order designed to protect witnesses from unwarranted solicitation. There, Montgomery Ward's attorneys (Steptoe, Johnson) had solicited former employees of their client by explaining that the employees had the option to hire Steptoe "free of charge" before the employee depositions. *See Aspgren, supra,* 1984 U.S. Dist. LEXIS 21892, at *2. The Court ordered that Steptoe must explain to the former employees that they could be unrepresented at their deposition, but that if they chose representation, Steptoe counsel could be their attorney *only* if the former employee *first* asked about this option. *Id.* at 13. The *Aspgren* court stated:

> In *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 461-62 (1978), the United States Supreme Court concluded that states have a "legitimate and indeed compelling" interest in preventing "fraud, undue influence, intimidation, overreaching." The Court held that the defendant could, without violating the Constitution, punish an attorney for soliciting employment from the parents of an 18 year old girl in connection with her recent car accident. *Id*. at 467…. "In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the 'availability, nature, and prices' of legal services ...." *Id. at 457-58 (quoting Bates v. State Bar of Arizona, 433 U.S. 350 (1977))*. Solicitation "may disserve ... 'informed and reliable decisionmaking.'" *Ohralik, 436 U.S. at 458.*

---

2     *See* Comment 2 to Model Rule 7.3 ("[t]hese forms of [direct] contact subject a person to the private importuning of the trained advocate in a direct interpersonal encounter. The person, who may already feel overwhelmed by the circumstances giving rise to the need for legal services, may find it difficult fully to evaluate all available alternatives with reasoned judgment and appropriate self-interest in the face of the lawyer's presence and insistence upon being retained immediately. *The situation is fraught with the possibility of undue influence, intimidation, and over-reaching.*" (emphasis added)).

6

*Id. See also Adams v. Attorney Registration & Disciplinary Comm'n of Supreme Court of Illinois*, 801 F.2d 968, 972 (7th Cir. 1986) (noting that *Ohralik* "recogniz[es] that individuals contacted in person might be especially susceptible to an attorney's pressures").

The *Aspgren* court also made it clear that a lawfirm offering to represent witnesses in a case is doing so for pecuniary gain:

> The motivation behind the ethical ban on solicitation implicates Steptoe's conduct. *Contrary to its protestations, Steptoe's representation of former Ward employees is remunerative employment. Ward compensates the attorney for his or her time spent representing the deponent. In fact, Ward even compensates Steptoe for the time that it spends discussing employment with the deponents.* Although Steptoe has not flagrantly solicited business, its offer to represent the deponent at no cost to him is an invitation to hire Steptoe. If made before the deponent can evaluate his need for legal assistance, the offer encourages him to seize on the opportunity of free representation without evaluating the advantages of independent counsel. *Because the deponent might feel pressure to get representation for the deposition, the offer can become coercive.*

*Id.* at 6-7, 9-11 (first emphasis in original; second emphasis added).

Similarly, here, Nestle's attorneys are being compensated by Nestle for their representation of Mr. Glynn. Further, the implied "free of charge" representation by Nestle's attorneys (Ex. 4, Glynn Dep., at 90:11-19 (no mention of payment by Mr. Glynn)) no doubt induced Mr. Glynn to agree to their solicitation – even after Mr. Glynn told Oil-Dri's attorneys he was not interested in either side representing him (Ex. 2). Additionally, solicitation in this instance – involving a third party rather than former employees as in *Asprgren* – disserves "informed and reliable decisionmaking."

The U.S. Supreme Court in *Ohralik* recognized that the "aim and effect of in-person solicitation may be to provide a one-sided presentation…." and "actually may disserve the individual and societal interest ... in facilitating 'informed and reliable decisionmaking.'" *See*

7

*Ohralik*, *supra*, 436 U.S. at 457-58. Obviously, in-person solicitation can have the effect of harming the opposing party by procuring one-sided testimony, and that is what happened here.

In *Aspgren* the court stated that the "evidence in the record is insufficient to conclude that Steptoe's presentation to the former employees constituted solicitation." *Id.* at 13. Here, in contrast, that is not the case, as Nestle's attorneys – by Mr. Glynn's own words – clearly solicited him in order to represent him during his deposition.

### 4. Nestle's Position On The Solicitation Issue Is Untenable

Nestle's attorneys *now* say that they solicited Mr. Glynn and represented him *before* Oil-Dri counsel spoke with Mr. Glynn on March 22, 2018 (Ex. 6, Nick Williamson email, 8/3/18 at 4:06 p.m., *et seq.*). Even if true, that still violates the ethical rules against improper attorney solicitation. Further, this new position of Nestle's counsel rings hollow, as: (1) they never bothered to contemporaneously "correct" the version of the facts in Mr. Mazza's email to them of 3/22/18, which clearly states that Mr. Glynn did not want to be represented by either side as of that date (Ex. 2); and (2) it contradicts Mr. Glynn's sworn testimony – which Nestle's attorneys likewise never sought to correct – that clearly shows Nestle's attorneys did not represent him on March 22, 2018:

```
 4    Q.   (BY MR. MAZZA)  Okay.  So you recall a few
 5   weeks ago, I called you and I asked you to talk about
 6   what you might talk about today.  Do you recall that?
 7    A.   Yes, sir.
 8    Q.   And you politely refused, and you said to me,
 9   if you recall -- and I have an e-mail to this effect if
10   you'd like me to show you -- that you preferred not to
11   talk to either side at the time and that you had hired a
12   third-party attorney.  Does that ring a bell so far?
13    A.   It rings a bell.
                    *****
25    Q.   Okay.  Why did you want to hire a – an
 1   attorney at that time?
                    *****
```

8

```
12    A.   Just from the standpoint when I was deposed
13   before [in an unrelated case], I was represented by legal counsel.
14    Q.   (BY MR. MAZZA)  Okay.
15    A.   And always thought it was a good idea.
```

(Ex. 4, Glynn Dep., at 86-87).  Surely if Mr. Glynn was already represented by Nestle's lawyers on March 22, he would have said so here, but he does not, and instead agrees that telling Mr. Mazza that he "preferred not to talk to either side at the time" "rings a bell."

### B. Nestle Withheld Producing the Glynn Documents, Further Impeding Effective Cross-Examination By Oil-Dri

Unfortunately, the improper solicitation of Mr. Glynn by Nestle's attorneys was not their only example of unfair gamesmanship at this deposition: Nestle also failed to produce to Oil-Dri's attorneys before the Glynn deposition nearly 1700 new documents that Mr. Glynn had earlier provided to Nestle's attorneys nearly a full week before the 4/16/18 Glynn deposition (Ex. 4, Glynn Dep., 18:8-16 and 34:10 – 35:11).  The timeline is as follows: (1) Mr. Glynn located the documents on 3/21/18 (*id.* at 92:16-25); (2) he alerted Nestle's attorneys that he had them "around March 29th, 30th" (*id.* at 96:24-97:8);[3] and (3) Nestle's attorneys took possession of the documents on April 10 (*id.* at 98:3-16).

Nestle's attorneys failed to provide copies of the 1700 documents for Oil-Dri's attorneys before asking Mr. Glynn questions regarding the documents.  And Nestle has only recently (August 8, 2018) produced bates-stamped copies of the documents.

The unfair prejudice to Oil-Dri from Nestle's hide-the-ball tactics here is unmistakable, foreclosing Oil-Dri's ability to effectively examine Mr. Glynn during his deposition.  Oil-Dri was not deposing the truly independent witness that Mr. Glynn should have been, and was further hampered by a complete lack of pre-deposition access to Mr. Glynn's documents (although

---

[3]    Earlier, Nestle's counsel said, instead, that they had received the Glynn documents "a couple of days" before Mr. Glynn's deposition (Ex. 4, Glynn Dep., at 34:10 – 35:11 and 39:10 – 40:20).

Nestle's lawyers had them). This unfair prejudice is particularly present given that Nestle has long known about Mr. Glynn: he is a co-inventor on the Pattengill patent, which Nestle used in the IPR it filed at the Patent Office in March, 2015. *See also* Ex. 7, ODC 3756, produced 10/9/17, documenting a 10/26/1994 visit by representatives from Western Aggregates, including "Jerry Glynn Project Manager, Absorbent Products Division" to Oil-Dri's R&D facility to discuss a potential joint venture in scoopable cat litter). Nestle refers to Mr. Glynn in its initial and final Contentions (Ex. 8, at 4, referencing Ex. B, Claim Chart for U.S Patent No. 5,458,091, "Clumpable Animal Litter Mixture," Maurice G. Pattengill & Jerry D. Glynn, *et al.*; and Ex. 9 at 58).

   C. **Nestle's Attorneys Repeatedly Misrepresented The Facts Here**

Attempting to hide the fact that they sat on the documents for nearly one full week before the deposition without producing them to Oil-Dri's counsel for review, Nestle's attorneys said during the deposition, instead, that they received the Glynn documents only "a couple of days" before Mr. Glynn's deposition:

```
10      MR. ROODMAN:  So Mike, this is another
11       original document that Mr. Glynn brought with him.
12      MR. MAZZA:  When did you receive these?
13      MR. ROODMAN:  A couple of days ago.
14      MR. MAZZA:  Why didn't you make copies for
15       me?
16      MR. ROODMAN:  I didn't have time, Mike.
17      MR. MAZZA:  You didn't have time and you
18       got them a couple of days ago?
19      MR. ROODMAN:  Let's just go on.
```

(Ex. 4, Glynn Dep., at 34:10-18, emphasis added.) But that was not true, as Mr. Glynn made clear that he informed Nestle's attorneys that he had possession of the documents on March 29 or March 30, and that they were present in Mr. Glynn's meeting with the Nestle attorneys on April 10, 2017, nearly one full week before the Glynn deposition:

  2 Q. Okay. When did -- when did you let somebody at

```
 3  Bryan Cave know that you had these documents?
 4     A.  Probably the following week when I got back to
 5  the Arlington office.
 6     Q.  Maybe you can --
 7     A.  Would have been around March 30th -- 29th,
 8  30th.
                 *     *     *
23     Q.  I see.  So you found the documents on
24  March 21st, and on March 30th, you let your Bryan Cave
25  attorneys know, I have the documents, I found them; is
    Page 98
 1  that fair?
 2     A.  That's fair.
 3     Q.  Okay.  And then the documents arrive to your
 4  Arlington office on April 9th, and so you have them for
 5  your meeting with your Bryan Cave attorneys on
 6  April 10th?
 7     A.  Correct.
 8     Q.  So they had those documents on April 10th?
 9     A.  That's correct.
10     Q.  Okay.  And again, in your April 10th meeting in
11  Arlington, Texas at the Trinity offices, Mr. Roodman and
12  Mr. Williamson were present; is that right?
13     A.  Yes.
14     Q.  And they had the documents that are marked as
15  20 -- Exhibits 25 through 31[4] at that meeting?
16     A.  Yes.
```

(Ex. 4, Glynn Dep., at 97:2-8, and 97:23-98:16; emphasis added). Despite this, when Oil-Dri's counsel requested a copy of any documents that Nestle's counsel planned to show the witness, Nestle's counsel refused:

```
 7           MR. MAZZA:  Anything you're going to show
 8  the witness that I don't have a copy, I'd like a copy
 9  before you ask the questions.
10           MR. ROODMAN:  Well, I'm not going to
11  be able to do that with everything ....
```

(*Id.* at 40:7-13, emphasis added.)

---

[4] Glynn Exhs. 25-31 are voluminous exhibits, covering WAI 152-WAI 1697.

11

To make matters worse, during the recent hearing, Nestle's attorney repeatedly misrepresented the salient facts to the Court:

(1) Nestle's attorney continued to say that "we did not get the documents until a day or two when we went down to the deposition" (Ex. 10, 7/26/18 Tr., at 6:19-20).

*Actual Facts*: Mr. Glynn testified that Nestle's attorneys took possession of the documents on April 10 (Glynn Dep., at 98:3-16), and Nestle's attorney admitted that he received the documents when he met with Mr. Glynn (which occurred nearly a week before the deposition) (*id.* at 6:22-24).

(2) Nestle's attorney told the Court that "the documents were available to both parties during the deposition" (*id.* at 6:24-25).

*Actual Facts:* This was a gross misrepresentation, as Nestle failed to provide copies of the documents to Oil-Dri's counsel until they were marked as exhibits during the deposition.

(3) Nestle's told the Court that "*We produced the documents*, *copied them*, and afterwards provided them to Mr. Mazza and Oil-Dri." *Id.* at 6:25-7:2 (emphasis added).

*Actual Facts:* This was highly misleading, as it suggested that copies of the documents were produced before the Glynn deposition, which did not occur; instead, Nestle did not produce copies of the 1700 new documents until a week *after* the deposition (4/23/18) and *only recently (August 8)* produced bates-stamped copies of the nearly 1700 documents to Oil-Dri (Ex. 11, Hale Dec., ¶3).

(4) Nestle's attorney told the Court: "Virtually all the documents were copies of the same documents that were in Oil-Dri's files" (Ex. 10, 7/26/18 Tr., at 7:3-4).

*Actual Facts*: This was perhaps the biggest fib of all: *nearly all* of the documents in question had *not* been produced by Nestle to Oil-Dri prior to the deposition (*see* Ex. 11, Hale Dec., ¶4).

(5) Nestle's attorney told the Court that there was "a box" of the documents that "we didn't even had time to go through" (Ex. 10, 7/26/18 Tr., at 7:8-9).

*Actual Facts*: Given that Nestle's attorneys had the documents for nearly a week before the deposition, this seems extremely unlikely.

Given these statements by Nestle's counsel, it is hardly surprising that when the Court, on hearing this very different version of the facts than that provided by Oil-Dri's counsel, suggested that

12

"maybe I should convene an evidentiary hearing," Mr. Jones, Nestle's counsel, immediately interjected, saying "No, that's not a good idea." (Ex. 10, at 7:12-19).

In short, Nestle's attorney made several misleading statements, and several blatantly-untrue statements, to the Court, which Nestle's attorney must have known at the time.[5]

### III. SANCTIONS ARE APPROPRIATE IN THESE CIRCUMSTANCES

In similar circumstances, where a party was "less than forthright in its use of third-party subpoenas" -- when it failed to provide the opposing party with copies of documents received in response to the subpoenas for ten days until after the last documents were received -- the district court awarded sanctions for this improper conduct, which (as here) the issuing party compounded by misrepresenting when it received the responsive documents. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 386–87 (7th Cir. 2008).

In *Judson*, the Seventh Circuit stated that a district court in deciding whether to impose sanctions for discovery violations should consider the following: "(1) the prejudice or surprise to the party against whom the evidence is being offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.* at 386. In affirming an award of sanctions, the Seventh Circuit in *Judson* found that "[t]he facts strongly suggest that Judson Atkinson was less than forthright in its use of third-party subpoenas," due to Judson Atkinson committing the following acts:

---

[5] Sadly, this same Nestle attorney also told the Court during the recent deposition of Oil-Dri's Dr. Robert Goss, in order to obtain a favorable ruling, that "a lot" of the Western Aggregate documents Nestle sought to question Dr. Goss about during his deposition "weren't produced until a few days prior to the close of fact discovery" and thus Nestle lost "the opportunity that we would have had with Dr. Goss to ask some of these questions…." (Ex. 12, 7/25/18 Goss Dep., at 182:23 – 183:3). This, too, was false: the Western Aggregate documents Nestle's attorney used to question Dr. Goss during his deposition were produced by Oil-Dri *in October, 2017* (*see* Ex. 13) – months before the 3/6/18 close of discovery, and well before Dr. Goss' December 7, 2017 deposition where Dr. Goss was questioned extensively concerning these same Western Aggregate documents.

13

> First, defense counsel was not provided with copies of the subpoenas. Then, although Judson Atkinson began receiving documents in response to the subpoenas in October, it did not provide copies to the defendants until November 15, 2006, ten days after the last installment was received … When defense counsel finally received the documents and contacted counsel for Judson Atkinson to protest the fact that Judson Atkinson failed to provide the defendants with copies of the subpoenas, *Judson Atkinson misrepresented the time that it had received responses to the subpoenas, stating that no documents were received from either bank until after the close of discovery on November 3rd. This was simply untrue. Judson Atkinson received some documents in October. Judson Atkinson's blatant misrepresentation supports the district court's finding that it was not acting in good faith. Id.* at 386-87 (emphasis added); *see also Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 196 F.R.D. 220, 226 (W.D.N.Y. 2000) (for purposes of awarding sanctions, attorney's delay in providing responsive documents "constitute[s] clear evidence of bad faith, and [was] taken for the improper purpose of obtaining and reviewing the documents in question before opposing counsel had the opportunity to object.").

*Judson* shows that once a discovery violation becomes apparent, late-in-the-game remedial measures offered by the violating party are not sufficient to avoid sanctions. *Judson Atkinson Candies*, 529 F.3d at 387 (a "party may not ignore Rule 45's requirements and then, when caught, dictate the terms under which the subpoenaed materials will be used. Rather, it is within the court's inherent powers to assess the appropriate sanctions for violations of discovery rules."). *See also Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 196 F.R.D. 220, 226 (W.D.N.Y. 2000) (for purposes of awarding sanctions, attorney's delay in providing responsive documents "constitute[s] clear evidence of bad faith, and [was] taken for the improper purpose of obtaining and reviewing the documents in question before opposing counsel had the opportunity to object").

*Judson* and *Murphy* support Oil-Dri's assertion that Nestle should be sanctioned due to its attorneys' hide-the-ball tactics with the third-party subpoenaed Glynn documents (*see* Ex. 4, Glynn Dep., at 34:10-18, 40:7-13, 97:2-8 and 97:23 – 98:16), and its improper solicitation of Mr. Glynn, especially when this conduct is coupled with Nestle's attorney's false statements to the Court regarding the events that transpired (*see* 7/26/18 Tr., Ex. 10, at 6:22 – 7:5).

14

## IV. CONCLUSION

Given the improper conduct by Nestle's attorneys, including not only their improper solicitation of Mr. Glynn, but also their failure to treat Oil-Dri's counsel fairly and reasonably in the Glynn deposition, including by failing to provide copies of a voluminous number of documents prior to the deposition, as well as their failure to discharge their duties to be honest and straightforward with Oil-Dri's counsel and with the Court – and the resulting unfair prejudice to Oil-Dri -- Oil-Dri seeks an order sanctioning Nestle's conduct by barring any trial testimony from Mr. Glynn, and barring the use of any documents produced by Mr. Glynn in response to Nestle's subpoena.

Dated: August 13, 2018

Respectfully submitted,

s/Michael P. Mazza/
Michael P. Mazza, No. 6201609
Paul R. Hale, No. 6320732
Michael P. Mazza, LLC
686 Crescent Blvd.
Glen Ellyn, Illinois 60137-4281
Phone: (630) 858-5071
Fax: (630) 282-7123
Email: mazza@mazzallc.com
paul@mazzallc.com

Shawn M. Collins, ARDC #6195107
Robert L. Dawidiuk, ARDC #6282717
Jeffrey M. Cisowski, ARDC #6308759
THE COLLINS LAW FIRM, P.C.
1770 Park Street, Suite 200
Naperville, IL 60563
Tel: 630-527-1595
E-mail: shawn@collinslaw.com
rdawidiuk@collinslaw.com
jcisowski@collinslaw.com

**Attorneys for Plaintiff
Oil-Dri Corporation of America**

**CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of the foregoing document via the Court's CM/ECF system pursuant to L.R. 5.9 on August 13, 2018.

s/Michael P. Mazza/