# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| OIL-DRI CORP. OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> NESTLÉ PURINA PETCARE CO., ) <br> ) <br> Defendant. ) | Case No. 15 C 1067 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Oil-Dri Corp. of America has sued Nestlé Purina PetCare Co., alleging that Purina is infringing U.S. Patent No. 5,975,019 (the '019 patent), a patent for "clumping animal litter." Both parties submitted written briefs regarding the construction of disputed terms in the relevant claims, and the Court held a claim construction hearing on August 24, 2018. This opinion sets forth the Court's construction of disputed claim language.

## Background

Oil-Dri is the assignee of the '019 patent, entitled "Clumping Animal Litter." Oil-Dri alleges that a line of clumping litters that Purina makes and sells infringes upon the '019 patent. Claim 1 of the patent claims:

A clumping animal litter comprising:

a. a particulate non-swelling clay material having a predetermined mean particle size no greater than about 4 millimeters; and

b. a particulate swelling clay having a predetermined mean particle size

no greater than about 2 millimeters, wherein the mean particle size of the non-swelling clay material is greater than the mean particle size of the swelling clay.

D.E. 392, Joint App. at JA007, 9:37-46 ('019 patent). The patent also includes the following dependent claims:

> 4. The animal litter of claim 1 wherein the ratio of the mean particle size of the non-swelling clay material to the mean particle size of the swelling clay is within the range of about 1.1:1 to about 4:1.
>
> 5. The animal litter of claim 4 wherein the ratio of the mean particle size of the non-swelling clay material to the mean particle size of the swelling clay is preferably within the range of about 2:1 to about 3:1.
>
> 6. The animal litter of claim 1 wherein the non-swelling clay material is at least about 40 percent by weight of the animal litter.
>
> 7. The animal litter of claim 6 wherein the non-swelling clay material is preferably about 60 percent by weight of the animal litter.

*Id.* at JA007, 9:51-61. The patent also discloses, in claim 30, a method for producing the invention:

> A method for making a clumping animal litter comprising the steps of:
>
> a. combining a particulate non-swelling clay material with a suitable particulate swelling clay to form a composition wherein the mean particle size of the particulate non-swelling clay material is greater than the mean particle size of the particulate swelling clay;
>
> b. mixing the composition to effect a substantially uniform distribution of the two materials;
>
> c. packaging a quantity of the mixed composition.

*Id.* at JA008, 11:3-13. The '019 patent was issued on November 2, 1999.

Purina seeks construction of nine terms within the '019 patent. The Court identifies each term, the parties' proposed construction, and their arguments in the following discussion.

2

**Discussion**

The construction of a patent is a question of law for the court. *Markman v. Westview Instrs., Inc.*, 517 U.S. 370, 387-88 (1996). The Court must discern the meaning of claim terms, which is "the ordinary and customary meaning . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Claim construction begins by considering the words of the claim. *Takeda Pharmaceutical Co. Ltd. v. Zydus Pharmaceuticals USA, Inc.*, 743 F.3d 1359, 1363 (Fed. Cir. 2014). There is a presumption that claims mean what they say, that is, that they possess their "ordinary and customary meaning." *Phillips*, 415 F.3d at 1313. To determine the meaning of a claim, the Court may need to read the term in light of the overall patent, the specification and—not at issue here—the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). These additional sources of meaning, known as intrinsic evidence, are not afforded the same weight at the claims themselves, but provide useful context. *Eastman Kodak v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997), *abrogated by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998). If the intrinsic evidence does not resolve the ambiguity, the Court may also consider extrinsic evidence. *Vitronics*, 90 F.3d at 1583-84. Extrinsic evidence includes inventor and expert testimony, dictionaries, technical treatises, articles, and uncited prior art. *Id.*

Purina asks the Court to interpret nine terms. Oil-Dri contends that three of these should not be construed, because they are not "outcome-determinative." Under

3

Northern District of Illinois Local Patent Rule 4.1, a party must certify to the Court that the term is "outcome-determinative" in seeking a construction of the claim. But this policy is intended to "encourag[e] the *parties* to focus upon outcome-determinative or otherwise significant claim construction disputes," not to require *courts* to shear off terms from the process of claim construction. *VendoNet, Inc. v. RedBox Automated Retail, LLC*, No. 13 C 3475, 2014 WL 4555287, at *8 (N.D. Ill. Sept. 15, 2014) (emphasis added). *See also Scholle Corp. v. Rapak LLC*, No. 13 C 3976, 2014 WL 3687734, at *1-2 (N.D. Ill. July 24, 2014) (deciding to construe claim terms that a party failed to certify as "outcome-determinative," because rejecting the claims without prejudice for failure to show they were outcome-determinative would only invite redundant briefing). The Court declines Oil-Dri's invitation to deny construction of certain terms on this basis.

**A.**    **"Particulate"**

Purina seeks construction of the term "particulate" used in claim 1, which, as indicated above, describes a litter comprised of "particulate non-swelling clay material" and "particulate swelling clay." D.E. 392, Joint App. at JA007, 9:38-42. From the claim term "particulate," Purina attempts to extract the following definition: "composed of separate and discrete particles that are not attached, bonded, or fused together." As discussed at the claim hearing, this is far more weight than this term can carry. The Court adopts the following construction of the term particulate: "composed of separate and discrete particles." Purina attempts to use "particulate" to support the proposition that the two materials cannot be bonded together, but the word denotes only that swelling clay and non-swelling clay material must be in particle form. For that reason,

4

the Court ruled at the hearing that "particulate" means "composed of separate and discrete particles."

**B.     "Predetermined"**

Purina next asks the Court to construe "predetermined," used when claim 1 describes "a particulate non-swelling clay material having a predetermined mean particle size no greater than about 4 millimeters." *Id.* at JA007,9:38-41.  It is also used to describe particulate swelling clay.  Purina contends that the term means "actually determined prior to combining the particulate nonswelling clay and particulate swelling clay."  And, as Purina's counsel made clear during oral argument, Purina contends that "actually determined" should be understood as "actually measured."  Oil-Dri argues that predetermined means:  "enabling a [person of ordinary skill in the art] to verify that the [mean particle] size limitations of Claim 1 are met, prior to combining the non-swelling clay material and swelling clay."  The Court concludes that the plain and ordinary meaning of "predetermined" applies; a person skilled in the art would have understood the term to mean "decided upon in advance."

Purina attempts to fit more content into "predetermined," arguing that this term in the patent requires Oil-Dri to actually measure the materials before mixing to ensure a proper mean particle size.  Purina contends this construction is supported by the specification and expert testimony.  The Court disagrees.  First, the specification only states that "desired absorbent clay material based on mean particle size . . . was selected."  *Id.* at JA005, 5:46-67.  If anything, this language supports defining "predetermined" as decided or selected in advance, not measured in advance. Likewise, the expert testimony does not establish a measurement requirement.  When

asked the meaning of "predetermined," the experts variously stated that "you would have to determine a mean particle size, yes, before you did something," D.E. 397, Purina App. at PA0020 (Oct. 25, 2017 Goss Dep. Excerpt); "it's already decided," *id.* at PA0036 (Nov. 10, 2017 Frugoli Dep. Excerpt); and the inventor would need to "calculate a mean particle size" before deciding to combine materials. *Id.* at PA0052 (Feb. 15, 2018 Herpfer Dep. Excerpt). None of the expert testimony supports the meaning that Purina urges.

For its part, Oil-Dri proposes a definition of "predetermined" that only requires the particles to be *capable* of measurement, "enabling a [person of ordinary skill] to verify that the [mean particle] size limitations of Claim 1 are met." No ordinary person skilled in the art would adopt such a nebulous definition of "predetermined." Oil-Dri's remaining arguments are unconvincing. First, it contends that the expert testimony discussed above supports its position. Yet, as the above review indicates, the expert testimony only reflects that the experts found "predetermined" to have its ordinary meaning: decided in advance. Second, Oil-Dri argues that its own practice was to test samples of the materials, which it contends supports a meaning of "predetermined" that only requires the materials be capable of determination. The Court rejects this argument, as Oil-Dri's actual practice is obviously not relevant evidence to a claim construction analysis. *Phillips*, 415 F.3d at 1313 (the "ordinary and customary meaning" depends on what a person skilled in the art would understand "at the time of the invention, i.e., as of the effective filing date of the patent application.").

For these reasons, the Court concludes a person of ordinary skill in the art would have understood "predetermined" to mean "decided upon in advance."

6

**C.     "Mean particle size"**

Claim 1 limits both the non-swelling clay material and swelling clay based on its "mean particle size."  Purina proposes that "mean particle size" means "[a]n estimated average particle size approximated by averaging two or more sieve or sample measurements of particulates."  Oil-Dri asks the Court to adopt the construction identified during an *inter partes* review proceeding regarding the '019 patent:  "the average of a representative sample of particle sizes or groupings of particle sizes."  The Court adopts Oil-Dri's construction, which is better supported by the intrinsic evidence.

 As used in the '019 patent, "mean particle size" refers to a characteristic of the particulate non-swelling clay material and particulate swelling clay used to produce the litter.  As Oil-Dri points out, Purina's proposed construction would permit calculations that did not accurately describe the *actual* mean particle size of the clay.  Purina argues that the average particle size may be approximated by taking the average of two sample measurements.  An observer could correctly find that all the particles in a sample were larger than 1 millimeter in diameter and smaller than 6 millimeters, yielding a mean particle size of a little over 3 millimeters.  It would logically follow that all the particles were also larger than 1 millimeter in diameter and smaller than 10 millimeters—but, under Purina's approach, its calculation would yield a mean particle size of a little over 5 millimeters.  This is obviously incorrect.

Oil-Dri correctly argues that the two measurements can be used to find the mean only if each is representative of the underlying sample.  The mean particle size measurement requires each measure to correspond to the overall distribution of particles within the sample.  The Court concludes that Oil-Dri's proposed construction,

7

also adopted during the IPR proceeding, better embodies the representativeness requirement.

The Court briefly addresses two other arguments. First, both parties dispute the proper use of Promesh paper, an industry method of calculating mean particle size described in the specification. Yet, as both parties concede, Promesh paper is just one of several ways to calculate mean particle size. The Court need not resolve the correct way to use Promesh paper to identify the proper construction of mean particle size. Second, Purina contends that the IPR construction of mean particle size is inapposite here, as the IPR claim construction standard, "broadest reasonable construction," is broader than the standard used in claim construction in a patent infringement suit, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Compare* 37 C.F.R. § 42.100(b) *and Phillips*, 415 F.3d at 1314. But the fact that the standards differ does not, without more, make the construction adopted in the IPR inappropriate. *See, e.g., Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1302 n.1 (Fed. Cir. 2015), *overruled on other grounds by Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017)) (noting the court would adopt its holding under either the IPR or *Phillips* standard of claim construction).

For these reasons, the Court adopts Oil-Dri's proposed construction.

**D.** **"Combining a particulate non-swelling clay material with a suitable particulate swelling clay"**

Purina asks the Court to construe the following phrase of claim 30: "combining a particulate non-swelling clay material with a suitable particulate swelling clay." D.E. 392, Joint App. at JA008, 11:5-9. At issue is the proper construction of "suitable." Purina contends that "suitable" is properly construed as synonymous with its

8

construction of "predetermined": material for which the mean particle size has been determined or measured in advance. Oil-Dri contends that the '019 patent uses "suitable" throughout the specification by its ordinary and plain meaning, "acceptable, satisfactory, or fitting." Indeed, the specification's summary of the invention uses "suitable" in ways that do not directly involve the measurement of mean particle size. For instance, the specification uses "suitable" to describe a combination of materials that "provides a good clump at a less than sixty weight percent . . . of sodium bentonite . . . ." *Id.* at JA003, 2:39-45. Because "suitable" is used more broadly to refer to positive characteristics besides mean particle size, the specification is at odds with Purina's attempt to construe it in line with its construction of "predetermined." The Court adopts Oil-Dri's proposed construction: "acceptable, satisfactory, or fitting."

**E.    "Composition wherein the mean particle size of the particulate non-swelling clay material is greater than the mean particle size of the particulate swelling clay"**

Claim 30 teaches a mixing process that produces a "composition" of clays. Purina contends that this term, as used in the phrase, "composition wherein the mean particle size of the particulate non-swelling clay material is greater than the mean particle size of the particulate swelling clay," is properly construed as meaning "[a] free-flowing combination of non-swelling clay particles and swelling clay particles where the MPS of the particulate non-swelling clay is greater than the MPS of the particulate swelling clay." Oil-Dri contends the phrase should be construed by its ordinary meaning; "composition," it argues, refers to a "thing composed of various elements."

Purina, through its proposed construction, is attempting to rule out the possibility of infringement under the guise of a proposed claim construction. It has reached deep

9

into the specification to pull out language that may make it more difficult to show its product infringed, but at the cost of sacrificing a logical and supportable relationship between the claim terms and the proposed construction. As should be clear, nothing in the term "composition" necessarily entails a "free-flowing" mixture.

In support of its position, Purina contends that the composition consists of particulate matter of different sizes: the non-swelling clay material must be larger than the swelling clay. From this, Purina concludes that the composition necessarily must be free-flowing, as the particles could not possess different sizes if they were not free-flowing. In further support of its position, Purina notes that the description of the preferred embodiment states that the invention "is in the form of a free-flowing admixture of particulate non-swelling clay material and swelling clay[.]" *Id.* at JA004, 3:10-15. The use of the phrase free-flowing in describing the preferred embodiment, however, is hardly an argument in favor of adopting it as a claim limitation. "[L]imitations may not be read into a claim from a preferred embodiment when the claim language is broader than that embodiment." *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1367 (Fed. Cir. 2003). Purina contends that the language of the '019 patent warrants treating it as a limitation on the scope of the invention. As the specification states, "[t]he animal litter of *this invention* is in the form of a free-flowing admixture of particulate non-swelling clay material and swelling clay . . . ." D.E. 392, Joint App. at JA004, 3:9-11 (emphasis added). Yet, no matter whether the specification characterizes the invention itself, the term "particulate" cannot bear the connotation that Purina proposes. *See also Sunoco Partners Marketing & Terminals LP v. US Venture, Inc.*, No. 15 C 8178, 2017 WL 1550188, at *5 (N.D. Ill. Apr. 28, 2017) (a patent's

reference to an embodiment as "this invention" does not necessarily limit the scope of the invention when not supported by the rest of the intrinsic evidence).

Once again, Purina is trying to make a relatively simple claim term do far too much work. The claim construction inquiry involves what person of ordinary skill in the art would understand the claim term to mean. Purina asks the Court to find that a composition of variously-sized particles must be "free-flowing"—yet nothing in the claim itself suggests this meaning. It well may be that when infringement is litigated, Purina will be able to establish that its product does not infringe the patent because its materials, unlike those of Oil-Dri, are bonded. But the Court does not see how this particular claim term can to be read to include the limitation that Purina seeks.

For these reasons, the Court adopts Oil-Dri's proposed construction; the term composition means "a thing composed of various elements."

**F.** **"Mixing the composition to effect a substantially uniform distribution of the two materials" and "mixed composition"**

Claim 30 describes "[a] method for making a clumping animal litter," including the following phrases that Purina asks the Court to construe: "mixing the composition to effect a substantially uniform distribution of the two materials" and "mixed composition" Purina proposes that the terms "mixing" and "mixed" refer to "[d]ry-blending (and [d]ry-blend of) free-flowing separate particles of non-swelling clay and separate particles of swelling clay, such that the two types of particles are evenly distributed." Oil-Dri suggests the Court should adopt the ordinary meaning of "mixing," "to combine or blend into one mass." Oil-Dri further proposes that "uniform distribution" means "well dispersed within the mixture."

In support of its position, Purina contends that the '019 patent only describes a

11

dry blend of the clays. Claim Constr. Br. at 18. But the phrase "dry blend," or any variation of it, appears in the specification, which describes how a starch may be mixed into the litter: "The starch, if used, can be admixed with the clay constituents of the animal litter as dry blending[.]" D.E. 392, Joint App. at JA007, 7:42-43. This isolated reference to dry blending does not require importing into the claims a requirement of dry blending when interpreting the claims' use of variations of the term "mix."

Purina also argues that the patent notes that the litter, if wetted, will form clumps. Thus, it concludes, a wet blending process would generate clumps of litter at odds with the free-flowing mixture that Purina contends the patent requires. That may be so, but it does not mean that the term "composition" itself should be read to require the materials to be free-flowing and unattached.

Finally, Purina argues that U.S. Patent No. 5,836,263, a sister patent to the '019 patent, lists thirty-seven examples of the litter in which mixing was accomplished through dry blending. But the Court's review of this patent reveals (1) that these are only examples within the sister patent, not the claims themselves, and (2) other examples exist within the '263 patent that do not require dry blending. The Court declines to define the terms of this patent through the ambiguous terms of another patent. Because nothing in claim 30, the intrinsic evidence, or the extrinsic evidence indicates that "mixing" and "mixed" necessarily involve dry blending, the Court declines to adopt Purina's definition. Rather, the Court adopts the ordinary meaning of composition: "combined or blended into one mass."

Oil-Dri also attempts to construe "substantially uniform distribution," the latter part of Claim 30, to mean "well-dispersed." It contends that it presented its position in

12

opposition to Purina's, which purportedly calls for an even amount of swelling and non-swelling clays. Having reviewed Purina's arguments, the Court does not find that Purina actually advanced this argument. The Court declines to construe "substantially uniform distribution," as it is not apparent that a meaningful dispute exists.

**G.     "Clumping animal litter"**

In the preamble to claim 1, the patent describes the invention as a "clumping animal litter." Though the term is located only in the preamble, both parties agree that the Court should construe it. "[I]f the claim preamble is necessary to give life, meaning, and vitality to the claim, then the claim preamble should be construed as if in the balance of the claim." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (internal punctuation and citation omitted). Purina offers the following construction: "[a]n animal litter that forms a clump when wetted that has a firmness of sufficient structural integrity to withstand mechanical separation from the unwetted litter for disposal without breaking or falling apart." Oil-Dri proposes: "[a] portion of a litter which, when wetted, sticks together in a sufficiently durable manner to allow for mechanical separation and removal from a cat litter box, for a period lasting from within about 30 seconds-1 minute of initial wetting, to at least 24 hours after initial wetting."

Oil-Dri fails to provide a persuasive explanation for how its duration limitation can be hung upon the phrase "clumping animal litter." It bases its argument on language located in the specification's description of the preferred embodiment. The specification describes as a preferred embodiment a litter that "generally" forms a clump of "durable clump strength." D.E. 392, Joint App. at JA004, 3:14-16. In turn, the specification defines "durable clump strength" as a clump that forms "within about 30 seconds to

13

about one minute of being wetted and retains such firmness for a period of at least 24 hours." *Id.* at 3:22-24. The Court declines to import this into the claim as a limitation for several reasons. First, as already discussed, the preferred embodiment rarely provides a basis to impose a limitation not found in the claims. *Resonate Inc.*, 338 F.3d at 1367. Second, the specification language itself does not support such a limitation. The timing requirement is qualified in several ways: the litter "generally" forms clumps of "durable clump strength," and each time limitation is limited by "about."

The Court declines to read any time limitation into the quoted language. A person of ordinary skill in the art would understand "clumping animal litter," taken in context, to entail "[a]n animal litter that forms a clump when wetted that has a firmness of sufficient structural integrity to withstand mechanical separation from the unwetted litter for disposal without breaking or falling apart."

### H.  "Clay" and "clay material"

The '019 patent uses "clay" and "clay material" throughout the claims. Purina proposes a single definition for both terms: "[l]ow bulk density sorptive material composed primarily of layered hydrous aluminum silicate minerals (phyllosilicate minerals)." Oil-Dri contends that these are distinct terms. It defines "clay" as "[a] naturally occurring material composed primarily of fine-grained minerals, which is generally plastic at appropriate water contents, and will harden when dried or fired." Oil-Dri defines "clay material" as "[a] sorptive substance composed primarily of fine-grained minerals, such as any of the commonly-known clays or other materials, which can absorb liquid, is characterized by relatively low bulk density, is generally plastic at appropriate water contents, and will harden when dried or fired."

14

Purina and Oil-Dri sharply dispute the significance of the intrinsic evidence. Oil-Dri contends that it used "clay" and "clay material" consistently throughout the claims, distinguishing "swelling clay" from "non-swelling clay material." Purina disagrees. Though Oil-Dri used the terms consistently in the claims, Purina argues, the terms are conflated throughout the specification. For instance, Blue Mountain Clay and Georgia White Clay—both clay materials, according to Oil-Dri—are described as "clays" in the summary of the invention. D.E. 392, Joint App. at JA004, 4:11-13. Oil-Dri contends this discrepancy can be explained: the specification used "clay," rather than "clay material," to refer to Blue Mountain Clay in accordance with the material's commonly-used name. Fair enough. But Oil-Dri's explanation for numerous other inconsistencies is less convincing. *See id.* at JA003, 1:11-16 ("A material most widely utilized in animal litter is generally *clay*. . . . *Clay materials* are sorptive minerals . . . .") (emphasis added); *id.* at JA003, 2:1-3 ("Some prior attempts also have been made to overcome the shortcomings of swelling clays by utilizing *non-swelling clay* and starch as a binder . . . .") (emphasis added); *id.* at JA004, 3:37-38 ("With respect to the *non-swelling clay material*, any of the commonly known *clays* will suffice.") (emphasis added); *id.* at JA006, 7:20-23 ("The range of preferred ratios is about 1.1:1 to about 4:1 (*non-swelling clay*-to-swelling clay), and most preferably about 2:1 to about 3:1 (*non-swelling clay*-to-swelling clay).") (emphasis added). Oil-Dri argues that it should be permitted to rely on "clay" as a "short-hand reference[]" for "clay material." Claim Constr. Resp. Br. at 20. This argument doesn't get Oil-Dri far: if "clay" serves as a shorthand reference for "clay material," it weakens, not strengthens, Oil-Dri's contention that these are distinct terms.

Purina contends that its proposed construction of "clay" and "clay material" is

consistent with the intrinsic evidence. It contends that the '019 patent also uses these terms interchangeably, as discussed above. Further, Purina proposes to define the "clay" and "clay material" terms using the definition contained within the specification itself. *See* D.E. 392, Joint App. at JA003, 1:15-24. Purina further notes that Oil-Dri's construction lacks any support in the intrinsic evidence: the '019 patent does not refer to materials "generally plastic at appropriate water contents" or hardening "when dried or fired."

Oil-Dri turns to extrinsic evidence to contest Purina's construction. Oil-Dri argues that Purina's construction would exclude several clay materials from the definition of "clay material." First, Oil-Dri argues that the Purina construction requires clay materials to contain aluminum. Yet, Oil-Dri continues, smectite is a clay material described in the patent that, in certain forms, does not contain aluminum. Purina's construction would therefore exclude materials that the specification describes as clay materials. In response, Purina contends that, if there is an error, it is in the definition of "clay materials" contained in the patent itself, from which Purina derived its construction. Purina concedes it would be willing to drop any requirement that the clay material include aluminum. Oil-Dri presents a similar argument regarding Purina's reliance on the term "low bulk density": it contends that sodium bentonite has a higher bulk density than other non-swelling clay materials. Purina responds only that it is relying upon the definition presented in the specification. (The Court further notes that, even if certain clays have different bulk densities, both could be considered low relative to a non-clay material.)

Oil-Dri also notes that Purina's construction requires that "clay materials" be

16

classifiable as phyllosilicates. Yet two materials commonly used in animal litters—bauxite and allophane—are not phyllosilicates. As Purina correctly contends, however, bauxite and allophane are not referenced in the patent, do not appear to be common litter materials, and are inconsistent with the definition of "clay material" provided in the '019 patent itself. This purported inconsistency is not so significant as to preclude Purina's proposed construction. Finally, Oil-Dri argues that its proposed construction of "clay" is consistent with the definition provided by other authorities, such as the Clay Mineral Society. But that is inadequate to dislodge the definition supplied by the specification itself. Thus the Court adopts a modified version of Purina's originally-proposed construction, shorn of the requirement that the material contain aluminum: "low bulk density sorptive material composed primarily of layered hydrous silicate minerals (phyllosilicate minerals)."

I.      **"About"**

The '019 patent uses the term "about" to qualify several values: mean particle size, the ratio of swelling clay to non-swelling clay material, and the weight percentage of the materials. Purina proposes construing "about" to impose certain tolerances by percentage. For instance, it construes the claim phrase "a predetermined mean particle size no greater than *about* 4 millimeters" to indicate a mean particle size of 4 millimeters with a 5 percent tolerance, such that the mean particle size could be as great as 4.2 millimeters. It provides similar tolerance percentages for each other contested use of "about."

The evidence Purina supplies in support of its position—an expert report—is insufficient to support its conclusion, because its expert report offers only skeletal

17

reasoning to justify each proposed tolerance. For instance, the expert, Dennis B. Jenkins, explains his opinion that "about" connotes a 5 percent tolerance in mean particle size as follows: "based upon screen tolerances available in August[] 1997, in my opinion, a litter manufacturer at the time would understand that the 'about' term means and targets a size within approximately 5% of the claimed upper limit of mean particle sizes." D.E. 397, Purina App. at PA0096 ¶ 70 (Jenkins Expert Rep.). This is not nearly enough of an explanation to justify adopting the opinion. And Oil-Dri does not explain its opposition to Purina's proposed construction, apart from one "about" term it discusses in its response. Taken together, neither Purina nor Oil-Dri has offered an adequate explanation for a construction of "about." Given the inadequacy of the parties' submissions, the Court forgoes construing the contested "about" terms at this point.

## Conclusion

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order. The Court sets a status hearing for September 13, 2018 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 5, 2018