# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| OIL-DRI CORPORATION OF AMERICA, | ) ) ) | **Case No. 15 C 1067** |
| Plaintiff/Counter-Defendant, | ) ) | |
| v. | ) ) | **District Judge Matthew F. Kennelly** |
| NESTLE PURINA PETCARE COMPANY, | ) ) ) | **Magistrate Judge Sidney I. Schenkier** |
| Defendant/Counter-Plaintiff. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

On August 13, 2018, plaintiff Oil-Dri Corporation of America ("Oil-Dri") filed a motion for sanctions against defendant Nestle Purina PetCare Company ("Purina") "regarding the deposition of third-party witness Jerry Glynn" (doc. # 515). This motion is now fully briefed. For the reasons that follow, we find that certain sanctions are warranted.

### I.

Mr. Glynn is listed as a co-inventor of Western Aggregates' U.S. Patent Number 5,458,091 ("the '091 Patent"), which is one of the bases for Purina's contention that the '019 Patent – the patent-in-suit – is invalid (*see* doc. # 535: Purina's Resp. at 1-2). On February 20, 2018, Purina's counsel, Nick E. Williamson of Bryan Cave Leighton Paisner ("BCLP"), served Mr. Glynn with a subpoena to testify at a deposition on March 8, 2018, and to bring with him to the deposition "all documents, things, electronically stored information, physical samples and communications" "concerning" or "related to" the '091 Patent and "related to Western Aggregates' communications with, disclosures to, agreements with, meetings with, and other business arrangements with Oil-Dri concerning cat litter" (Oil-Dri Mot., Ex. 1: Glynn Subpoena).

On February 27, 2018, Mr. Glynn called Mr. Williamson to ask about logistics for his March 8, 2018 deposition (Purina Resp., Decl. of Jerry Glynn, ¶ 8). During the call, Mr. Glynn stated that he was not represented by counsel, and Mr. Williamson did not offer to represent him (*Id.*). Messrs. Glynn and Williamson communicated several additional times about scheduling Mr. Glynn's deposition (*Id.* at ¶¶ 8-9).

On March 20 or 21, 2018, while in Colorado at a former Western Aggregates facility, Mr. Glynn discovered two boxes of documents that "appeared to relate, generally, to the '091 Patent, Western Aggregates, and Oil-Dri" (the "Western Aggregates documents") (Glynn Decl., ¶ 11). On March 20, 2018, Mr. Glynn called Mr. Williamson and left a voicemail for him. That same day, Mr. Williamson (with his colleague David Roodman, another attorney at BCLP) returned the call to Mr. Glynn and, at that time, "discussed Bryan Cave's potential representation of" Mr. Glynn (*Id.*, ¶ 12). In response to Mr. Glynn's statement that he had been deposed in the past and found it "beneficial to be represented by counsel in a deposition," Messrs. Williamson and Roodman offered to represent Mr. Glynn, and Mr. Glynn verbally agreed to retain their law firm (*Id.*; *see also* Purina Resp., Decl. of N. Williamson, ¶ 7). Mr. Glynn states that he made the decision to retain BCLP independently, without any pressure or coercion by BCLP (Glynn Decl., ¶ 13).

On March 22, 2018, Michael Mazza, one of Oil-Dri's attorneys, spoke with Mr. Glynn by telephone (Glynn Decl., ¶ 15). That same day, after the telephone call, Mr. Mazza sent an email to Mr. Williamson, stating that he had "just got off the phone with Jerry Glynn," who told Mr. Mazza that he had "retained counsel, and [did] not wish to speak to either side on any substantive matter before the deposition" (Purina's Resp., Ex. E: 03/22/2018 Mazza email). By contrast, in his declaration, Mr. Glynn states that he told Mr. Mazza he "was represented by counsel and did not wish to speak to [Mr. Mazza]" (Glynn Decl., ¶ 15). At Mr. Glynn's deposition, Mr. Mazza asked

whether Mr. Glynn recalled telling him that he "preferred not to talk to either side at the time and that [he] had hired a third-party attorney" (Oil-Dri's Mot., Ex. 4: Glynn Dep. at 86:9-12). Although Mr. Roodman objected repeatedly to this line of questioning to the extent it called for attorney-client communications (*see, e.g., Id.* at 86:17-19, 87:2-4, 89:17-19), Mr. Glynn stated that Mr. Mazza's description "rings a bell" (*Id.* at 86:13), and later clarified that he said "more along the lines that [he] wanted to hire an attorney and [he] didn't want to talk to anybody that day" (*Id.* at 89:12-14).

After receiving Mr. Mazza's March 22, 2018 email, Messrs. Roodman and Williamson contacted Mr. Glynn to determine whether he had retained counsel other than BCLP (Williamson Decl., ¶¶ 9-10). Mr. Glynn responded that he was only represented by BCLP (*Id.*). There is no dispute that Mr. Mazza was unaware of BCLP's representation of Mr. Glynn until Mr. Glynn showed up for his deposition on April 16, 2018. Mr. Williamson states that "BCLP chose not to confront Mr. Mazza regarding the misrepresentations in his March 22, 2018 email as it saw no upside to an acrimonious discourse" (Purina Resp. at 3 n.4 and Williamson Decl., ¶ 11).[1]

Mr. Glynn told his attorneys about the Western Aggregates documents sometime between March 28 and 30, 2018 (Purina's Resp., Ex. F: Glynn Dep: 111:5-11). Purina does not dispute that the Western Aggregates documents consisted of 1,697 pages (Oil-Dri Mot. at 1). On April 10, 2018, Messrs. Roodman and Williamson met with Mr. Glynn at his Texas office, where Mr. Glynn had shipped the Western Aggregates documents (Glynn Decl., ¶¶ 16-17). Messrs. Roodman and Williamson spent approximately 30 minutes reviewing the documents and one to one and one-quarter hours meeting with Mr. Glynn (Williamson Decl., ¶ 12; Glynn Decl. ¶ 16).

---

[1]Purina's accusation that Mr. Mazza falsely stated in the March 22 email that Mr. Glynn had retained "new counsel" (Purina Resp. at 3) is itself false. The email says no such thing, and Purina does not explain how Mr. Mazza could have thought Mr. Glynn retained "new counsel" when at the time he was unaware Mr. Glynn was being represented by BCLP in the first place.

Mr. Glynn next met with BCLP attorneys for one hour on April 16, 2018, prior to the commencement of his deposition that day (Glynn Decl., ¶ 16). Mr. Glynn brought all the Western Aggregates documents to his deposition (Williamson Decl., ¶ 13). At the beginning of the deposition, Mr. Mazza first learned that BCLP represented Mr. Glynn and that Mr. Glynn possessed documents responsive to Purina's subpoena. Purina contends – without contradiction – that "at least eleven of the exhibits Purina used at Mr. Glynn's deposition were previously produced by Oil-Dri or Purina in the litigation or are duplicates of documents already produced" (Purina's Resp. at 10; Williamson Decl., ¶ 14). Purina does not state how many total exhibits it used at Mr. Glynn's deposition. For its part, Oil-Dri contends – again, without contradiction – that 1,424 out of the 1,697 pages of Western Aggregates documents had never before been produced (Oil-Dri. Mot. at 1).

Purina's attorneys questioned Mr. Glynn first at the deposition. Mr. Roodman told Mr. Mazza that "Mr. Glynn provided us with copies of some original documents, which we don't have copies of. . . . I was able to make copies of a couple of them, but not all of them" (Purina's Resp., Ex. F: Glynn Dep. at 18:8-16). Mr. Mazza questioned why Mr. Roodman had not previously made copies of the documents for him, and Mr. Roodman replied that he "didn't have time" (Oil-Dri's Mot., Ex. 4: Glynn Dep. at 34:10-16). Mr. Mazza requested a copy of everything that Mr. Roodman planned to show Mr. Glynn that he did not already have, but Mr. Roodman stated that he was "not going to be able to do that with everything because we haven't had enough time to review everything either since this witness produced documents to us" (*Id.* at 39:23-40:13). Mr. Mazza received marked copies of the exhibits Purina used as the deposition progressed (Oil-Dri. Mot. at 1).

On April 23, 2018, Mr. Williamson emailed electronic copies (PDFs) of all the Western Aggregates documents to Mr. Mazza (Williamson Decl., ¶ 16). Approximately three and a half months later, on August 3, 2018, counsel for both parties met to discuss the instant motion, and Mr. Mazza requested bates-stamped copies of the Western Aggregates documents (*Id.*, ¶ 19). Purina's attorneys provided bates-stamped copies to Mr. Mazza on August 8, 2018 (*Id.*).

## II.

In the current motion, Oil-Dri contends that BCLP should be sanctioned for soliciting the representation of Mr. Glynn and withholding the Western Aggregate documents until the day of Mr. Glynn's deposition. Oil-Dri claims that these actions "foreclose[d] Oil-Dri's ability to effectively examine Mr. Glynn during his deposition" (Oil-Dri Mot. at 9).

This Court's authority to impose sanctions for BCLP's behavior derives from the Federal Rules of Civil Procedure and this Court's inherent authority. Federal Rule of Civil Procedure 30(d)(2) provides that "[t]he court may impose an appropriate sanction – including the reasonable expenses and attorney's fees incurred by any party – on a person who impedes, delays or frustrates the fair examination of a deponent." Fed. R. Civ. P. 30(d)(2).

In addition, district courts "possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Fuery v. City of Chicago*, 900 F.3d 450, 452 (7th Cir. 2018) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, – U.S. –, 137 S.Ct. 1178, 1186 (2017) (internal citations omitted)). "A court may use its inherent authority to sanction those who show willful disobedience of a court order, act in bad faith, vexatiously, wantonly, or for oppressive reasons, for fraud on the court,

delay, disruption, or hampering enforcement of a court's order." *Fuery*, 900 F.3d at 463 (internal citations and quotations omitted).

## A.

Oil-Dri argues that BCLP's representation of Mr. Glynn was improper because BCLP coerced Mr. Glynn into accepting its representation in this matter, in violation of ABA Model Rule 7.3(c), which states that "[a] lawyer shall not solicit professional employment . . . if (1) the target of the solicitation has made known to the lawyer a desire not to be solicited by the lawyer; or (2) the solicitation involves coercion, duress or harassment."[2] In his declaration, however, Mr. Glynn states that he entered into an attorney-client relationship with BCLP freely, and that BCLP offered to represent him after he showed interest in their representation. We have no basis, other than Oil-Dri's speculation, to question Mr. Glynn's sworn statement – and we decline to base a ruling on that speculation. Contrary to Oil-Dri's contentions, the text of the subpoena, which like all subpoenas "command[ed]" Mr. Glynn's presence, does not indicate that Mr. Glynn was somehow coerced into accepting representation by BCLP.

In addition, Oil-Dri contends that Mr. Glynn's testimony was "highly suspect" simply because he was represented by Purina's counsel. We disagree. Oil-Dri points with suspicion to Mr. Glynn's ability at his deposition to recall details from more than twenty years ago "with remarkable precision," and argues that "the inference is inescapable that Mr. Glynn believed his job was to testify favorably for the lawyers who had rescued him from the federal subpoena" (Oil Dri Mot. at 4-5). On this basis, Oil-Dri claims that BCLP's behavior violated Model Rule 3.4(a), which

---

[2]The Northern District of Illinois has adopted the model rules promulgated by the ABA. L.R. 83.50. Oil-Dri cites to both the ABA Model Rules and the Illinois Rules of Professional Conduct. However, because the ABA Model Rules and the Illinois rules are identical in all relevant respects here – and state professional rules only apply when they are inconsistent with the ABA Model Rules (Oil-Dri Mot. at 5, n.1) –we refer only to the ABA rules here.

states that "[a] lawyer shall not . . . unlawfully obstruct another party's access to evidence" (*Id.* at 5-6).

The conclusion Oil-Dri asks us to reach is far from "inescapable." We see no basis to conclude that Mr. Glynn (who had been deposed in the past) was so flummoxed by receiving a subpoena that he felt a need to be "rescued" from it. Indeed, BCLP's representation of Mr. Glynn did not rescue him from the subpoena, as Mr. Glynn did everything the subpoena would have required had he not been represented: he produced documents and he sat for his deposition. Nor is the fact that a witness may recall events from the distant past an unusual occurrence. Oil-Dri may *argue* that the representation was designed to allow Purina's attorneys to "woodshed" Mr. Glynn under the cover of attorney-client privilege, and that this influenced his testimony. But that is an argument to be presented (if permitted by the district judge) at trial, and not a conclusion to be drawn on a motion for sanctions.[3]

### B.

Oil-Dri also argues that Purina's decision to withhold the Western Aggregates documents until April 16, 2018, the day of Mr. Glynn's deposition, was sanctionable behavior. As explained above, Mr. Glynn discovered the Western Aggregates documents on March 20 or 21, 2018, the same day, or the day after, he agreed to be represented by BCLP. Mr. Glynn informed BCLP of

---

[3]Oil-Dri also states that "Nestle's attorneys are being compensated by Nestle for their representation of Mr. Glynn," rather than paid by Mr. Glynn (Oil-Dri Mot. at 7). However, Oil-Dri does not explain why the provision of representation at no charge was improper. Oil-Dri cites to *Aspgren v. Montgomery Ward & Co.*, No. 82 C 7277, 1984 WL 49011, at *4-5 (N.D. Ill. Nov. 19, 1984), which held that to minimize the danger that deponents would feel coerced into accepting representation from the defendant's counsel, the defendant's counsel should tell the deponent that it would provide free representation only after the deponent considered hiring defendant's counsel and inquired about fees. The court refused to issue an order preventing the defendant's counsel from soliciting and providing free representation to the third-party deponents because the Model Rules allowed such an arrangement provided that both clients consented after consultation, and there was no interference with the lawyer's independent professional judgment or with the attorney-client relationship. *Id.* In this case, we have no basis to conclude that client consent was absent or that BCLP's representation of both Purina and Mr. Glynn limited in any way BCLP's representation of either. Indeed, Oil-Dri does not dispute Purina's assertion that Oil-Dri's attorneys themselves have represented third-party witnesses in this case at no charge (Purina's Resp. at 6).

7

the documents within the next ten days, and BCLP attorneys reviewed the Western Aggregates documents on April 10, 2018, the date they met with Mr. Glynn to prepare him for his deposition.

Purina's only explanation for not producing the Western Aggregates documents until April 16, 2018, the day of the deposition, is that the production was timely because the subpoena Purina issued to Mr. Glynn asked that the documents be brought to the deposition and not sooner (Purina's Resp. at 1, 11-12). Purina contends that if Oil-Dri wanted access to the documents earlier, it should have served its own subpoena on Mr. Glynn (*Id.* at 5).

However, the commentary to Rule 45(a) states that even if the adversary does not serve its own subpoena, "[t]he party serving the subpoena should in any event make reasonable provision for prompt access." Purina failed to do so here. While Purina says Oil-Dri waited one to two months to share documents it received for two subpoenas, those subpoenas sought only the production of documents and not testimony (Purina Resp. at 12 and Exs. O and P). By contrast, the documents sought from Mr. Glynn were in connection with his deposition – and were used by Purina at the deposition. Whether access is "prompt" depends on the circumstances. Here, providing documents only at the deposition – when BCLP itself had access to the documents earlier and could have provided them to Oil-Dri – was not prompt.

Purina plainly sought – and gained – an advantage by having access to the Western Aggregates documents as early as April 10, 2018, but waiting until the commencement of the deposition to share them with counsel for Oil-Dri. Purina was able to spend time reviewing the documents on April 10, and to decide which ones it might wish to use at Mr. Glynn's deposition. Oil-Dri had no similar pre-deposition opportunity to review the documents to see if there were ones that it might wish to discuss with Mr. Glynn at the deposition.

Any suggestion by Purina that it did not have a genuine opportunity to review the Western Aggregates documents before the deposition on April 16, 2018 (Williamson Decl., ¶ 12 (stating that he and Mr. Roodman had about 30 minutes to "thumb[] through some of the documents" on April 10 and "did not have an opportunity to review all of the documents before Mr. Glynn's deposition")) blinks reality. When BCLP lawyers saw the documents on April 10, they represented Mr. Glynn. We have no doubt that if those lawyers asked Mr. Glynn if they could take possession of the documents or make copies of the documents at that time, Mr. Glynn would have acceded to his lawyers' request.

While not itself a violation of the rules of discovery or the ethical rules, Purina's purposeful decision to delay informing Oil-Dri of its representation of Mr. Glynn is further evidence, at a minimum, of the gamesmanship by BCLP's lawyers in connection with that deposition. Purina attempts to explain its failure to disclose the representation as an attempt to avoid "an acrimonious discourse" (Williamson Decl., ¶ 11). That assertion does not pass the straight-face test. In nearly one year of supervising discovery in this case and addressing nearly a dozen disputed discovery motions, we have not previously observed any reticence of counsel for either side to engage in "acrimonious discourse." Indeed, disappointment about the needlessly contentious conduct of all counsel led the district judge then presiding to convene a proceeding on April 5, 2018, with clients present, to admonish counsel for both parties about their conduct (doc. # 406). We are disappointed that the actions by Purina's counsel in withholding the Glynn documents until the last minute occurred less than two weeks after that proceeding.

In sum, we find Purina's excuses for withholding the Western Aggregates documents unpersuasive. We find it more likely that Purina's decision to withhold the Western Aggregates documents from Oil-Dri until the day of the deposition was an improper tactical attempt to hinder

Oil-Dri's ability to cross-examine Mr. Glynn at his deposition. Purina's actions warrant sanctions under Rule 30(d)(2) and this Court's inherent authority.

## III.

The Court has "broad discretion" in determining what sanctions to impose for Purina's conduct. *Hunt v. Moore Bros., Inc.*, 861 F.3d 655, 661 (7th Cir. 2017). However, "when judges measure out sanctions they strive for proportionality." *Walton v. Bayer Corp.*, 643 F.3d 994, 999 (7th Cir. 2011). That requires us to "tailor sanctions to the severity of plaintiffs' misconduct," *Nelson v. Schultz*, 878 F.3d 236, 238-39 (7th Cir. 2017), as well as to the degree of prejudice caused by their misconduct. *See Roughneck Concrete Drilling & Sawing Co. v. Plumbers' Pension Fund, Local 130, UA*, 640 F.3d 761, 768 (7th Cir. 2011) ("if the prejudice is slight the sanction imposed on the lawyers or their client is light"). That said, "[a] district court's inherent power to sanction for violations of the judicial process is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (internal citations and quotations omitted).

Oil-Dri asks that "[a]s a sanction due to its attorneys' conduct, Nestle should not be permitted to call Mr. Glynn to trial, or to use any documents he produced" (Oil-Dri Mot. at 1, 15). By contrast, Purina argues that no sanctions are warranted, because Mr. Mazza had "ample time to review and ask questions about all of the exhibits used at Mr. Glynn's deposition," and Oil-Dri's counsel "had prior possession of most of the pertinent documents" (Purina Resp. at 10).

We find Purina's characterization of Mr. Mazza's time to review the documents and question Mr. Glynn as "ample" to be disingenuous. Purina's argument here does not square with its argument when the shoe was on the other foot. In support of a previous motion to strike, Purina

argued that it was prejudiced when "Oil-Dri produced the new documents *one-night before* the noticed deposition of the alleged author of one of the new documents, Robert Soral" (doc. # 352: Purina's Mot. to Strike at 10, emphasis in original). Likewise, Purina complained that it was prejudiced because it did not have an opportunity to review another witness's notebooks ahead of his deposition or to have "unfettered access" to the notebooks during the deposition (doc. # 414: Purina's Supp'l Br. in Supp. of Mot. to Strike at 9, 14). Here, Mr. Mazza first learned what documents Mr. Glynn possessed only when he arrived at Mr. Glynn's deposition. At that time, BCLP's attorney – who had previously reviewed the documents and decided which ones to use in the deposition – made copies for Mr. Mazza of some, but not all, the documents he planned to show Mr. Glynn (Glynn Dep. at 34:10-16, 39:23-40:13). BCLP's decision to withhold the production of the Glynn documents until the morning of the deposition surely created an unlevel playing field for Mr. Mazza.

Purina contends Mr. Mazza was not prejudiced by his lack of earlier access to the documents produced by Mr. Glynn because he already had "most of the pertinent documents" (*see* Purina's Resp. at 10). Neither party has been entirely illuminating in its description of which or how many of the Western Aggregates documents were in Oil-Dri's possession before April 16, 2018. However, Purina does not argue that *all* of the documents Mr. Glynn produced already were in Oil-Dri's possession. As we noted above, 1,424 out of the 1,697 pages of Western Aggregates documents had never before been produced (Oil-Dri. Mot. at 1). Oil-Dri was entitled to have received and reviewed all of the Western Aggregates documents in advance of Mr. Glynn's deposition, just as did Purina's attorneys. We view Purina's decision to conceal the Western Aggregates documents and the fact of its representation of Mr. Glynn as an attempt to hinder Oil-Dri's ability to question Mr. Glynn at his deposition.

Purina's behavior warrants sanctions to remedy any prejudice to Oil-Dri, and to deter Purina from further like behavior. *Salmeron*, 579 F.3d at 797. However, neither Purina's conduct nor any prejudice to Oil-Dri warrants the extreme sanction Oil-Dri requests. The parties' description of the importance of Mr. Glynn's testimony indicates that he could be an important witness at trial. There is a "well-established public policy favoring hearing cases on the merits." *Rice v. City of Chicago*, 333 F.3d 780, 786 (7th Cir. 2003) (internal quotations and citations omitted). The Seventh Circuit has urged district courts to consider "alternative sanctions available" before "imposing exclusionary sanctions that are [potentially] outcome determinative." *Karum Holdings LLC v. Lowe's Cos., Inc.*, 895 F.3d 944, 952-53 (7th Cir. 2018). These include, among other things, "ordering the Defendants to pay a portion of [the plaintiff's] attorney's fees." *Hicks v. Avery Drei, LLC*, 654 F.3d 739, 745 (7th Cir. 2011).

We decline to impose the extreme sanction Oil-Dri seeks, as it would not be proportional to either the degree of prejudice caused by Purina's conduct or to the severity of its conduct. *See Tomasian v. C.D. Peacock, Inc.*, No. 09 C 5665, 2012 WL 2590493, at *11 (N.D. Ill. July 3, 2012) (declining to bar testimony of witness where, despite the fact that the plaintiff's attorney briefly represented both the witness and the plaintiff unbeknownst to the court and the defendant, the dual representation went to the weight to be given the witness's testimony and was "not a basis to exclude that testimony altogether").

We find that the most proportionate way to remedy any merits prejudice Oil-Dri *may* have suffered by its inability to review the documents before questioning Mr. Glynn at his deposition is to order Mr. Glynn to sit for a second deposition. We say merits prejudice that Oil-Dri "may" have suffered because Oil-Dri has not identified specific documents that were in the Western Aggregates production that Oil-Dri failed to receive until the day of the deposition, and that Oil-

Dri deems important. However, Oil-Dri now has had access to all of the Western Aggregates documents for some time, and thus will be able to question Mr. Glynn after a fair opportunity to review the documents he produced. The reconvened deposition will be limited to no more than three hours, and shall be limited to questioning related to any documents contained in the Western Aggregates production that had not previously been produced and that were not used during the first Glynn deposition. The deposition shall be completed by November 16, 2018. Since BCLP represents Mr. Glynn, we expect there will be no difficulty in scheduling the deposition. In addition, we order Purina to pay Oil-Dri's reasonable expenses and attorneys' fees incurred in conducting the reconvened deposition (including travel and one night's lodging for one Oil-Dri attorney to conduct the deposition), and in briefing this motion for sanctions. This additional sanction is appropriate to remedy any financial prejudice Oil-Dri suffered as a result of Purina's conduct.[4]

---

[4]We impose these sanctions jointly and severally on Purina and its attorneys, BCLP. Purina was on notice as a result of the April 5, 2018 hearing that the Court expected its attorneys to refrain from sharp discovery practices. Purina thus must share responsibility with its attorneys, who act in its name, for the conduct we address in this ruling. *See, e.g., Blaga v. Old Dominion Freight Line, Inc.*, No. 12 C 8049, 2015 WL 3957737, at *2 (N.D. Ill. June 29, 2015) ("As both Plaintiff and his counsel are at fault for the failure to comply with the Court's discovery orders, the sanction of fees and costs will be entered against both of them—jointly and severally").

## CONCLUSION

Oil-Dri's motion for sanctions (doc. # 515) is granted in part and denied in part. The Court orders Mr. Glynn to sit for a second deposition by November 16, 2018, and orders Purina to pay Oil-Dri's reasonable expenses and attorneys' fees incurred in conducting the deposition and in briefing the instant motion for sanctions. We set the matter for a status hearing on November 20, 2018 at 9:00 a.m. for a report on the parties' compliance with this ruling.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: October 15, 2018

14