# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Oil-Dri Corporation of America, | ) | |
| | ) | No. 1:15-cv-01067 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Matthew F. Kennelly |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| Nestlé Purina PetCare Company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OIL-DRI'S COMBINED MOTIONS IN LIMINE

# TABLE OF CONTENTS

**Page**

*Table of Authorities*....................................................................................................................iii

I.    MIL #1 TO EXCLUDE CERTAIN TESTIMONY OF NESTLE'S EXPERTS
BOXLEY AND JENKINS ...........................................................................................1

    A.    The Vast Majority of Boxley's And Jenkin's Testimony Should
Be Excluded As Inconsistent With The Court's Claim Construction........................1

    B.    The Court Should Preclude Boxley And Jenkins From Introducing
New Facts, Or Testifying To Opinions Based On Those New Facts,
That Contradict Nestle's Rule 30(b)(6) Testimony ...................................................2

    C.    Jenkins' Expert Testimony Based On Never-Before-Disclosed Documents
And Facts, Should Be Excluded ................................................................................8

    D.    Portions Of Jenkins' Testimony and Certain Exhibits Should Be Excluded
Based On The Magistrate's Prior Discovery Order ...................................................9

II.    MIL #2 TO EXCLUDE TESTIMONY OF NESTLE'S LEGAL EXPERT
Q. TODD DICKINSON.................................................................................................9

III.    MIL #3 TO PRECLUDE NESTLE FROM REFERENCING ITS R&D
EXPENSES AT TRIAL...............................................................................................11

    A.    Nestle Never Produced Its R&D Costs For The Accused Products ........................11

    B.    Nestle Is Precluded By The Best Evidence Rule From Relying On R&D Cost-
Estimates Based On A Product Other Than The Accused Products.........................14

    C.    The Use Of Nestle's R&D Cost Estimates Would Be Unfairly Prejudicial.............15

IV.    MIL #4 TO EXCLUDE DEFENDANT'S "ENTIRE MARKET THEORY"
EVIDENCE AND UGONE'S EXPERT TESTIMONY BASED ON IT ............................15

V.    MIL #5 TO PRECLUDE NESTLE'S RELIANCE ON THE WESTERN AGGREGATE
AND ALTERLINK LICENSES *FIRST RAISED* IN NESTLE'S EXPERT REBUTTAL
REPORTS .................................................................................................................16

VI.    MIL #6 TO PRECLUDE NESTLE FROM OFFERING REPUTATION-BASED
EVIDENCE.................................................................................................................17

VII.    MIL #7 TO PRECLUDE NESTLE FROM OFFERING WITNESS TESTIMONY
        THAT WOULD ALLOW NESTLE TO USE THE ATTORNEY-CLIENT
        PRIVILEGE AS A SWORD ............................................................................................18

VIII.   MIL #8 TO LIMIT THE INFRINGEMENT ANALYSIS TO THE ACCUSED
        PRODUCTS PROVIDED DURING THE KING WILLIAM INSPECTION .....................19

IX.     MIL #9 TO EXCLUDE REFERENCE TO THE LIGHTWEIGHT LITIGATION……..20

X.      CONCLUSION.............................................................................................................20

STATEMENT REGARDING THE PRETRIAL DUTY TO
MEET AND CONFER .............................................................................................................22

APPENDIX...............................................................................................................................a-e

# TABLE OF AUTHORITIES

*Cases*                                                                       Page(s)

*A.I. Credit Corp. v. Legion Ins. Co.*,
265 F.3d 630 (7th Cir. 2001)........................................................................................6

*Asghari-Kamrani v. United Servs. Auto. Ass'n*,
252 F. Supp. 3d 562 (E.D. Va. 2017).........................................................................10

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
2005 U.S. Dist. LEXIS 10692 (N.D. Ill. Feb. 22, 2005)............................................17

*City of Gary v. Shafer*,
2009 U.S. Dist. LEXIS 47113 (N.D. Ind. June 2, 2009)............................................15

*DSM IP Assets, B.V. v. Lallemand Specialties, Inc.*,
2018 U.S. Dist. LEXIS 68504 (W.D. Wis. Apr. 24, 2018).........................................19

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
2017 U.S. Dist. LEXIS 75517 (E.D. Tex. May 18, 2017)...........................................18

*Estate of Thompson v. Kawasaki Heavy Indus.*,
291 F.R.D. 297 (N.D. Iowa 2013)................................................................................6

*Hartman v. EBSCO Indus., Inc.*
758 F.3d 810 (7th Cir. 2014).........................................................................................7

*Henry v. Quicken Loans Inc.*,
2008 WL 4735228 (E.D. Mich. Oct. 15, 2008)...................................................7-8, 16

*Hologic, Inc. v. Minerva Surgical, Inc.*,
2018 U.S. Dist. LEXIS 113051 (D. Del. July 9, 2018)..............................................19

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007)...................................................................................19

*Int'l LLC v. Pentech Pharm., Inc.*,
2010 WL 3928598 (N.D. Ill. Oct. 1, 2010).................................................................10

*LifeNet Health v. LifeCell Corp.*,
2014 U.S. Dist. LEXIS 154481 (E.D. Va. Oct. 31, 2014)..........................................19

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,

449 F.3d 1209 (Fed. Cir. 2006)...................................................................................................1

*Mahurkar v C.R. Bard, Inc.*,
Case No. 92 C 4803 N.D. Ill. ...............................................................................................18

*Medicines Co. v. Mylan Inc.*,
2014 WL 1227214 (N.D. Ill. Mar. 25, 2014)........................................................................9

*MKB Constructors v. Am. Zurich Ins. Co.*,
49 F. Supp. 3d 814 (W.D. Wash. 2014).................................................................................6

*Noskowiak v. Bobst SA*,
2005 WL 2146073 (E.D. Wis. Sept. 2, 2005)........................................................................9

*Owens v. Auxilium Pharmaceuticals, Inc.*,
895 F.3d 971 (7th Cir. 2018).................................................................................................7

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
137 S. Ct. 954 (2017)...........................................................................................................15

*Se-Kure Controls, Inc. v. Diam USA, Inc.*,
2009 WL 77463 (N.D. Ill. Jan. 9, 2009)..............................................................................10

*Shuffle Tech Int'l LLC v. Sci. Games Corp.*,
2017 U.S. Dist. LEXIS 141445 (N.D. Ill. Sept. 1, 2017).....................................................18

*Shuffle Tech Int'l LLC v. Sci. Games Corp.*,
2017 WL 3838096 (N.D. Ill. Sept. 1, 2017).........................................................................10

*State Farm Mut. Auto. Ins. Co. v. New Horizont*,
250 F.R.D. 203 (E.D. Pa. 2008).............................................................................................6

*Sylvania Elec. Prods., Inc. v. Flanagan*,
352 F.2d 1005 (1st Cir. 1965)..............................................................................................14

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) (en banc)...........................................................................10

*Ultratec, Inc. v. Sorenson Communics., Inc.*,
2014 U.S. Dist. LEXIS 141428 (W.D. Wis. Oct. 3, 2014)....................................................19

*Urban v. United States*,
2005 U.S. Dist. LEXIS 14234 (N.D. Ill. June 9, 2005)........................................................14

*Walters v. PDI Mgmt. Servs.*,

2004 WL 2137513 (S.D. Ind. June 14, 2004).................................................................................14

*Zivits v. Greenberg*,
1999 U.S. Dist. LEXIS 19160 (N.D. Ill. Dec. 3, 1999).................................................................18

## *Rules*

Fed. R. Civ. P. 26.................................................................................................................................8

Fed. R. Civ. P. 30……………………………………………………….........2, 4, 6, 13-14

Fed. R. Civ. P. 36……………………………………………………….....................6

Fed. R. Civ. P. 56……………………………………………………………...9-10

Fed. R. Civ. P. 404…………………………………………………………………18

Fed. R. Evid. P. 608.........................................................................................................................17

Fed. R. Evid. P. 1002......................................................................................................................14

Fed. R. Evid. P. 1004......................................................................................................................14

N.D. Ill. LPR 3.6 ............................................................................................................................18

## *Statutes*

35 U.S.C. § 298....................................................................................................................18-19

## I.     MIL #1 TO EXCLUDE CERTAIN TESTIMONY OF NESTLE'S EXPERTS BOXLEY AND JENKINS

Nestle's experts Boxley and Jenkins assert opinions that are (1) contrary to the Court's claim construction order and its summary judgment ruling (R647); and (2) improperly based on new "facts."

Nestle's discovery abuses, documented below, have prevented Oil-Dri from learning all that it had a right to know on what has now become the critical infringement issue left in the case: does Nestle "predetermine" its clay particle sizes? The Court relies on the testimony of Messrs. Boxley and Jenkins to conclude there is a genuine issue of fact on this point (R647, at 14-15). Oil-Dri respectfully requests a ruling here that this testimony be excluded for the reasons presented below.

### A.     The Vast Majority of Boxley's And Jenkins' Testimony Should Be Excluded As Inconsistent With The Court's Claim Construction

Expert testimony based on an incorrect claim construction should be excluded. *Liquid Dynamics Corp. v. Vaughan Co., Inc.,* 449 F.3d 1209, 1224, n.2 (Fed. Cir. 2006).

*Claim Term "Predetermined": Pre-mixed versus Post-mixed.* As regards '019 Patent Claim 1, Boxley's and Jenkins' opinions are based on an assessment of the post-mixed constituents of the Accused Products rather than their pre-mixed ingredients as the Court has now made clear is the appropriate analysis (R647, at 10-13). The Court should exclude all conflicting expert testimony by Nestle's experts. [1]

*Claim Term "Predetermined": Determined in Advance versus Actually Calculated:* Boxley and Jenkins also opine that "predetermined" means "actually calculated," [2] but the Court previously

---

[1] *See, e.g.,* Ex. 1-A, Boxley Report, ¶¶36-70, 76-89, 98; Ex. 1-B, Jenkins Reb. Report, ¶¶33, 39-48, 49-54, 65-69, 116.

[2] *See* Ex. 1-A, Boxley Report, ¶63 ("Oil-Dri ha[s] failed to identify any evidence that Purina . . . decides upon in advance *a specific [MPS]* for each clay") (emphasis added); Ex. 1-B, Jenkins Reb. Report, ¶37 (Nestle does not "measure[]" or "calculate[]" the size of its NaB); *see also id.* at ¶¶118-119, 121, 129.

rejected Nestle's "attempts to fit more content into 'predetermined' . . . to require[] Oil-Dri to *actually measure* the materials *before mixing* to ensure a proper mean particle size") (R533, at 4; emphasis added). Again, the contrary position of Nestle's experts should be excluded.

*Claim Term "Mean Particle Size":* The Court adopted Oil-Dri's proposed construction of MPS, and rejected Nestle's position that "the average particle size may be approximated by taking the average of two sample measurements," ruling that "two measurements can be used to find the mean only if each is representative of the underlying sample" (R533, at 7-8). Yet Jenkins repeatedly averages two sample sizes, and calls it "MPS" without making any "representative" determination.[3] Those portions of Jenkins' expert testimony adopting this flawed methodology should be excluded.

**B.    The Court Should Preclude Boxley And Jenkins From Introducing New Facts, Or Testifying To Opinions Based On Those New Facts, That Contradict Nestle's Rule 30(b)(6) Testimony**

Claim 1 of Oil-Dri's '019 Patent recites a clumping animal litter obtained using: a non-swelling clay (NSC) with a mean particle size (MPS) < 4 mm, a swelling clay (SC) with a MPS < 2mm, and an $MPS_{NSC} > MPS_{SC}$ (Ex. 1-C, 9:36-46). To prove that this claim limitation is infringed by the Accused Products, Oil-Dri sought to discover information relevant to determining the MPS of Nestle's clays in their condition before they are mixed. But throughout the 13-month fact discovery period, Nestle refused to provide this information, citing a blizzard of blatantly improper objections to numerous written discovery requests covering this information,[4] including that Oil-Dri's definition

---

[3] *See, e.g.,* Ex. 1-X, Jenkins Op. Report, ¶¶234-250 (alleging Pattengill invalidates based on average of two data points when Pattengill actually provides only upper and lower sieve size data as to its Mixture 11 (Pattengill patent, Ex. 1-BB, at column 13, Table 11, asterisks [**] below table), and says nothing about it being representative of any sample); *see also* Ex. 1-X, ¶410 (discussing Nestle alleged prior invention); Ex. 1-Y, Jenkins Dep., at 240:3-242:22, using Ex. 1-Z, PG25-PG28, to find "MPS" for KLMS formulation sheets).

[4] *See* Ex. 1-D, at A14-A15, A28-A29, A39, A41-A43, A55-A56, A60-A61, A62-A64, A66-A67, A68-A69, A72-A73, A81-A82 (Responses to Interrs. 3, 19 and RPD 2, 23, 32, 41).

of "formulation"[5] seeks information "not relevant to the asserted claims of [the '019 Patent]," Ex. 1-D, at A39 – i.e., it is inconsistent *with Nestle's* (post-mix) claim construction theory.

Oil-Dri also sought to inspect those portions of Nestle's plants which took the "*raw materials through to their final preparation prior to commercial sale,*" as well as mine or storage facilities for pre-agglomeration clay constituents (Ex. 1-E, 9/7/17 inspection notice). Again, Nestle objected as "*wholly irrelevant to the issues in the lawsuit,*" asserting there was "*no legitimate basis*" for Oil-Dri's inspection requests (Ex. 1-F, Nestle Objections ¶¶6, 8 (emphasis added)). Nestle only allowed Oil-Dri to inspect what it deemed to be "appropriate [post-mix] portions of Purina's King William, Virginia, manufacturing facility," *id.* at ¶3. Nestle also stated – falsely -- that "[t]he parties ha[d] *agreed* that in lieu of" obtaining its own samples, Oil-Dri would accept samples "voluntarily produce[d]" by Nestle, *id.* at ¶8.[6]

Nestle's overall obstructionist and keep-away strategy on this (and many other) issues forced Oil-Dri to file multiple motions to compel. *See* Oil-Dri's Third (R180), Fourth (R208) and Fifth (R240) Motions to Compel. While some of Nestle's written discovery responses cited product formulation sheets that Nestle had produced for the Accused Products, these did not reference particle size (e.g., Ex. 1-AA [e.g., N272-N274]) while, curiously, those that related to KLMS (Nestle-alleged prior art) did (e.g., Ex. 1-Z, PG25-28). Oil-Dri's efforts to obtain meaningful information about the missing particle sizing information through depositions of Nestle's fact witnesses also proved futile.[7]

---

[5] Ex. 1-D at A32 ("formulation" is "the average particle size of the clay constituents of the referenced cat litters, *prior to their mixing and/or agglomeration*, as well as the amounts of constituents within such litters") (emphasis added).

[6] That Oil-Dri never agreed to accept clay samples not independently collected and verified by Oil-Dri – and was blindsided by Nestle's last-minute refusal to allow Oil-Dri to inspect or take samples from any part of the facility where the pre-mixed clays were kept – is confirmed by counsel email exchanges on the eve of the King William facility inspection. *See* Ex. 1-G, 11/2/17-11/3/17 Emails.

[7] Nestle's witnesses avoided answering on this topic, stating: they were "not comfortable" providing the

Nestle continued its hide-the-ball delay tactics with a motion to quash Oil-Dri's 30(b)(6) deposition notice (R167). *See* Ex. 1-M, 11/2/17 Tr., at 7 (Nestle arguing against the need for a deposition despite its clearly inadequate discovery responses). Ultimately, after a second hearing on this subject, the Magistrate ordered the Rule 30(b)(6) deposition to proceed. *See* Ex. 1-N, 11/20/17 Tr., at 9; *id.* at 26-28 (finding that neither Nestle's interrogatory responses nor the formulation sheets showed Nestle particle sizing for the Accused Products[8]).

Oil-Dri's Rule 30(b)(6) deposition notice (Ex. 1-O) sought information under two relevant topics: Topic 14 ("The formulations for each of the Accused Products over the entire time frame from [2/3/9] to [8/19/17]"), and Topic 21 ("[a] complete explanation of each of the processing steps that occurs during the manufacture of the Accused Product").[9] In response, Nestle's representative, Anderson, testified repeatedly that Oil-Dri had already been provided with the product formulations (Ex. 1-P, Anderson Dep. at 125-134) – even though these failed to identify particle size information.

---

information (Ex. 1-J, Greene Dep., at 73:22-74:10); or could not remember it (Ex. 1-K, Marx Dep., at 27:1-5, 28:7-14; Ex. 1-L, Job Dep., at 78:25–79:6 (Job "aware of the current formulations … [a]t a high level"); *id.*, at 80:6-21, 84:3-9, 18-23 (as to CaB & NaB Material Specifications, Job Dep. Exs. 10-11 (Purina 7241-81 & 7282-84), Job unable to confirm that that these are the "current specifications for the clay fines that are used in the engineered litter" and stating these are "uncontrolled documents" and "I don't know if there's a newer version out there")).

[8] Nestle's repeated assertions throughout discovery, including at the 11/20/17 hearing before the Magistrate (Ex. 1-N, at 26), that it could not provide the requested discovery because "Nestle does not calculate an MPS for the Accused Products," was obviously beside the point -- the issue was not whether Nestle ever actually calculated the MPS of its clays, but rather whether it is "predetermined" based on Nestle's particle sizing practices.

[9] Oil-Dri had reasonably believed Nestle's formulation sheets would reveal particle sizing information. But when this proved not to be the case, Oil-Dri requested that Nestle identify the sizing information provided to its NaB suppliers, which ultimately proved a successful way to obtain it. The Magistrate later faulted Oil-Dri for its use of the term "manufacturing processes" in the Rule 30(b)(6) deposition notice (issued 5 months earlier), as opposed to "supplier information" (Ex. 1-H, 5/16/18 Tr., at 9-10). Clearly, though, both parties understood that Oil-Dri was seeking the particle sizing information, and Nestle was playing hide-and-seek on the issue all along.

Nor was Oil-Dri able to further question Anderson on this, as he was not prepared to discuss such "fine" details (Ex. 1-P, Anderson Dep., at 168:11-18, 169:11–170:9).

This led to Oil-Dri's Fourth Motion to Compel (R208), which resulted in another Court Order directing Nestle to designate yet another Rule 30(b)(6) witness (Ex. 1-Q, 2/22/18 Tr., at 27-29 (R399); Ex. 1-R, 2/22/18 Minute Order (R313)).[10]  Before the deposition, Oil-Dri told Nestle that it intended to inquire, *inter alia,* about "how Nestle orders the different clays used to make the Accused Products with its suppliers, i.e., what is communicated to the suppliers so that they know what particle size clays to provide to Nestle…" (Ex. 1-T, 3/30/18 Mike Mazza Email).  Finally (on 4/4/18, one month after the 3/9/18 close of discovery, R176), in response to this very specific inquiry, Nestle (through its representative witness Nathan Huck) advised Oil-Dri of its clay particle sizing practices for the Accused Products that Huck said Nestle had been practicing *for nearly the last decade*.  (Ex. 1-U, Huck Dep., at 61:3 –72:1-6).  Huck produced NaB "Material Specifications" (Ex. 1-V, NH3A-NH3C) which Nestle provides to its suppliers so that they can size the NaB clay used in the Accused Products (Ex. 1-U, Huck Dep., at 65:15-23).  As to Nestle's CaB particle sizing practices, Huck said Nestle had been using the specifications contained in a 2006 email (Ex. 1-W, NH4; Ex. 1-U, Huck Dep. at 66:16-72:11).  This 2006 email had previously gone unnoticed: Nestle failed to identify it in its interrogatory responses, and it seemed unrelated, as it is from a Nestle employee to an *Oil-Dri employee* seeking Oil-Dri clay samples per a specification.  *See* Ex. 1-W.

In short, after 13 months of resisting Oil-Dri's multiple discovery requests, Nestle was forced to acknowledge that its Specifications (Exs. 1-V & 1-W): (a) are used by Nestle to size its clay particles for its Accused Products, as Huck made perfectly clear; and (b) clearly employ four-or-more

---

[10] The Magistrate also ordered Nestle to provide Oil-Dri with an affidavit "stating the final formulations of the accused products." Ex. 1-R, 2/22/18 Minute Order.  The Job Declaration Nestle provided in response (Ex. 1-S) once again cited formulations *without reference to particle size information*.

sieves, i.e., a sufficient number to predetermine MPS. Further, the Specifications have not varied as to particle size over the last 8 years (Ex. 1-U, Huck Dep., at 65:24-66:15; *id.* at 72:7-9).

Now, Nestle's experts, Boxley and Jenkins,[11] seek to contradict this (long-withheld) evidence of Nestle's particle sizing practices. In stark contrast to Huck and Nestle's Specifications, Boxley and Jenkins now say that Nestle does not infringe due to an alleged single-sieve-sizing of its clays. This improper expert testimony should be excluded for the following reasons:

First, Boxley and Jenkins flatly misrepresent Huck's testimony (*see* Appendix 3). Indeed, Nestle's experts' "single-sieve-size" claim *directly contradicts* Huck's Rule 30(b)(6) testimony and the Material Specifications that Huck provided, which establish that Nestle uses multiple sieves to size its Accused Product clays. In an effort to show there is no contradiction between his factual "observations" and Huck's testimony, Boxley *misrepresents* the latter and bases his opinions on that misrepresentation (*id.*). A party "may not retract" prior Rule 36(b)(6) testimony "with impunity." *State Farm Mut. Auto. Ins. Co. v. New Horizont*, 250 F.R.D. 203, 212 (E.D. Pa. 2008).[12] Here, Nestle has failed to offer any reasonable explanation for why it never proffered the facts now presented through Boxley/Jenkins during fact discovery. Nestle should not be permitted to contradict the sworn testimony of its corporate representative on its particle size practices – or sponsor expert opinions based on this contradiction – particularly as Nestle improperly withheld discovery for more than 1 year about those practices; had to be compelled by the Court to divulge it; and, when it finally did

---

[11] Ex. 1-A, Boxley Report, ¶¶28, 57-58, 62, 65; Ex. 1-B, Jenkins Rebuttal Report, ¶¶34-37.

[12] The Seventh Circuit's opinion in *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001), holding that Rule 30(b)(6) testimony is not a binding judicial admission, does not consider or preclude a district court from preventing a corporate defendant from engaging in the kind of discovery abuse that has occurred here. *See MKB Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 829 (W.D. Wash. 2014) ("a party cannot rebut the testimony of its Rule 30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and there is no adequate explanation for the rebuttal"); *Estate of Thompson v. Kawasaki Heavy Indus.*, 291 F.R.D. 297, 304 (N.D. Iowa 2013) (same).

divulge it, did so only after Oil-Dri's final infringement contentions were due, and after the close of discovery, thereby precluding further inquiry by Oil-Dri on the subject.

Second, Boxley and Jenkins say that their single-sieve-size assertions are based on their (unverifiable) "*personal observations* of Nestle's manufacturing process" (Ex. 1-A, Boxley Report, ¶58 (emphasis added); *see also* Ex. 1-B, Jenkins Reb. Report, ¶¶34, 37). *But at the time of their expert reports, neither had even inspected the King William plant* (Ex. 1-Y, Jenkins Dep., at 131:13-23[13]; Ex. 1-A, ¶11, Boxley referring only to his Bloomfield plant inspection). Remarkably, during his deposition, Jenkins *contradicted his report* and agreed that Nestle's use of its Material Specifications (Ex. 1-Y, DJ Ex. 10), per Huck, *does not result in the use of single sieves (id.* at 171:14-172:20). In short, neither expert has demonstrated actual personal knowledge of Nestle's sieve sizing practices, and their asserted "personal observations" are wholly unreliable and inadmissible. *See Owens v. Auxilium Pharmaceuticals, Inc.*, 895 F.3d 971, 972-73 (7th Cir. 2018) (affirming Judge Kennelly's exclusion of expert testimony that assumed plaintiff was using prescribed dose of topical gel, when that was not the case); *see also Hartman v. EBSCO Indus., Inc.* 758 F.3d 810, 819 (7th Cir. 2014) (affirming expert's exclusion assuming facts contrary to evidence in case).

Third, Nestle previously *refused Oil-Dri's multiple requests* to inspect or otherwise discover the "pre-mix" portion of Nestle's manufacturing process, saying it was "wholly irrelevant" to the case – yet Boxley and Jenkins now seek to introduce new "facts" based on this very point. A party "cannot use an expert to develop facts after the close of discovery when those same facts could have been developed by attorneys during fact discovery." *Henry v. Quicken Loans Inc.*, 2008 WL 4735228, at

---

[13] Jenkins' only citation at Ex. 1-B, ¶36 is to Tab OO to the Johnston expert report (Ex. 1-W, Huck NH4) – which says nothing about any alleged single sieve size at the King William plant. Similarly, Jenkins admitted he had no "specific personal knowledge" as to how Nestle suppliers size the NaB used by Nestle in the Accused Products (Ex. 1-Y, Jenkins Dep., at 133:16-21).

*6 (E.D. Mich. Oct. 15, 2008). Once again, Nestle is attempting to "replace" evidence developed during fact discovery with unsupported expert assertions. *See* R619 (excluding Walter Clark).

### C. Jenkins' Expert Testimony Based On Never-Before-Disclosed Documents And Facts, Should Be Excluded

Even though Nestle *never identified Jenkins as a fact witness,* Jenkins bases various opinions upon his personal experience in the 1990s when he worked for a clumping cat litter competitor, Clorox. In his expert reports, Jenkins provides substantial fact testimony concerning his work at Clorox in the 1990s that relates to several litters Nestle relies upon as prior art, including: Scoop Fresh; Tidy Cat with baking soda ("TCBS"); and Kitty Litter Maxx Scoop ("KLMS"). This *fact testimony* should all be excluded, as it is untimely and unfairly prejudicial. As with Walter Clark, Nestle is attempting with Jenkins to "repackage [a fact witness] as an expert" to "attempt[] to end-run the requirements of Rule 26(a)(2)" (R619).[14]

In addition to excluding Jenkins' testimony based on his personal experience at Clorox, Oil-Dri also moves to exclude (with one exception[15]) the late-produced Clorox documents on which that testimony is based. Some of the late-produced Clorox documents were produced on 10/19/18, more than 7 months after the 3/9/18 close of fact discovery (*see* Ex. 1-EE, 10/19/18 Williamson email of 5:50pm, attaching documents, referenced in Jenkins' rebuttal report, Ex. 1-B, ¶¶102-105), and others were produced on 10/29/18 as part of Jenkins' rebuttal report. *See* Appendix 2. The documents and corresponding Jenkins testimony in question (Ex. 1-I, as well as the Clorox documents at Ex. 1-EE) apparently were taken by Jenkins when he left Clorox in 2011. *None of this was produced during*

---

[14] Nestle has agreed that portions of Jenkins' expert testimony should be excluded, but the parties were unable to reach agreement as to other portions, as shown in Appendix 2.

[15] The exception is an internal Clorox memo dated 7/12/93 (Ex. 1-CC), which the parties previously agreed could be used by their respective experts in their reports (*see* Ex. 1-DD, 11/10/18, 7:51 a.m. counsel email).

*fact discovery* as it should have been.[16]  There is no justification for Nestle's late production of these new Clorox documents and they, along with Jenkins' corresponding testimony, should be excluded from use at trial.

### D. Reference To Pattengill "Mixture 7" Should Be Excluded

The Magistrate ruled that due to discovery non-compliance, Nestle could not rely on physical litters allegedly constituting prior art other than KLMS, Scoop Scamp, Private Scoop and Western Aggregate litters (*see* Ex. 1-Q, 2/22/18 Tr., R399, at 23-27).  Pattengill discloses dozens of litter formulations, and through this entire case Nestle relied on "Mixture 11" of Pattengill, but now Jenkins seeks to opine on Pattengill "Mixture 7"[17], but as it is not among the four-permitted physical litters, reference to it should also be excluded.

## II. MIL #2 TO EXCLUDE TESTIMONY OF NESTLE'S LEGAL EXPERT Q. TODD DICKINSON

Dickinson is a legal expert expected to testify on the issue of inequitable conduct.  His testimony should be excluded for at least four reasons:

First, Dickinson applied the wrong legal standard for materiality, so his testimony should be excluded.  *See Medicines Co. v. Mylan Inc.*, 2014 WL 1227214, *5 (N.D. Ill. Mar. 25, 2014) (striking expert's opinions in patent case, when expert applied the wrong legal standard); *Noskowiak v. Bobst SA*, 2005 WL 2146073, at *5 (E.D. Wis. Sept. 2, 2005) (same).  He pervasively employs the rejected Rule 56 materiality standard (Ex. 2-A, Dickinson Report, ¶¶26, 27, 30, 63, 65, 73, 76, 77, 80, 81, 84, 89), i.e., that "*any ... withholding* of material information" is a violation") (emphasis added).  The proper standard is *but-for* materiality, i.e., would the PTO "have allowed a claim had it been aware

---

[16] Ex. 1-FF, Oil-Dri's Interr. 8 and RPD 13 (both requesting this prior art).

[17] *See* Ex. 1-X, 10/29/18 Jenkins Report, ¶¶236, 247, 249, 255, 258-259, 261-263, 267, 420, 422, 424, 567.

of the undisclosed prior art"? *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285, 1294-96 (Fed. Cir. 2011) (en banc) ("reliance on [the Rule 56] standard has resulted in the very problems the Court sought to address by taking this case en banc").[18] Second, Dickinson's testimony that Oil-Dri acted with a "lack of candor" is inadmissible because it is entirely conclusory (Ex. 2-A, ¶¶27, 97).[19]

Third, in *Therasense*, the Federal Circuit also held that when multiple reasonable inferences may be drawn, "intent to deceive cannot be found." 649 F.3d at 1290-91. Dickinson's report does not recognize this standard either – despite, again, his awareness of it. *See Asghari-Kamrani v. United Servs. Auto. Ass'n*, 252 F. Supp. 3d 562, 581 (E.D. Va. 2017) (court could not find that alleged inequitable conduct "was the single most reasonable inference").

Fourth, Dickinson summarily relies upon Jenkins that certain prior art is allegedly material, without providing any independent analysis (Ex. 2-A, ¶95). In other words, Dickinson's testimony simply repackages Jenkins' testimony, adding nothing to it, and therefore it is not helpful to the Court.

---

[18] Dickinson's error is indefensible not only in light of his credentials (a former Director of the Patent Office), but also because he previously employed the correct standard when testifying in *Asghari-Kamrani v. United Services Automobile Assoc.,* Case No. 2:15-cv-478-RGD-RJK (E.D. Va.). There, Dickinson testified that *Therasense* imposes an "extremely high bar," and he employed not Rule 56, but instead the "but for" test adopted by the Federal Circuit. *See* Ex. 2-B, at 886:12-19. Dickinson also relies extensively on the Manual of Patent Examination and Preparation (the "MPEP"), which he concedes "does not have the force of law." *See* Ex. 2-A, Dickinson Report, ¶32.

[19] *See Shuffle Tech Int'l LLC v. Sci. Games Corp.*, 2017 WL 3838096, at *9 (N.D. Ill. Sept. 1, 2017) (portion of legal expert report that "whether individuals in this case must have known about the omitted references and therefore intended to deceive the PTO," was inadmissible); *Int'l LLC v. Pentech Pharm., Inc.*, 2010 WL 3928598 (N.D. Ill. Oct. 1, 2010) (expert may not "plumb the inventor's and attorneys' minds and discern whether they 'lacked candor' or had actual intent to deceive during prosecution of the patent and related applications").

### III. MIL #3 TO PRECLUDE NESTLE FROM REFERENCING ITS R&D EXPENSES AT TRIAL

The Court's 2/22/18 Minute Order (R279) states: "DEFENDANT WILL NOT BE PERMITTED TO USE AT TRIAL EVIDENCE OF ANY [R&D] COSTS WHICH ARE NOT DISCLOSED BY 3/02/18." (all caps in original). Oil-Dri sought discovery on Nestle's R&D costs for the Accused Products to show that they were lower than would be expected, saying use of the '019 Patent allowed Nestle to shortcut its R&D efforts. Nestle now says it "lost" the actual R&D costs for its Accused Products, and wishes to use "estimates" *based on costs for a different product,* to try to show that commercial success of the Accused Products is not due to the '019 Patent technology, but rather Nestle's own "significant investments" in R&D."[20]

Nestle's estimated R&D costs for the Accused Products based on a different product should be excluded because: (1) Nestle never conducted a reasonable seasrch for those costs; and (2) Nestle's estimates based on a different product are unreliable and unfairly prejudicial to Oil-Dri.

#### A. Nestle Never Produced Its R&D Costs For The Accused Products

Nestle's R&D costs were the subject of an on-going discovery battle in this case, much like Nestle's sieve sizes discussed earlier. Oil-Dri sought disclosure of Nestle's R&D costs through written discovery (Ex. 3-B, Interr. 17, RPD 29). Nestle objected: (a) that Oil-Dri's "improper, knowing, intentional, misleading, prejudicial, and unreasonable delay in asserting its infringement allegations" allegedly made it difficult for Nestle to find its R&D cost documents (Ex. 3-E, at 13-14); and (b) that it need not disclose these crucial facts to Oil-Dri until expert discovery was due (*id.* at 12). Nestle was quick to concede upon questioning by the Magistrate that Oil-Dri was "entitled to

---

[20] Ex. 3-A, Ugone Report, ¶9a(ii) (p.7:1-2, citing fn 20), ¶15a:4, 16c:6, 58c:8, 119, 121, 124c, 157a, 174c. Ugone says that Nestle's supposed R&D costs for the Accused Products amount to $20 million. *Id.* at ¶9c(i) (at p.10:1-2), ¶85 last line & fn 283 (at p.78), ¶117b.

have [the facts] produced in discovery prior to seeing it in the expert report" (Ex. 1-Q, 11/2/17 Tr., at 3), yet outside of court Nestle continued to stonewall Oil-Dri. At the next hearing, the Magistrate once again admonished Nestle's counsel: "certainly [Oil-Dri] is entitled to get the underlying factual data . . . prior to seeing it in an expert report . . . at a time where [Oil-Dri] can meaningfully have a chance to follow up on it in discovery" (Ex. 1-N, 11/20/17 Tr., at 34).

Nestle's continuing obstruction led Oil-Dri to move to compel, noting that Nestle's "lost documents due to the passage of time" claim was suspicious given that Nestle had produced hundreds of documents from similar time periods concerning other aspects of the Accused Products (Ex. 3-I, 3rd Motion To Compel, at 7-8; *see also* Ex. 3-C, Tuffli Dep., at 56-58, 169-70). In response to Oil-Dri's motion, the Court noted Nestle's discovery recalcitrance, and set a deadline for Nestle to produce the information (Ex. 1-N, 11/20/17 Tr., at 34-35; R.190, 11/20/17 Minute Order). Nestle's ensuing 1/8/18 supplement (to Int #17) alleged that "much" of its R&D cost documentation had in fact been "lost," although it provided no details. Nestle told Oil-Dri for the first time that it intended to rely instead on an "estimate" it had prepared – largely based on costing concerning an *entirely different product line* (Nestle's Lightweight Litter, which use perlite ash rather than nonswelling clay) (Ex. 3-D, at 3, 5), developed *years after* the Accused Products (Ex. 3-C, Tuffli Dep., at 66:6-20). Further, Nestle provided only a bottom-line estimate, with no supporting documents identified (Ex. 3-D, at 7). This clearly inadequate response engendered yet another Oil-Dri motion to compel (Ex. 3-F, 5th to Compel, at 10-11).

The Magistrate expressed great concern over the still-preliminary nature of Nestle's supplemental response[21], stating: "[Oil-Dri is] entitled to know [how the numbers were calculated]

---

[21] *See* Ex. 3-G, 2/2/18 Tr., at 7 (stating "I don't know exactly what 'exemplary' means," and noting Nestle's amended interrogatory response: (1) contained "9 or 10 pages of discussion, most of which is . . . why it's [Oil-Dri's] fault [Nestle] d[idn't] have certain information," and (2) failed to "say how [the estimated numbers

because . . . it didn't emerge full-blown from the head of Zeus." Ex. 3-G, 2/2/18 Tr., at 7. Reminding Nestle *for the third time now* that Oil-Dri was entitled to this fact discovery prior to expert witness discovery (*id.* at 8), the Court ordered Nestle to supplement its R&D costs response yet again, and produce a corresponding Rule 30(b)(6) witness or else forfeit the right to use this evidence at trial. *Id.* at 9 ("You're not allowed to give an expert things that you didn't give [Oil-Dri] in discovery"); *see also* R279 (quoted in all caps above).

Nestle's *next* (Third) supplemental response (to Int #17) included an additional 3½ pages describing how Nestle *estimated* its R&D costs for the Accused Products *using cost information for its Lightweight Litter* (Ex. 3-H, at 7-10). Nestle designated Brock Tuffli, Controller of Nestle's Golden Product line (Ex. 3-C, Tuffli Dep., at 78), as its Rule 30(b)(6) witness on this topic. Tuffli, on 4/4/18 – nearly 1 month after the 3/9/18 close of fact discovery (R176, at 2) – explained that Nestle could not locate its R&D cost documentation for the Accused Products and "assumed" it was "lost" (Ex. 3-C, Tuffli Dep., at 24:14-25:5 and 26:13-34:2). But Tuffli was unable to advise *when* this documentation was misplaced or under what circumstances. *Id.* at 43:2-45:19 and 46:18-49:2. In fact, he could not identify any documents or even the time period in which those documents would have existed. *Id.* at 58-65; *see also* Ex. 1-P, Anderson Dep. at 228:10-229:2 (Nestle's 1st Rule 30(b)(6) witness testifying that he was unable to point to any specific documents that were lost). *And he made no effort to identify anyone involved in cost accounting at Nestle for either the Accused or Lightweight Litter.* Ex. 3-C, Tuffli Dep. at 89:2-11. Tuffli's testimony displays a remarkable lack of curiosity by he and Nestle concerning the circumstances of the "lost" documents.[22]

---

provided in the response] were calculated").

[22] Tuffli's deposition testimony (attached hereto in full, Ex. 3-C) is striking in the degree to which Nestle's counsel actively tried to prevent Oil-Dri from asking any questions: designed to flush out the details of what happened to the missing R&D cost documents for the Accused Products; or, to test the extent of Tuffli's actual knowledge on the subject (either his own or corporate knowledge gleaned from other Nestle employees), as

### B. Nestle Is Precluded By The Best Evidence Rule From Relying On R&D Cost-Estimates Based On A Product Other Than The Accused Products

Nestle should not be allowed to claim that it "lost" the actual records for R&D costs related to the Accused Products when, as shown by the Tuffli Rule 30(b)(6) deposition, Nestle did not conduct a reasonable search for those documents. *See* Fed. R. Evid. 1002 (best evidence rule); Fed. R. Evid. 1004(1) (other evidence of the contents of a writing may be admitted if the originals were lost, *unless the proponent lost or destroyed them in bad faith*") (emphasis added); *Urban v. United States*, 2005 U.S. Dist. LEXIS 14234, *7 (N.D. Ill. June 9, 2005) ("Evidence that a document was searched for *diligently* and not located is an accepted means of establishing that a document is lost.") (citing *Sylvania Elec. Prods., Inc. v. Flanagan*, 352 F.2d 1005, 1008 (1st Cir. 1965) (little evidence of a search and no evidence as to the extent of the search is insufficient); *Walters v. PDI Mgmt. Servs.*, 2004 WL 2137513, at *4 (S.D. Ind. June 14, 2004) (bare assertion that original document was lost is insufficient)).

The Court should disallow the surrogate cost estimates, and instruct the jury that Nestle did not produce any R&D cost documents related to the Accused Products. The Court should also disallow Nestle from arguing that *Oil-Dri is to blame* for its inability to produce those documents (although Nestle may argue that the documents are missing because of the passage of time).[23]

---

opposed to what he was merely told to say by Nestle's attorneys. Just one example: Nestle's attorney interjected the frivolous objection that the questioning exceeded the scope of the Rule 30(b)(6) deposition notice, when the deposition was pursuant to court order and not any Rule 30(b)(6) notice – for 9 out of 9 questions in a row (Ex. 3-C, Tuffli Dep., at 13:10-16:13). As the Court can see for itself, this pattern of obstructionism continued throughout the deposition.

[23] Oil-Dri's alleged delay in discovering and/or asserting infringement of the '019 Patent is the subject of Oil-Dri's summary judgment motion on Nestle's equitable estoppel defense. Apart from that defense, Nestle's repeated assertion on virtually every subject that *Oil-Dri is to blame* for the lapse of time between the start of Nestle's infringing activities and this lawsuit, *see* Ex. 1-N, 11/20/17 Tr., at 33 (Magistrate noting that Nestle was asserting "a laches argument" in defense to Oil-Dri's discovery), has no legal relevance to the issues in this case. *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954 (2017) (laches does not apply to a patent infringement action).

**C.      The Use Of Nestle's R&D Cost Estimates Would Be Unfairly Prejudicial**

Nestle's post-hoc R&D cost estimates made for purposes of this litigation that are not based on any actual data concerning the Accused Product should be held inadmissible for the additional reason that they are unfairly prejudicial to Oil-Dri.  These estimates are not based on the contents of any records concerning the Accused Products.  If Nestle used the '019 Patent to short-circuit its own R&D for the Accused Products, as Oil-Dri sought to discover, its actual R&D costs would likely be much lower than is R&D costs for a product like the Lightweight Litter, which presumably were developed without use of another's patented technology.  In other words, allowing Nestle to rely on such estimates at trial would permit Nestle to mask its use of the particle size teachings in the '019 Patent, enabling Nestle to unfairly and artificially elevate its R&D costs that are more than likely abnormally low.  Without a factual basis in the record for saying that Nestle's R&D costs for the Accused Products were in the normal range rather than being unusually low, Nestle's estimated costs based on its Lightweight Litter are speculative and unreliable, and therefore should not be allowed into evidence.  *See City of Gary v. Shafer*, 2009 U.S. Dist. LEXIS 47113, at *36 (N.D. Ind. June 2, 2009) (speculative evidence did not create genuine issue of material fact).

**IV.     MIL #4 TO EXCLUDE DEFENDANT'S "ENTIRE MARKET VALUE THEORY" EVIDENCE AND EXPERT TESTIMONY BASED ON IT**

Nestle's damages expert, Keith Ugone, intends to testify that the damages calculations of Oil-Dri's damage expert, Julie Davis, are inaccurate because they are based upon the entire market value of the Accused Products.  The facts on which Ugone bases his "entire market value theory" argument[24] were never disclosed to Oil-Dri in fact discovery, despite Oil-Dri having asked for them

---

[24] *See* Ex. 4-C, Ugone Report, ¶171(c) (asserting that Nestle "incorporates a number of product attributes for which there is consumer demand in the Accused Products that are unrelated to the claimed teachings of the ['019 Patent]," including "at least high clump strength, odor control/fragrance, quality packaging (e.g., ease of dispensing, litter tracking, and low dust levels"); *see also id.,* ¶¶171(d), (e).

through an interrogatory timely served on 7/19/17, *see* Ex. 4-A, Interr. 15. Nestle responded with a litany of objections (Ex. 4-B, at 7-8) concluding with the assertion that "responsive information will be provided by way of expert disclosures and reports" (*id.*, at 9). Ugone's testimony should be excluded for the same reasons discussed *supra* concerning Jenkins and Boxley (single sieve size testimony), Johnston (Clorox testimony), new R&D "facts" based on substitute products, and this Court's prior ruling regarding another Nestle witness (Clark, R619): Nestle is attempting to introduce facts purposefully withheld from Oil-Dri during fact discovery in violation of the Magistrate's repeated warning to Nestle that Oil-Dri was entitled to answers to its discovery requests prior to the close of fact discovery which sought key facts in the case, even if those facts would later be the subject of Nestle's experts' opinions. *See Henry*, *supra*, at 7.

**V.      MIL #5 TO PRELUDE NESTLE'S RELIANCE ON THE WESTERN AGGREGATE AND ALTERLINK LICENSES *FIRST RAISED* IN NESTLE'S EXPERT REBUTTAL REPORTS**

In opining on a reasonable royalty rate in this case, Nestle's Ugone in his rebuttal report relies on the Oil-Dri/Western Aggregate and Nestle/Alterlink license agreements (Ex. 5-A, Ugone Dep., at 97:4-16; Ex. 5-B, Ugone Report, ¶¶9a, 11d, 13b, 15c, etc.). In doing so, Ugone also relies on Jenkins' rebuttal report that these licenses concern "comparable" technology to the '019 Patent (Ex. 5-C, Jenkins Reb. Report, ¶¶154-158, 181-187). However, *none* of this potential testimony was addressed in Nestle's initial expert reports. In short, Oil-Dri and its experts have been sandbagged.[25] "The rebuttal expert report is no place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 2005

---

[25] In questioning Oil-Dri's damages expert (Julie Davis), Nestle's attorneys attempted to fault *Ms. Davis* for not opining on these licenses in her damages report. Ms. Davis correctly advised that she had no reason to believe these licenses concerned comparable technology, and thus had no reason to opine on them in her expert report (Ex. 5-D, Davis Dep., at 87:1 – 88:16, 99:13 – 100:3).

U.S. Dist. LEXIS 10692, at *5-6 (N.D. Ill. Feb. 22, 2005) (striking arguments regarding validity of patent claims, presented for first time in expert rebuttal report). Nestle's experts should not be permitted to rely on these licenses first addressed in their rebuttal reports.

## VI. MIL #6 TO PRECLUDE NESTLE FROM OFFERING REPUTATION-BASED EVIDENCE

Nestle intends to claim at trial that the commercial success of its Accused Products is due not to its use of the '019 Patent, but rather to Nestle's "well-established brand name and reputation" and the fact that the Accused Products are "high-quality products" ("reputational evidence").[26] Nestle will also seek to present reputational evidence to defend against Oil-Dri's claim of willful infringement. During the parties' meet-and-confer conferences, Nestle said that it intends to argue at trial that Nestle is a "good company" that "respects" the rights of other patentholders. But there is a great deal of counter evidence (*see* Appendix 1) in which Nestle has been charged with misconduct, both in and outside of the context of patent infringement.

Should Nestle be permitted to introduce evidence of its good reputation or brand strength for any reason, including to defend against willful infringement, Oil-Dri should be entitled to impeach that evidence with evidence of Nestle's bad acts in Appendix 1. *See* FRE 608(b). This should be especially true in the patent context, as Nestle's prior bad acts concerning patent matters are relevant Rule 404(b) evidence of Nestle's willful intent in this case to infringe the '019 Patent.[27] The notion

---

[26] *See* Ex. 6-A, Ugone Report, ¶¶ 9a(ii) (p.10:1-3 & fn 20), 11b (i & iii), 15a:4, 16c:5-7, 58c:5-7, 100:3, 104b, 113:2, 122:6-7, 124c:7, 157a:4, 174b .

[27] *See Zivits v. Greenberg*, 1999 U.S. Dist. LEXIS 19160, *12-13 (N.D. Ill. Dec. 3, 1999) (permitting prior bad acts similar to those occurring 15 months earlier, to show plan, intent, and knowledge to style allegedly illegal stock transactions as legitimate loans); *Shuffle Tech Int'l LLC v. Sci. Games Corp.*, 2017 U.S. Dist. LEXIS 141445, at *46-47 (N.D. Ill. Sept. 1, 2017) (permitting reference to past infringement of technology at issue, not to show character but rather to demonstrate knowledge of relevant prosecution references and intent to deceive USPTO).

of "where there's smoke there's fire" should be given weight, here, as it is in other areas of the law. *E.g., Williams v. City of Chicago,* 658 F. Supp. 147, 155 (N.D. Ill. April 7, 1987) (number of complaints versus police officer significant for sufficiency of *Monell* claim).

To be clear, Oil-Dri seeks to introduce this bad character evidence *only*: (1) as part of a separate presentation to the Court to show the egregiousness of Nestle's willful infringement to justify an additional punitive sanction,[28] and/or (2) if Nestle opens the door by introducing reputational evidence, such as to counter commercial success and/or to show due diligence and that it did not act recklessly in order to avoid a jury finding of willful infringement. *See Mahurkar v. C.R. Bard*, *Inc.*, Case No. 92 C 4803 (in patent infringement case, Judge Zagel granting infringer's MIL to preclude plaintiff from referring to infringer's criminal indictment, provided that infringer refrained from defending against commercial success and willful infringement allegations by relying on generalized reputational evidence).[29]

## VII. MIL #7 TO PRECLUDE NESTLE FROM OFFERING WITNESS TESTIMONY THAT WOULD ALLOW NESTLE TO USE THE ATTORNEY-CLIENT PRIVILEGE AS A SWORD

Neither side should reference Nestle's communications with attorneys, on the willfulness or any other issue, given that: (1) Nestle has waived the right to rely upon advice of counsel, per LPR 3.6(a); and (2) Oil-Dri is not allowed to use Nestle's "failure . . . to present such advice [of counsel] to the court or jury . . . to prove that [Nestle] willfully infringed the ['019] [P]atent."  35 U.S.C. § 298.

---

[28] *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co*., 2017 U.S. Dist. LEXIS 75517, *3 n.1 (E.D. Tex. May 18, 2017) (the Federal Circuit has treated the issue of willfulness as a question "for the finder of fact, with the ultimate decision on enhancement reserved for the court").

[29] Ex. 6-B consists of the parties' briefs and minute order in *Mahurkar* on this issue.  The undersigned was involved in the trial of the case, and can represent that Judge Zagel's order had 2 parts: (1) precluding reference to Bard's criminal indictment; (2) *unless* Bard opened the door by relying upon reputational evidence.  (The undersigned is still seeking the (archived) transcript where this was addressed by Judge Zagel.)

For example, Nestle's witnesses should not be permitted to suggest that infringement was "green-lighted" due to consultations with attorneys – should Nestle do that, that would "open the door" to use of Nestle's withheld opinions.[30]  *See In re Seagate Tech.,* 497 F.3d at 1372-73 ("principles of fairness . . . prevent a party from simultaneously using the privilege as both a sword and a shield").[31]

## VIII.  MIL #8 TO LIMIT THE INFRINGEMENT ANALYSIS TO THE ACCUSED PRODUCTS PROVIDED DURING THE KING WILLIAM INSPECTION

During discovery, in order to limit Oil-Dri's physical inspection to a single facility, Nestle said: "Purina manufactures the accused products at three facilities," and that "*all three facilities employ the same manufacturing process.*" (R240-17, 9/15/17 Williamson Letter, p.5; emph. added). Earlier, on 10/10/17, Nestle produced clay samples but only advised that these samples "are used prior to the manufacture" of the Accused Products (Ex. 8-A).  When Oil-Dri sought more information about where these samples had been procured, it was again told only that these samples "exist before the accused products are manufactured" (R240-19, 11/14/17 Williamson email, p.2).  When Oil-Dri filed a motion to compel a second plant inspection (R240, at 11-12), Nestle argued against the inspection (R248, at 8-10), and again stated: "Purina's counsel advised Oil-Dri's counsel that "*all three facilities employ generally the same types of equipment and processes* for manufacturing the accused products" (R248-8, ¶2, pp. 2-3; emph. added).  Based on these representations, the Magistrate denied Oil-Dri's request for inspection of the second plant (R279, (4)).  In short, Nestle was able to

---

[30] *See Hologic, Inc. v. Minerva Surgical, Inc.*, 2018 U.S. Dist. LEXIS 113051, at *6-7 (D. Del. July 9, 2018) ("the protection granted by 35 U.S.C. § 298 dissolves in the event defendants 'open the door' by attempting to refute a claim of willful infringement by implying that they relied on the advice of counsel"); *LifeNet Health*, 2014 U.S. Dist. LEXIS 154481, *14 (E.D. Va. Oct. 31, 2014) (quoting *Ultratec, Inc. v. Sorenson Communics., Inc.,* 2014 U.S. Dist. LEXIS 141428 *7 (W.D. Wis. Oct. 3, 2014) (same)); *DSM IP Assets, B.V. v. Lallemand Specialties, Inc.*, 2018 U.S. Dist. LEXIS 68504 *56 (W.D. Wis. Apr. 24, 2018) (same).

[31] Separately, as to whether Oil-Dri may rely on a redacted version of Nestle's privilege log, either for impeachment or to refresh recollection, or else affirmatively to establish the dates and participants (other than attorneys) discussing the '019 Patent for purposes of Oil-Dri's willful infringement claim, the parties attempted to reach agreement on this issue but were unable to do so.

successfully hide where the non-swelling clay samples from the Bloomfield facility that Nestle's attorneys had provided to Oil-Dri, had been procured.

Given the history of Nestle's representations that the manufacturing processes for Nestle's Bloomfield facility was not materially different from its King Williams facility and the denial of further discovery to Oil-Dri on this basis, Nestle should not be permitted to argue that any alleged variances in its Accused Products at its Bloomfield plant, as opposed to those at the King William plant (where Oil-Dri was able to identify the locations of its samples), evidence that it is not infringing[32].

## IX. MIL #9 TO EXCLUDE REFERENCE TO THE LIGHTWEIGHT LITIGATION

There is no reason for Nestle to reference Oil-Dri's previous, unrelated patent litigation against Nestle concerning a different (lightweight) litter, filed 9/23/16 and voluntarily dismissed 6/16/17 (Case No. 1:16-cv-09179, Kendall, J.), other than to unfairly prejudice Oil-Dri.

## X. CONCLUSION

For the foregoing reasons, Oil-Dri respectfully requests that the Court grant its Motions in Limine and enter the attached Proposed Order (Ex. 10-A). Oil-Dri reserves the right to seek further evidentiary rulings based on the Court's decisions on the pending summary judgment motions.

Dated: February 22, 2019                    Respectfully submitted,

                                            /s/ Michael P. Mazza/
                                            Michael P. Mazza, No. 6201609
                                            Lynn D. Moffa, No. 6197181
                                            Paul R. Hale, No. 6320732
                                            Michael P. Mazza, LLC
                                            686 Crescent Blvd.
                                            Glen Ellyn, Illinois 60137-4281

---

[32] This should be particularly true given that Nestle's Rule 30(b)(6) witness, Nathan Huck, testified that Nestle's particle sizing practices were the same, using the same Nestle written specifications, for each plant. *See supra*, MIL#1, at 5, above.

Phone: (630) 858-5071
Fax: (630) 282-7123
Email: mazza@mazzallc.com
lynn@mazzallc.com
paul@mazzallc.com

Shawn M. Collins, ARDC #6195107
Robert L. Dawidiuk, ARDC #6282717
Jeffrey M. Cisowski, ARDC #6308759
THE COLLINS LAW FIRM, P.C.
1770 Park Street, Suite 200
Naperville, IL 60563
Tel: 630-527-1595
E-mail: shawn@collinslaw.com
rdawidiuk@collinslaw.com
jcisowski@collinslaw.com

**Attorneys for Plaintiff**
**Oil-Dri Corporation of America**

## STATEMENT REGARDING THE
## PRETRIAL DUTY TO MEET AND CONFER

Pursuant to this Court's Pretrial Order guidelines, counsel for Oil-Dri hereby state that they have conferred with counsel for Nestle and that the matters raised in each of the above motions in limine are actually in dispute – that is, Nestle actually intends to offer the evidence that Oil-Dri seeks to exclude (*see* M&C Ex. 1, email correspondence, dated 2/4/19 – 2/21/19 (key meet and confer emails and attachments are highlighted for emphasis)).

Dated: February 22, 2019

Respectfully submitted,

/s/ Michael P. Mazza/
Michael P. Mazza, No. 6201609
Lynn D. Moffa, No. 6197181
Paul R. Hale, No. 6320732
Michael P. Mazza, LLC
686 Crescent Blvd.
Glen Ellyn, Illinois 60137-4281
Phone: (630) 858-5071
Fax: (630) 282-7123
Email: mazza@mazzallc.com
      lynn@mazzallc.com
      paul@mazzallc.com
Shawn M. Collins, No. 6195107
Robert L. Dawidiuk, No. 6282717
Jeffrey M. Cisowski, No. 6308759
The Collins Law Firm, P.C.
1770 Park Street, Suite 200
Naperville, IL 60563
Tel: 630-527-1595
E-mail: shawn@collinslaw.com
      rdawidiuk@collinslaw.com
      jcisowski@collinslaw.com

**Attorneys for Plaintiff Oil-Dri**
**Corporation of America**

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electric Filing to all counsel of record who have consented to service by such means.

 Michael P. Mazza

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Oil-Dri Corporation of America | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:15-cv-01067 |
| | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| Nestlé Purina PetCare Company | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT LIST**

**MIL#1**

Ex. 1-A – Excerpts of 11/26/18 Boxley Report, and Boxley Ex. M

Ex. 1-B – Excerpts of 11/26/18 Jenkins Rebuttal Report

Ex. 1-C – '019 Patent

Ex. 1-D – "A" numbered written discovery responses and requests

Ex. 1-E – Oil-Dri's 9/7/17 inspection notice

Ex. 1-F – Nestle' objections to Oil-Dri's 9/7/17 inspection notice

Ex. 1-G – Counsel email correspondence, dated 11/2/17-11/3/17

Ex. 1-H – Excerpt of 5/16/18 Court Transcript

Ex. 1-I – Late-produced Jenkins Clorox documents and corresponding report excerpts (cited at Appendix 2) that Oil-Dri seeks to exclude, not including Ex. 1-EE.

Ex. 1-J – Excerpts of Greene Dep.

Ex. 1-K – Excerpts of Marx Dep.

Ex. 1-L – Excerpts of Job Dep. and Job Dep. Exhs. 10-11

Ex. 1-M – Excerpts of 11/2/17 Court Transcript

Ex. 1-N – Excerpts of 11/20/17 Court Transcript, and Minute Order (R190)

Ex. 1-O – Oil-Dri's 12/18/17 Rule 30(b)(6) deposition notice

Ex. 1-P – Excerpts of Anderson Dep.

Ex. 1-Q – Excerpts of 2/22/18 Court Transcript

Ex. 1-R – 2/22/18 Minute Order (R313)

Ex. 1-S- 4/16/18 Job Declaration

Ex. 1-T – Counsel email correspondence, dated 3/30/18

Ex. 1-U – Excerpts of Huck Dep.

Ex. 1-V – Huck Dep. Exs. NH3A-NH3C

Ex. 1-W – Huck Dep. Ex. NH4

Ex. 1-X – Excerpts of Jenkins Opening Report, and Exhibits 35-37

Ex. 1-Y – Excerpts of Jenkins Dep., and DJ Ex. 10

Ex. 1-Z – Greene Dep. Exs. PG25-PG28

Ex. 1-AA – Nestle product formations (Nestle 272 – 274)

Ex. 1-BB – '091 Pattengill Patent

Ex. 1-CC – Clorox memo dated 7/12/93

Ex. 1-DD – Counsel email correspondence, dated 11/10/18

Ex. 1-EE – Counsel email correspondence with attached late Clorox documents, dated 10/19/18

Ex. 1-FF – Oil-Dri's 3/15/17 Int. No. 8 and RPD No. 13 (both requesting prior art)


**MIL#2**

Ex. 2-A – Excerpts of Dickinson 10/29/18 Report

Ex. 2-B – Excerpts of Dickinson testimony in *Asghari-Kamrani v. United Services Automobile Assoc.,* Case No. 2:15-cv-478-RGD-RJK (E.D. Va.)


**MIL#3**

Ex. 3-A – Excerpts of Ugone 11/26/18 Report

Ex. 3-B – Oil-Dri's 7/19/17 Int. #17 and RPD #29

Ex. 3-C – Full Tuffli Dep.

Ex. 3-D – Nestle's 1/8/18 Supp. Response to Int. #17

Ex. 3-E – Nestle's 8/18/17 Response to Int. #17

Ex. 3-F – Excerpts of Oil-Dri's 5th MO to Compel (R240)

Ex. 3-G – Excerpts of 2/2/18 Court Transcript

Ex. 3-H – Nestle's 3/2/18 Supp. Response to Int. #17

Ex. 3-I – Excerpts of Oil-Dri's 11/16/17 3rd Motion to Compel

**MIL#4**

Ex. 4-A – Oil-Dri's 7/19/17 Int. No. 15

Ex. 4-B – Nestle's 8/18/17 Response to Oil-Dri's 7/19/17 Int. No. 15

Ex. 4-C – Excerpts of Ugone 11/26/18 Report

**MIL#5**

Ex. 5-A – Excerpts of Ugone Dep.

Ex. 5-B – Excerpts of Ugone 11/26/18 Report

Ex. 5-C – Excerpts of Jenkins 11/26/18 Report

Ex. 5-D – Excerpts of Davis Dep.

**MIL#6**

Ex. 6-A – Excerpts of Ugone 11/26/18 Report

Ex. 6-B – Reputation evidence briefs from *Mahurkar v. Bard* (Hon. Zagel), and Order (R485)

**MIL#7**          **(No exhibits)**

**MIL#8**

Ex. 8-A – Nestle's 10/10/17 letter regarding clay samples

**MIL#9**          **(No exhibits)**

**Proposed Order**

Ex. 10-A – Proposed Order

**M&C Ex. 1** – counsel emails regarding Court ordered meet and confer, dated 2/4/19 – 2/21/19

**Appendix and Exhibits**

Appendix 1 – Nestle "Bad Acts" (patent-related and non-patent-related)

      Appx. Ex. 1 – Excerpts of Watt Dep.

      Appx. Ex. 2 – Articles of Nestle bad acts

Appendix 2 – Agreed/Objected-to Portions of Jenkins Expert Reports

Appendix 3 – Excerpts of Boxley Report versus Huck (contradictory) testimony