**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Oil-Dri Corporation of America, | ) | |
| | ) | No. 1:15-cv-01067 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| Nestlé Purina PetCare Company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**OIL-DRI'S RESPONSE TO NESTLE PURINA'S**
**_DAUBERT_ MOTIONS AND MOTIONS IN LIMINE**

# TABLE OF CONTENTS

I.     NESTLE'S *DAUBERT* MOTION REGARDING THE GOSS TESTING .........................1

II.    NESTLE'S *DAUBERT* MOTION TO EXCLUDE OIL-DRI'S DAMAGES EXPERT JULIE DAVIS.............................................................................................2

III.   NESTLE'S *DAUBERT* MOTION REGARDING OIL-DRI'S DAMAGES EXPERT JT HARRISON ..........................................................................................7

IV.   NESTLE'S MIL #1 TO EXCLUDE EVIDENCE OF IPR PROCEEDINGS ....................9

      A.     Relevance ...................................................................................................9

      B.     Prejudice .................................................................................................11

V.     NESTLE'S MIL #2 TO PRECLUDE OIL-DRI'S USE OF NESTLE'S PRIVILEGE LOG..........................................................................................................12

VI.    NESTLE'S MIL#6 TO PRECLUDE DR. GOSS' INFRINGEMENT OPINIONS ..........15

VII.   NESTLE'S MIL#7 TO PRECLUDE EVIDENCE OF NESTLE'S SIZE & WEALTH........................................................................................................................16

VIII.  NESTLE'S MIL#8 TO PRECLUDE CORRECTIONS TO DR. JOHNSTON'S REPORT AND HIS 1/7/19 DECLARATION ................................................................18

IX.    NESTLE'S MIL#9 TO PRECLUDE OIL-DRI'S PHYSICAL SAMPLE OF NESTLE'S CANADIAN MAXX SCOOP........................................................................19

X.     CONCLUSION.........................................................................................................20

APPENDIX 1

i

# TABLE OF AUTHORITIES

*Cases*                                                                  *Page(s)*

*ABS Global, Inc. v. Iguran, LLC,* 14-CV-503, Dkt. 576
    (W.D Wis. July 25, 2016) ...................................................................11

*Acantha LLC v. DePuy Orthopaedics Inc.*, 2018 U.S. Dist. LEXIS 89854
    (E.D. Wis. May 30, 2018) ...............................................................11

*Accent Packaging, Inc. v. Leggett & Platt, Inc.,* 707 F.3d 1318, 1327 (Fed. Cir. 2013) ...............1

*Adams Laboratories, Inc. v. Jacobs Eng'g Co*., 761 F.2d 1218 (7th Cir. 1985) ...........................16

*Astrazeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1338 (Fed. Cir. 2015) ...................................3, 6

*Callaway Golf Co. v. Acushnet Co*., 576 F.3d 1331 (Fed. Cir. 2009) ...........................................11

*Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 898 F. Supp. 1334 (N.D. Iowa 1995) ........17

*Deere & Co. v. Int'l Harvester Co.,* 710 F.2d 1551 (Fed. Cir. 1983) ...........................................17

*Eli Lilly & Co. v. Perrigo Co.*, 202 F. Supp. 3d 918 (S.D. Ind. 2016) ...........................................2

*Eli Lilly & Co. v. Teva Pharms. U.S., Inc.*, 657 F. Supp. 2d 967 (S.D. Ind. 2009) .....................20

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, 2018 WL 2149736
    (E.D. Tex. May 10, 2018) ...............................................................17

*Estate of Escobedo v. Martin*, 702 F.3d 388 (7th Cir. 2012) ........................................................18

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group, LLC*,
    879 F.3d 1332 (Fed. Cir. 2018) .........................................................4

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) .............17

*Heckler & Koch, Inc. v. German Sport Guns Gmbh,* 2014 U.S. Dist. LEXIS 200643
    (N.D. Ind. May 15, 2014) ...............................................................14

*Huawei Techs. Co. Ltd v. T-Mobile US, Inc.*, 2017 WL 7052463 (E.D. Tex. Sept. 20, 2017) ......14

*Hunting Energy Servs. v. Kavadas*, 2018 U.S. Dist. LEXIS 161416
    (N.D. Ind. Sept. 20, 2018)...............................................................1, 2, 8

*Isbell v. John Crane, Inc.*, 74 F. Supp. 3d 893 (N.D. Ill. 2014).....................................................16

*K-TEC, Inc. v. Vita-Mix Corp.,* 696 F.3d 1364 (Fed. Cir. 2012) ................................................9, 11

*Kellogg v. Nike, Inc.*, 2008 WL 4216130 (D. Neb. Sept. 12, 2008) ...............................................14

*Magna Elecs., Inc. v. TRW Auto Holdings Corp.*, 2016 U.S. Dist. LEXIS 156779
    (W.D. Mich. Jan. 28, 2016) ................................................................................................ 11-12

*Mattenson v. Baxter Healthcare Corp.*, 2003 WL 22839808 (N.D. Ill. Nov. 26, 2003)...............14

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.,* 2017 U.S. Dist. LEXIS 168504
    (E.D. Wis. Oct. 12, 2017) ................................................................................................... 11-12

*Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 2417367 (E.D. Tex. June 14, 2011)....................5

*Nestle Purina Petcare Co. v. Oil-Dri Corp. of Am.,* 2018 U.S. App. LEXIS 15861
    (Fed. Cir. June 11, 2018) ............................................................................................................10

*Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,*
2006 WL 3782994 (N.D. Ill. Dec. 21, 2006) ...............................................................................14

*Oracle Am., Inc. v. Google Inc.,* 2012 U.S. Dist. LEXIS 688
    (N.D. Cal. Jan. 4, 2012) ..................................................................................... 9-10, 11, 12

*Oshana v. Coca-Cola Co.*, 2005 U.S. Dist. LEXIS 14184 (N.D. Ill. July 13, 2005) ....................8

*Polaris Indus. v. Arctic Cat, Inc.*, 724 Fed. Appx. 948 (Fed. Cir. 2018)................................10, 11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
    904 F.3d 965 (Fed. Cir. 2018)...................................................................................................4, 6

*Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995) ........................................................3

*SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ....................................................................10

*Sciele Pharma, Inc. v. Lupin Ltd*., 684 F.3d 1253 (Fed. Cir. 2012)................................................9

*Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2018 U.S. Dist. LEXIS 71492
    (N.D. Ill. Apr. 29, 2018) ...............................................................................................................7

*Siemens v. Seagate Tech.,* 2009 U.S. Dist. LEXIS 132522 (C.D. Cal. Apr. 27, 2009) ................14

*StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.* 2015 U.S. Dist. LEXIS 79971
    (M.D. Fla. June 19, 2015).............................................................................................................11

*Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, 2004 U.S. Dist. LEXIS 20845
    (N.D. Ill. Oct. 14, 2004)...............................................................................................................18

*Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F. Supp. 2d 780 (S.D. Tex. 2010) ...........................11

*Ultratec, Inc. v. Sorenson Comms., Inc.*, 2014 WL 5023098 (W.D. Wis. Oct. 8, 2014)...............11

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)............................................3

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 2014 U.S. Dist. LEXIS 182755
    (C.D. Cal. Apr. 21 2014).............................................................................................................11

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*,
    561 Fed. Appx. 934 (Fed. Cir. 2014)..........................................................................................3

*Urban v. U.S.*, 2005 U.S. Dist. LEXIS 14234 (N.D. Ill. June 9, 2005)..........................................19

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 2018 U.S. Dist. LEXIS 106970
    (N.D.N.Y. June 27, 2018)..........................................................................................................14

*Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255 (Fed. Cir. 2013)......................................2

*VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308 (Fed. Cir. 2014)...........................................................5

### *Statutes & Rules*

35 U.S.C. § 102.................................................................................................................................19

35 U.S.C. § 315..........................................................................................................................10, 11

35 U.S.C. § 298.................................................................................................................................13

Fed. R. Civ. P. 26...............................................................................................................................2

Fed. R. Civ. P. 30.......................................................................................................................8, 19

Fed. R. Civ. P. 807........................................................................................................................*14*

### *Secondary Sources*

Joseph Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*,
    21 Fed. Cir. B.J. 539 (2012) (Ex. P) ........................................................................................10

I.    **Nestle's *Daubert* Motion Regarding the Goss Testing**

When he had no access to the precursor clays, Goss performed testing of Nestle's agglomerated granules to satisfy Oil-Dri's reasonable pre-lawsuit belief of infringement. In his report, Goss cites similar tests he repeated post-filing (Ex. A, Goss Report ¶¶16, 17, 18 (first sentence), and Tab E). Once Oil-Dri obtained Nestle's precursor clay materials late in discovery, Goss confirmed his preliminary conclusions (*id.,* ¶18 and Tabs E, Y-Z). It is now unnecessary for infringement purposes for Goss to rely on his earlier testing. But Oil-Dri may wish to present evidence of the post-composition testing as background information regarding the proof difficulties it encountered prior to filing this lawsuit.

Nestle says Goss' post-composite testing methodology is unreliable. R648 at 1-5. Goss' testing[1] estimates the MPS of the clay constituents of Nestle's agglomerated granules by scraping portions of those granules and examining those scrapings under a microscope. While less than ideal, this was the only method available to Goss at the time. The method was devised by Goss, who is an expert in the field, in the face of a problem to which there was no established answer. *See* Ex. B, Goss 10/25/17 Dep. at 125-29; 132-37. The results of Goss' post-composition testing were statistically-meaningful (Ex. T, Goss 12/5/18 Dep. 170:10-24) and later confirmed by calculations using Nestle's precursor clays (Ex. A, Goss Report, ¶18).

Goss' testing is not so unreliable as to warrant its exclusion. *See Hunting Energy Servs. v. Kavadas*, 2018 U.S. Dist. LEXIS 161416 *36-40 (N.D. Ind. Sept. 20, 2018) (rejecting criticisms of

---

[1] It is wrong to label Goss' testing, as Nestle does, as being "destructive." The focus of Goss' testing was not to establish that the Accused Products satisfied the "particulate" limitation of Claim 1 but rather to establish the MPS ratio limitation. And unlike *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1327 (Fed. Cir. 2013), the case on which Nestle relies, Goss did not alter the Accused Products and then opine that they satisfied the MPS ratio limitation *in their altered state*. Instead, Goss' testing caused a change in the Accused Products to determine their qualities in their *unaltered* state. *See* Ex. B, Goss 10/25/17 Dep. at 139 (opining based on his expertise in the field that his testing was sufficiently accurate to predict what the MPS values were for the Accused Products in their pre-composition state, an opinion confirmed once Goss was able to calculate the pre-composition MPS of Nestle's precursor ingredients).

expert's methodology based on absence of evidence regarding peer review of testing method and other established factors; "the test of reliability is flexible," and "*Daubert's* list of specific factors neither necessarily or exclusively applies to all experts or in every case"); *Eli Lilly & Co. v. Perrigo Co.*, 202 F. Supp. 3d 918, 1013-14 (S.D. Ind. 2016) (expert's "at-home testing methods" "based on personal observations" not inherently unreliable" as this could be tested on cross-examination).

## II.   Nestle's *Daubert* Motion to Exclude Oil-Dri's Damages Expert Julie Davis

Nestle argues that the testimony of Oil-Dri's damages expert, Julie Davis, should be excluded because she fails to apportion the royalty base to align the "incremental value" of the '019 Patent with the total value of the clumping animal litter to which it applies. R648 at 6. According to Nestle, the only way a patentee can avoid apportionment is by properly invoking the Entire Market Value Rule ("EMVR"), which Davis purportedly has not done here.

As an initial matter, Nestle should be precluded from offering evidence or argument concerning apportionment and the EMVR because of its total failure to respond to Oil-Dri's discovery requests, as set forth in Oil-Dri's MIL #4 (R654 at 15-16). Nestle misrepresents what happened in discovery, and suggests Oil-Dri is at fault for not filing more than the five motions to compel it filed to combat Nestle's discovery misconduct. *See* R648 at 11. But the Magistrate repeatedly warned Nestle it could not wait until expert discovery to disclose facts and Nestle had a continuing duty under Rule 26(e) to supplement, which it did not do. *See Hunting Energy Servs.,* 2018 U.S. Dist. LEXIS 161416 *19-20 (that discovery deadline has passed does not absolve defendant from violating a previous court order to compel and its Rule 26(e) obligation to supplement its discovery responses; "defendant[ ] cannot get off scot-free for these violations and avoid producing these relevant materials just because [it] [was] able to run out the clock on the discovery period through [its] own neglect"). But even if the Court were to allow Nestle to violate its discovery obligations and sandbag Oil-Dri like it has done, Nestle badly mischaracterizes and misapplies the law of apportionment and EMVR.

*First,* the EMVR only applies when "a patentee seeks damages on unpatented components sold with a patented apparatus." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). When that is the case, a patentee may "assess damages based on the [EMV] of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (internal quotation marks omitted). But a threshold question here is whether the EMVR even applies. The clumping animal litter of the '019 Patent, like the pharmaceutical subcoating at issue in *Astrazeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1338 (Fed. Cir. 2015), "cover[s] the infringing product as a whole, not a single component of a multi-component product." In *Astrazeneca*, the plaintiff's patents covered the entire product, like here, and the court held that "[t]his case does not fit the pattern in which the entire market value rule applies." *Id.* Nestle's attempt to characterize the Accused Products as "multi-component" is belied by the plain language of the claims, this Court's summary judgment opinion (R647 at 2), and common sense. Like the patents in *Astrazeneca*, the '019 Patent unambiguously covers the entirety of the Accused Products.

*Second,* although the Federal Circuit held that the EMVR did not apply in *Astrazeneca*, it went on to explain that "[w]hen a patent covers the infringing product as a whole, and the claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the conventional elements recited in the claim, standing alone." 782 F.3d 1324. But the court then found that the *Georgia-Pacific* reasonable royalty analysis takes account of whatever apportionment is required by this principle. *Id.; see also Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc*., 561 Fed. Appx. 934, 950 (Fed. Cir. 2014) ("guard[ing] against compensation for more than the added value attributable to the invention" is "precisely what the *Georgia–Pacific* factors purport to do"). Davis has done exactly that, most directly through *Georgia-Pacific*'s Factor 13, i.e, considering what "portion of the realizable profit [

] should be credited to the invention as distinguished from non-patented elements … [or other features]." Ex. C, Davis Report at 46.[2]

Davis' apportionment analysis is consistent with the Federal Circuit's decision in *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Group, LLC,* 879 F.3d 1332, 1348 (Fed. Cir. 2018) (court rejecting defendant's argument that plaintiff's damages expert failed to properly apportion the value of the patented baffle from other features of the claimed lawn mower, as apportionment "can be addressed in a variety of ways, including by careful selection of the royalty base to reflect the value added by the patented feature). The court noted that using the accused lawn mower sales as the royalty base was "particularly appropriate" in that case because the asserted claim was "directed to the lawn mower as a whole." *Id.* Nestle suggests that this portion of *Exmark* has been superseded by *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 904 F.3d 965, 978 (Fed. Cir. 2018), which supposedly "clarified that patentees cannot choose any royalty base so long as they attempt to apportion the royalty rate." R648 at 10-11. *Power Integrations*, however, involved a multi-component product, and the court merely held that, first, the patentee must separate out the smallest salable unit attributable to the patented technology, and only then may it use royalty rate to account for the relative value of the conventional elements within that smallest unit. 904 F.3d at 977. Like *Exmark,* however, the asserted claim here is directed to the product as a whole, and as a result, there is no smaller saleable unit to separate out before apportionment of added value through *Georgia-Pacific* selection of a reasonable royalty rate.

---

[2] For example, Davis considers Nestle's position that other "unpatented features" of the Accused Products—or indeed, even other of Nestle's patents—should affect the royalty base. *See* Ex. C, Davis Report at 47 (considering Nestle's claim that six of its own patents cover aspects of the Accused Litters, but noting that it is "Oil-Dri's position that the '019 Patent encompasses the technology of these patents (as practiced by [Nestle]"); *id.* at 27-28 (noting that Nestle's claimed benefits of the Accused Products—crumble-free performance, odor control, dust control, and easy maintenance—are all "enabled by [Nestle's] use of the '019 patented technology").

Another way in which Davis apportioned the '019 Patent is through the use of a reduced royalty base (excluding $567 million from that base by use of Nestle's "Net Net Sales," which accounts for performance trade allowances for Nestle's investments in promotion, marketing, and advertising, *id.* at 47).[3]  A damages expert "may use the [EMV] of the accused products in calculating the reasonable royalty because it is economically justified" in instances where comparable licenses are based on a percentage of the total sales price.  *Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 2417367 *2 (E.D. Tex. June 14, 2011).  Both Davis and Nestle's damages expert, Ugone, relied on license agreements that contained "net sales" royalty bases.  For example, Oil-Dri licensed the Hughes '803 Patent[4] in 1996, paying a 3% royalty rate across all "Net Sales."  Ex. C, Davis Report at 20-21.  Similarly, in the settlement of a clumping cat litter patent lawsuit, Oil-Dri agreed to pay a 4% royalty rate on all net sales.  *Id.* at 22.  Nestle's 2002 and 2014 General License Agreements also apply a royalty rate across all net sales.  *See* Ex. D, Ugone Report at 14.  Ugone concedes the Nestle GLA would have been used by the parties at the hypothetical negotiation as a "reasonableness check."  *Id.* At least two other licenses considered by the parties' experts utilize a net sales royalty base. Substantially all of the remaining licenses are not apportioned, but rather apply a royalty rate across total litter weight.  Davis' use of Net Net Sales as a royalty base, rather than a basis for disqualification, is "economically justified."  *Mondis Tech., Ltd.*, 2011 WL 2417367 at *2.

*Third*, even applying the EMVR as Nestle would have it applied here does not lead to exclusion of Davis' testimony. Nestle quotes *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014), holding that to base royalties on the entire market value, the patentee must prove that the

---

[3] Nestle incorrectly states that Oil-Dri seeks $85 million in damages (R648 at 6) derived from $2.8 billion of Nestle's "total revenue" (*id.*, at 7-8), when Oil-Dri actually seeks a reasonable royalty of $73 million from $2.4 billion of Nestle's net-net sales.

[4] Nestle unsuccessfully attempted to invalidate the '019 Patent using the Hughes '803 Patent in the IPR, showing that Hughes is not comparable technology.

patented feature "drove demand for the entire product."  But Nestle points to certain generic components of the Accused Products, like color and "quality packaging."  R648 at 7 (arguing that the Accused Products "include a host of features" that are not covered by the '019 Patent, and then listing just four such features:  "fragrance, quality packaging, and colors," and the clays themselves).  But such generic features do not matter, as the Federal Circuit said in a case Nestle repeatedly (*id.* at 6, 8, 9, 10, 11) cites:

> In some circumstances, for example, where the other features are simply generic and/or conventional and hence of little distinguishing character, *such as the color of a particular product*, it may be appropriate to use the entire value of the product because the patented feature accounts for almost all of the value of the product as a whole.

*Power Integrations,* 904 F.3d at 978 (emphasis added).[5]

The patented features in the Accused Products, i.e., the clumping nature of the litter, is what drives the demand for the Accused Products as a whole.  The generic features Nestle mentions may contribute to consumer demand, but they do not create consumer demand separate from the clumping nature of the litter—if the litter doesn't clump, it won't sell, period.  As discussed above, Davis apportioned for certain features she deemed significant.[6]  Whether Davis apportioned appropriately is a question of weight, not admissibility.

---

[5] Nestle also relies on the clay components themselves as contributing to consumer demand separate from the clumping invention of the '019 Patent. *See* R648 at 6 (asserting that the '019 Patent "represents an alleged improvement to an existing product").  In this regard, Nestle appears to be attempting to resurrect its barred Section 101 defense.  *See* R571 (arguing that swelling and non-swelling clay "are found in nature, separately and together" and therefore the '019 is invalid).  Nestle also appears to be invoking an outdated iteration of the EMVR under which "a patentee owning an 'improvement patent' [seeks] to recover damages calculated on sales of a larger machine incorporating that improvement." *Astrazeneca,* 782 F.3d at 1338.  The Federal Circuit now recognizes that "all inventions are for improvements," and to "remov[e] the value of all of those ['old'] elements would mean that nothing would remain.  In such cases, the question is how much new value is created by the novel combination." *Id.*

[6] Even Nestle's damages expert Ugone doesn't apportion for some of Nestle's generic features.  For example, he mentions the phrase "quality packaging" only twice in his Report (Ex. D, Ugone Report, pp. 21 and 148), but never even attempts to apportion or account for that "feature" in his damages opinion.

### III.   Nestle's *Daubert* Motion Regarding Oil-Dri's Damages Expert JT Harrison

Oil-Dri's damages expert JT Harrison opines on Nestle's cost-savings from using the '019 Patent stemming from reducing transportation costs based on using less sodium bentonite. Ex. F, Harrison Report. Nestle incorrectly says Harrison's expert testimony should be excluded because he bases his opinion "on speculation about *Oil-Dri's* hypothetical savings had it made the Accused Products." R648 at 11 (emphasis in original). But instead, Harrison relies on publicly available sales data for *Nestle*, not Oil-Dri. *See* Ex. E, Harrison Dep. at 25-33. This criticism is particularly disingenuous because Nestle marked its relevant business records "Highly Confidential" and then refused to allow Harrison, an Oil-Dri employee, to review them.

Harrison's data comes from Nielson and other public sources on which industry experts frequently rely. In fact, Harrison's estimates versus Nestle's actual sales of Accused Products from 2013 to 2017, were very close (within 5.5%) (*compare* Ex. C, Davis Report at 28-29 *with* Ex. F, Harrison Report at Tab B). Harrison "did not 'rote adopt[]' these figures as [Nestle suggests]." *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2018 U.S. Dist. LEXIS 71492 *7-8 (N.D. Ill. Apr. 29, 2018) (Kennelly, J.) (cited by Nestle, R648 at 1). Harrison's estimates, as this Court has recognized, are "not a basis for excluding his testimony . . . [T]hese points are appropriately challenged by cross-examination and presentation of contrary evidence." *Id.* *8. Any adjustments deemed advisable in Harrison's calculations can be made for the jury once Nestle's actual sales figures are admitted into evidence.

Nestle also challenges Harrison's reliance on the figure 80% for the amount of NaB used by Nestle in its non-clumping animal litter. But any discrepancy between Harrison's 80% figure and the 70%-75% figure Nestle claims is the correct number goes to weight, not admissibility, and Harrison's estimates can easily be adjusted to reflect the lower figure if shown to be more accurate. Oil-Dri has good reason to question the accuracy of Nestle's lower figure, as the "formulation" sheets cited by

Nestle in support (R648, Nestle MIL at 12 n.7) appear from discovery to be unreliable (i.e., are they "final"?, what dates do they relate to?, etc., *see* R654, Oil-Dri's MIL#1 at 2-8), while Nestle's witnesses have repeatedly confirmed that the predecessor KLMS litter[7] used either 80% or 90% NaB, depending upon the formulation. Ex. G, Huck Dep. at 18:3-8; Ex. H, Raymond Dep. at 69: 1-3; Ex. I, P625-P628 (KLMS formulations showing this).

Finally, with respect to "[unspecified] facts that could alter [Harrison's] opinion" (R648 at 12), which Nestle argues Harrison failed to consider, Oil-Dri sought those facts in discovery but Nestle refused to provide them. *See* Ex. J (Nestle's 6/5/17 Response to Oil-Dri's (1) Doc. Prod. Requests ##25-26; Ex. K, Rule 30(b)(6) Deposition Notice). Aside from the fact that this argument goes purely to weight, not admissibility, Nestle should not be able to profit from its discovery abuse, as Oil-Dri has shown. R654, MILs 1-3; *supra* at pp. 2 (citing *Hunting Energy Servs.,* 2018 U.S. Dist. LEXIS 161416 *19-20).

In short, Harrison *is undeniably* an expert on the transportation issue on which he provided an opinion (he has been heavily involved in that issue for Oil-Dri, Ex. E, Harrison Dep. at 10:18-11:14; *see also* Ex. F, Harrison Report, ¶ 1). Nestle does not challenge Harrison's methodology, i.e., how he *used* those sales numbers. Any discrepancy in the numbers goes to weight, not admissibility. *See Oshana v. Coca-Cola Co.*, 2005 U.S. Dist. LEXIS 14184, *10-11 (N.D. Ill. July 13, 2005) ("Challenges addressing flaws in an expert's application of reliable methodology may be raised on cross-examination).

---

[7] Golden Cat allegedly manufactured KLMS. Ralston purchased Golden Cat in 1995, and Nestle acquired Ralston in 2001. Golden Cat became "Golden Products" and it is this Nestle division that developed and sold the Accused Products. So it appears reasonable to use the KLMS NaB levels as a predecessor product, for comparison to the NaB levels in the Accused Products. In any event, Nestle grossly overstates any "inflation" from using 80% rather than, say, 75%, while not providing any support for its numbers.

## IV.    Nestle's MIL #1 To Exclude Evidence of IPR Proceedings

Oil-Dri seeks to introduce evidence of the IPR proceedings to rebut Nestle's current invalidity contentions that the '019 Patent is anticipated by Pattengill or is obvious in light of Pattengill, Hughes and KLMS (*see* Ex. L, Nestle Am. Final Invalidity Contentions at 85-90). Nestle argues that any evidence relating to the IPR proceeding should be excluded as irrelevant and unduly prejudicial, R648 at 12-14, but neither is the case.

**Relevance:**  The Board found that Nestle had failed to "demonstrate[] a reasonable likelihood of prevailing on its argument that Pattengill anticipates" the '019 Patent, and thus declined to institute an IPR on that basis (Ex. M, 7/9/15 PTO Decision on Institution of *Inter Partes* Review ("DIPR") at 12). After instituting review solely on the basis of obviousness of Pattengill in combination with Hughes, the Board ultimately rejected that claim of invalidity, not *once* but *twice* (Ex. N; 6/20/16 PTO Final Written Decision ("FWD")); Ex. O 2/9/17 PTO Decision On Rehearing ("DOR")). While (due to non-institution), obviousness in light of Pattengill alone was not before the Board, Nestle nevertheless raised the issue and the Board addressed it, stating: "[W]e find that Pattengill [alone] does not render the challenged claims obvious, for the reasons discussed above [*i.e.,* in connection with Pattengill in combination with Hughes]" (Ex. N, FWD at 19:2-4).

The above rulings are clearly relevant here, as the Federal Circuit has explained:

[I]t may be harder to meet the clear and convincing burden when the invalidity contention is based upon the same argument on the same reference that the PTO already considered. Importantly, whether a reference was before the PTO goes to the weight of the evidence, and the parties *are of course free to*, and generally do, *make these arguments to the fact finder*.

*Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260-1261 (Fed. Cir. 2012) (emphasis added); *see also K-TEC, Inc. v. Vita-Mix Corp.,* 696 F.3d 1364, 1376 (Fed. Cir. 2012) ("it was not an abuse of discretion to allow the parties to discuss the extent to which the PTO had considered Ash or instruct the jury that Ash was before the PTO in the reexamination proceedings"); *Oracle Am., Inc. v. Google*

9

*Inc.,* 2012 U.S. Dist. LEXIS 688 *10-11 (N.D. Cal. Jan. 4, 2012) ("The '520 patent has finished reexamination with all asserted claims allowed. . . . It would be wrong to conceal this important information from the jury.").

Nestle's "non-final[ity]" argument (R648 at 12 & n.8) is seriously misleading. Its cases involve determinations prior to a final ruling by the Board. Here, the Board has issued a FWD, which is a final decision. *See* Ex. P, Joseph Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II,* 21 Fed. Cir. B.J. 539, 616 (2012) (The "effect [of a final written decision of the Board] is not delayed pending completion of an appeal to the Federal Circuit.").[8] Further, nothing about the remand order raises questions concerning the validity of the Board's previous FWD, which decision was not vacated by the Federal Circuit, *see Nestle Purina Petcare Co. v. Oil-Dri Corp. of Am.*, 2018 U.S. App. LEXIS 15861 *6 (Fed. Cir. June 11, 2018), and hence continues to be valid, following the Federal Circuit appeal and remand. Nestle ignores that its appeal was remanded by the Federal Circuit to allow the Board to enter a new FWD that included the non-instituted claims -- ensuring appropriate estoppel effect is given to all invalidity contentions raised by Nestle in the IPR proceeding. *Id.,* citing *Polaris Indus. v. Arctic Cat, Inc.*, 724 Fed. Appx. 948 (Fed. Cir. 2018) (per curiam).[9]

---

[8] Arguably, IPR estoppel should have applied here to preclude Nestle from relying on Pattengill as an invalidity defense because the Board actually considered that reference *during* the IPR proceeding, notwithstanding that it did not institute IPR review on that basis. *See* 35 U.S.C. § 315(e). Although earlier in these proceedings, Judge St. Eve rejected that argument, R140, 8/2/17 Order at 11, the law has changed since that ruling. *See infra* n. 9. This change will prevent in future cases the situation that occurred here from Judge St. Eve's interpretation of § 315(e) -- repetitive litigation over the same prior art references.

[9] As in *Polaris,* the triggering event for the Federal Circuit's remand here was the Supreme Court's intervening decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), which holds that the Board is statutorily precluded from instituting only partial *inter parties* review. As the *Polaris* court recognized, this new law will benefit patent owners because, previously, courts have held (as Judge St. Eve did in this case, *supra* n. 8) that invalidity grounds on which the Board declined to institute review were not foreclosed by § 315(e)(2), *even if* the Board addressed them and found them substantively lacking when declining to institute review. As the Federal Circuit explained: "[A] patent owner benefits from complete decisions because following a final

**Prejudice:** Nestle claims undue prejudice because of the different standards applicable in IPR proceedings versus this litigation, but just the opposite is true: here, the Board *upheld* the validity of the '019 Patent notwithstanding Nestle's *lower* burden of proof in those proceedings, making the Board's decision *more*, not less, probative of the validity issue and further eliminating any complexity that might otherwise be involved with corrective jury instructions (if any are even called for) because the differing standards of proof work in Nestle's favor and hence need not be explained. Nestle's cases are inapposite, as they involve a *patentholder* seeking to preclude the *alleged infringer* from introducing evidence of pending reexamination proceedings in support of the latter's argument of *invalidity*.[10] In that situation, an IPR *invalidating* a patent is significantly less probative in the parallel federal court litigation where (unlike in an IPR), there is a presumption of patent validity and a standard of clear and convincing proof to establish invalidity.

This distinction is what generally explains the different outcomes between cases in which courts allowed evidence of IPR proceedings versus cases in which they have excluded such evidence.[11] Indeed, the only case Nestle cites where the patentholder was precluded from presenting evidence of an IPR *upholding* a patent's validity is *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 2017

---

written decision on a claim, the petitioner . . . [is] largely barred from challenging that claim's validity." *Polaris,* 724 Fed. Appx. at 949 (citing § 315(e)(2)).

[10] *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1342-43 (Fed. Cir. 2009); *Acantha LLC v. DePuy Orthopaedics Inc.*, 2018 U.S. Dist. LEXIS 89854, *6-9 (E.D. Wis. May 30, 2018); *Magna Elecs., Inc. v. TRW Auto Holdings Corp.*, 2016 U.S. Dist. LEXIS 156779 *6-9 (W.D. Mich. Jan. 28, 2016); *Ultratec, Inc. v. Sorenson Comms., Inc.*, 2014 WL 5023098, at *3 (W.D. Wis. Oct. 8, 2014); *Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F. Supp. 2d 780, 794 (S.D. Tex. 2010). *ABS Global, Inc. v. Iguran, LLC*, 14-cv-503, Dkt. 576 (W.D Wis. July 25, 2016) (R648 at 13) is totally inapposite because the IPR proceedings at issue there concerned *different* patents than the ones pending in the federal litigation.

[11] *Compare* cases cited in n. 10 *with K-TEC, Inc.* and *Oracle Am., Inc.,* both cited *supra*, as well as *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 2014 U.S. Dist. LEXIS 182755, *18 (C.D. Cal. Apr. 21 2014) (rejecting defendant's argument against introducing evidence of the PTO's *rejection* of the defendant's *inter partes* review petition because "[a]ny potential confusion can be addressed by appropriate jury instructions"); *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.* 2015 U.S. Dist. LEXIS 79971, *22 (M.D. Fla. June 19, 2015) (same).

U.S. Dist. LEXIS 168504, *11-20 (E.D. Wis. Oct. 12, 2017) (R648 at 13), but there the court stressed as the basis for its decision that the prior art at issue in the IPR was *different* than the prior art at issue in the litigation.[12]  *See id.*, *20 (a "*caveat*" to the Court's exclusion ruling "*must be* that to the extent an examiner on reexamination looked at *the same prior art* being raised [in the litigation], *it is relevant* that the examiner did not invalidate the patent on that ground") (emphasis added).  The Board considered Pattengill during the IPR, and therefore even the *Milwaukee Elec.* court would permit the IPR evidence at trial.

Finally, even Nestle's cases acknowledge that evidence of the IPR may be used for other purposes, such as to show inconsistent statements made by one party in those proceedings.  *E.g., Magna Elecs.,* 2016 LEXIS 156779 *9; *see also Oracle Am., Inc.*, 2012 U.S. Dist. LEXIS 688, *12. Here, depending on what arguments the Court allows Nestle to make regarding the claim term "mean particle size"[13] (e.g. Nestle's expert should not be permitted to testify that MPS can be determined based solely on two or less sieve sizes, *see* R.654 (Oil-Dri MIL #1(A) at 1-2), the Board's decision also may be relevant to rebut those arguments or evidence.

## V.  Nestle's MIL #2 To Preclude Oil-Dri's Use Of Nestle's Privilege Log

Nestle argues that Oil-Dri may not rely on Nestle's privilege log in presenting evidence on the issue of Nestle's willful infringement of the '019 Patent.  R648 at 14.  Nestle is wrong for at least three reasons.

---

[12] *See Milwaukee Elec. Tool Corp.,* 2017 U.S. Dist. LEXIS 168504, *15, 18 ("even if the potentially different legal standards between the IPRs and this case may be explained through jury instructions, it is more important to appreciate that the prior art is different" and "discussing IPR proceedings will result in an unnecessary expenditure of time dedicated to explaining how decisions were rendered *on prior art references not at issue here*") (emphasis added).

[13] The Court expressly adopted the Board's construction of MPS (R533 at 7), and the Board's discussion of that issue provides clarification or guidance on how that construction should be applied to the claims in this case.  *See, e.g.,* Ex. N, FWD at 9-12, 15-16; Ex. M, DIPR at 9-10, 12; Ex. O, DOR at 3-5.

*First*, admitting the log will not "inform the jury that [Nestle] has chosen not to present advice of counsel, in violation of [35 U.S.C. § 298]." *Id.* As Oil-Dri informed Nestle in meet-and-confer discussions, Oil-Dri would redact any references on the log to attorneys or to "attorney-client privilege." *See* Ex. Q (proposed redacted version of privilege log). Nestle says redaction does not solve the § 298 problem because it "would mislead the jury by depicting the communications in a false light—that they were *not* made while seeking attorney advice." R648 at 14 n.11. But the jury would not be aware of any false depiction, so the "false light" is only from Nestle's perspective, not the jury's. And it is the product not of Oil-Dri's use of a redacted version of the log, but of Nestle's own choice to eschew reliance on an advice of counsel defense. *See* R654, Oil-Dri MIL#7 at 18-19 (Nestle should be barred from suggesting to the jury that it *did* consult with attorneys).

*Second*, Nestle's assertions that the log has "no probative value" (R648 at 14) and that Oil-Dri "does not need the log" are both false. The log shows the sheer number of times that key Nestle personnel – those involved in the development of the Accused Products and in the decision to manufacture and sell the Accused Products – were engaged in discussions concerning the '019 Patent.[14] This is crucial evidence relevant to Oil-Dri's willful infringement claim. Oil-Dri is entitled to present this level of detail rather than being forced to rely on a general statement that Nestle had corporate knowledge of the '019 Patent "by 11/01."[15] This detailed information is even more

---

[14] For example, (1) Phillip Greene, a key developer of the Accused Products and the lead inventor on Nestle's patent on the process for making them, is mentioned **7 times** during a key period of development of the Accused Products (from 11/9/01-1/23/02), as having discussed the '019 Patent; **3** more times (on 7/25/14 & 8/5/14 & 8/25/14) as having discussed "prior art litter"; and a dozen more times in 2014 having discussed "the Oil-Dri matter" (Ex. R, Nestle Privilege Log); (2) Marvin Raymond, former Chief Scientist for Golden Cat, discussed the '019 Patent **8** times from 11/9/01-11/21/01, and **2** more times on 8/22/14; (3) Cesar Mauras discussed the '019 Patent **8** times from 11/9/00-12/18/01 (1X re "EL" litter); (4) Jim Job discussed the '019 Patent **6** times from 11/12/01- 11/19/01, the "prior art" litters **4** times in 2014, and "the Oil-Dri matter" **20** times in 2014; and (5) James Kearbey discussed the '019 Patent **1** time on 12/18/01.

[15] The '019 Patent discussions among these key Nestle personnel as shown on the log were not just with attorneys, but with each other: in a number of these emails concerning the '019 Patent, *attorneys are not identified on the Log as even being involved*, *see e.g.,* Ex. R, at 1:5; 2:1; 2:2; 2:3; 3:3; 4:4.

important here given that two key Nestle witnesses, Greene and Raymond, each professed in their respective depositions not to "recall" discussing the '019 Patent, and then said (inconsistently) that they were "not concerned" about it, for vague reasons.[16]

*Third*, Nestle's reliance on *Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 2006 WL 3782994 (N.D. Ill. Dec. 21, 2006), is misplaced. There, admission was sought of an old, error-filled privilege log that had been replaced by a new, accurate log. The old log was found inadmissible as irrelevant and also due to jury confusion. *Id.* at *12. Here, Nestle has never informed Oil-Dri that its log is inaccurate in any way. *See Heckler & Koch, Inc. v. German Sport Guns Gmbh,* 2014 U.S. Dist. LEXIS 200643 *15-21 (N.D. Ind. May 15, 2014) (distinguishing *Old Republic* and concluding that log was relevant "to support inferences regarding when and to what exten[t] Iloff knew about HK USA's assignment of its IP rights to HK"); *Siemens v. Seagate Tech.,* 2009 U.S. Dist. LEXIS 132522 *18-22 (C.D. Cal. Apr. 27, 2009) (distinguishing *Old Republic,* concluding that log fell under residual hearsay exception of Rule 807 and did not violate best evidence rule; and finding log relevant to show fact of communications); *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 2018 U.S. Dist. LEXIS 106970 *39 (N.D.N.Y. June 27, 2018) (privilege log constitutes an "admission of a party opponent, and thus would not be hearsay").[17]

---

[16] *See* Ex. S, Greene Dep., at 190:13-192:15-16, 192:17-192:25 (not concerned about '019 during IPR); Ex. H, Raymond Dep., at 59:22-60:1; 60:8-14, 77:20-22 (Raymond never personally concerned about '019 Patent, but did not focus on its claims); *id.*, at 77:16-24, 79:19-23, 80:1-11, 80:17-24, 77:16-24, 82:3-7 (Raymond did not have a concern about the '019 Patent because the '570 patent describes "an entirely different invention").

[17] At the very least Nestle must admit (although it has refused to) that Oil-Dri is entitled to use the log to impeach or to refresh the recollection of witnesses. *See, e.g., Mattenson v. Baxter Healthcare Corp.*, 2003 WL 22839808 (N.D. Ill. Nov. 26, 2003) (allowing witness to be impeached with privilege log); *Kellogg v. Nike, Inc.*, 2008 WL 4216130, at *2-3 (D. Neb. Sept. 12, 2008) (permitting use of privilege log for impeachment in patent case when establishing if party consulted attorney before production of an alleged infringing product); *Huawei Techs. Co. Ltd v. T-Mobile US, Inc.*, 2017 WL 7052463, *1 (E.D. Tex. Sept. 20, 2017) (confirming privilege log may be used for impeachment purposes in patent case when witness denies meeting with an attorney for legal assessment of patent-in-suit).

14

## VI. Nestle's MIL#6 To Preclude Dr. Goss' Infringement Opinions

Nestle made four arguments to exclude Goss's infringement opinions (R648 at 17); it has since withdrawn one (*see* R660, withdrawing MIL #6 to preclude Goss's infringement opinions related to claims 30 and 32). Nestle's three remaining arguments are without merit.

*First*, as to Dr. Goss' claim construction (Ex. A, Goss Report ¶13 ("I have always believed that . . . Claim 1 . . . refer[s] to [the pre-mixed clays]"), the Court has ruled in favor of Oil-Dri on the this issue (R647 at 12-13). Accordingly, Goss's precursor clay interpretation of Claim 1 is proper.

*Second*, as to "predetermined" (R648 at 18), Dr. Goss' isolated use of the phrase "capable of" in two paragraphs of his report (Ex. A, ¶¶16-17) is not grounds for excluding his infringement opinions. Dr. Goss appropriately testifies as to how an MPS can be *actually determined* in advance of mixing, Ex. A, Goss Report, ¶¶15, 19, as well as to his findings "as shown at Tab Z" that the actual MPS of the Accused Products fall within the scope of Claim 1 (*id.*, ¶¶17-18 (relying on Tab Y, Nestle's pre-cursor ingredient specifications).[18] This methodology is consistent with the Court's definition of "predetermined" (i.e., decided upon in advance, R647 at 13), and there is no reason to exclude it. Further, nothing about these opinions is "tainted" by Goss's use of slightly off claim construction terminology in other parts of his report.[19]

---

[18] Even though Goss's infringement opinions in ¶¶16, 17, and the first sentence of ¶ 18 of his report are based on his testing of the post-composition clays, those opinions concern estimates of the precursor clay particle sizes and are not contrary to the Court's recent pre-composition ruling. *See* Ex. T, Goss 12/5/18 Dep. at 170:10-17 and Tab E. To the extent that Nestle argues that Goss's testing based on the final composition is *unreliable* (as opposed to contrary to the Court's claim construction), Oil-Dri addresses that issue *supra* at 1-2, in response to Nestle's first *Daubert* motion.

[19] Goss' declaration (from which his report was based in part) was prepared before the Court's claim construction ruling (R533). *See* R433, OA211-247. Goss' understanding of "predetermined" ("capable of being determined in advance") was not substantively different from what the Court ultimately ruled, only the Court held, correctly so, that Goss' verbiage was misleading and so adopted language ("actually determined in advance") that better described what Goss intended. That Goss failed to revise his old verbiage to reflect the Court's more precise and accurate terminology does not mean he intended an incorrect claim construction, as his report as a whole plainly shows (as discussed above) he did not. Dr. Goss will of course refrain from using the incorrect phrasing for "predetermined" when testifying at trial.

*Third*, Nestle argues that Dr. Goss should be precluded from testifying regarding Purina's '570 Patent. R648 at 18-19. While Oil-Dri does not agree that Goss' infringement opinions are improper as Nestle argues,[20] Oil-Dri agrees that, to avoid jury confusion in light of the Court's summary judgment ruling, it is proper for the Court to preclude *any* reference -- whether by Oil-Dri *or Nestle* -- to the '570 Patent for infringement-related purposes.[21]

## VII. Nestle's MIL#7 To Preclude Evidence Of Nestle's Size & Wealth

Evidence that is "unnecessary, inflammatory rhetoric," *Adams Laboratories, Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985), for one purpose may be relevant for another, as Nestle's own citations show. *See Isbell v. John Crane, Inc.*, 74 F. Supp. 3d 893, 898-99 (N.D. Ill. 2014). Nestle's request for a blanket prohibition against such evidence (R648 at 25) is over-broad.

Oil-Dri does not intend to discuss the *net worth* of Nestle or its Swiss parent in an attempt to *improperly* inflame the jury on the issue of damages. However, some of the relevant, *not unfairly* prejudicial, reasons Oil-Dri may wish to point out Nestle's size and/or wealth include: (1) whether it is believable that the *only* written record a company the size of Nestle has of the sieve sizes it uses for the non-swelling clay ingredients in its Accused Products (*crucial* information that would have to be conveyed in some form to various groups involved in the manufacturing process) is an informal *email* dated 13 years ago (Ex. A, Tab Y (NH4)) from an employee of Oil-Dri to a *relatively low level*

---

[20] The Court previously denied Nestle's motion attempting to preclude Oil-Dri from relying on the '570 Patent (R591). Further, at ¶25 of his Report (Ex. A), Dr. Goss notes that given exemplary clay particle sizes disclosed in the '570 Patent, a litter product "made according to the '570 Patent teaching … will fall within the scope of [Claim 1] … of the '019 Patent." Dr. Goss does *not* say that Nestle "infringes" because of the '570 Patent. ((At Nestle's citation to R632-2, Resp. DSAF ¶1, Oil-Dri states, *inter alia,* that Nestle's Boxley admits that the "specific mesh sizes identified by Dr. Goss [at ¶25 of the Goss Report] may meet the limitations of [Claim 1] of the '019 Patent" (citing to R625-10, Boxley Report, ¶104).) Should Nestle be permitted to suggest to the jury that Nestle "can't infringe because it has its own patent on its process," Dr. Goss' finding here can be used to refute that argument.

[21] As to damages, Oil-Dri's expert appropriately refers to the '570 Patent for features of Nestle's products that are relevant to his cost-savings calculations. *See* Ex. E, Harrison Report, ¶¶6-7.

*employee* of Nestle regarding an unrelated matter; (2) whether it is suspicious that a company the size of Nestle has not produced *a single written piece of evidence* showing how it came up with the sieve sizes it uses in manufacturing the Accused Products; (3) the fact that Nestle produced a document to show its R&D expenses that is extremely cursory and not of the type one would normally expect from a large multinational corporation; (4) whether Nestle might have thought it could get away with stealing the '019 invention because it is much bigger than Oil-Dri; (4) whether a company the size of Nestle, which saw itself as a market leader, could have been motivated to steal the '019 invention by its desire to re-capture the market lead in animal litters after having dropped to the number two position behind Clorox; and (5) the fact that Oil-Dri has about the same number of animal litter patents as Nestle, even though Nestle is a company about 300 times larger than it, showing that Oil-Dri was a leader in terms of such patents notwithstanding its much smaller size. In addition, both sides damages experts, in reaching their opinions in this case, have quite appropriately invoked, *inter alia*, the *Georgia-Pacific* factors, which make relevant many aspects of Nestle's size and wealth. *See* Appendix 1.[22]

Ironically, *a centerpiece of Nestle's defense is precisely its size and wealth,* especially compared to Oil-Dri's. Specifically, Nestle argues that the Oil-Dri's 3% royalty on net-net sales of Accused Products is too high, because those sales (says Nestle) are due not to the teachings of Oil-Dri's '019 Patent but rather Nestle's many millions in cash, reputation, and market place muscle (as

---

[22] Courts universally recognize that a defendant's overall revenues, market share, and wealth are relevant because they are factors that might influence the negotiating positions in a hypothetical negotiation over the reasonable royalty rate. *See Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1558-1559 (Fed. Cir. 1983) (finding that the accused infringer's profitability and wealth were relevant to determining a reasonable royalty); *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 898 F. Supp. 1334, 1336-38 (N.D. Iowa 1995) (denying motion in limine seeking to exclude testimony regarding the accused infringers' financial condition); *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, 2018 WL 2149736, *11 (E.D. Tex. May 10, 2018) (vacating a trial court's order granting a new trial on damages because the jury's damages verdict was supported by substantial evidence, including evidence of the accused infringer's profits and financial status).

compared to Oil-Dri's), which created those sales. *See* Appendix 1. When a party puts evidence at issue, that party must "accept the consequence[s]" of opening the door to that evidence. *Estate of Escobedo v. Martin*, 702 F.3d 388, 400–01 (7th Cir. 2012). If Nestle is entitled to present such evidence for its own relevant purposes, then certainly Oil-Dri should not be foreclosed from the same. *See Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, 2004 U.S. Dist. LEXIS 20845, at *25 (N.D. Ill. Oct. 14, 2004) (holding that "to the extent that Defendant places its wealth and/or power at issue, it may open the door to evidence on the issue").

## VIII.   Nestle's MIL#8 To Preclude Corrections To Dr. Johnston's Report And His 1/7/19 Declaration

Nestle argues that Oil-Dri's expert, Dr. Johnston, attempted to tardily expand his opinions (1) on the day of his deposition, and (2) with a declaration submitted in support of Oil-Dri's summary judgment motion. Both arguments mischaracterize the record.

*First,* prior to his deposition, Dr. Johnston provided Nestle with corrections to his 10/26/18 report (Ex. U, CJ1 to his 12/7/18 deposition).[23] Dr. Johnston explained in his deposition that he had only recently noticed the errors, and was finalizing the corrections the day before his deposition (*id.*, at 12/7/18 Johnston Dep., at 284:8-21). Nestle has not been unfairly prejudiced, as Dr. Johnston explained the bases for his corrections extensively during his deposition (*id.*, at 285:2-294:3), and will be subject to cross-examination at trial.

*Second*, Johnston's declaration resulted from the fact that Nestle introduced new fact testimony through its experts, Boxley and Jenkins, to displace the fact testimony of Nestle's

---

[23] Page 1 of CJ1 (Ex. U) is irrelevant (deals with Maricopa clay). Pages 2-3 of CJ1 correct a "transcription error" in Tab OO values to Johnston's 10/26/18 report; this resulted in a change to his corresponding graph (at page 4). Page 5 to CJ1 explains another error in Johnston's 10/26/18 report, concerning the inadvertent non-reporting of certain data. Page 6 of CJ1 provides the corrected version of Table 3 in Appendix A to this 10/26/18 report. Page 7 reproduces Table 3 from his 10/26/18 report. Pages 8-9 provide revised captions to original Figures 8-9 to Appendix B to Johnston's 10/26/18 report.

designated Rule 30(b)(6) witness, Nathan Huck, and sandbagged Oil-Dri in rebuttal reports, all of which is detailed in R654, Oil-Dri's MIL#1 at 1-8. It is remarkable in light of those facts that Nestle now complains of the timing of Johnston's responsive submission. Nestle's new, belated, contradictory expert submissions are *significantly* prejudicial to Oil-Dri. Accordingly, the Court should exclude Nestle's untimely factual submissions (per Oil-Dri's MIL #1), thereby eliminating Oil-Dri's need for the Johnston declaration.

## IX.    Nestle's MIL#9 To Preclude Oil-Dri's Physical Sample of Nestle's Canadian Maxx Scoop

Nestle alleges that KLMS anticipates the claims of Oil-Dri's '019 Patent under 35 U.S.C. § 102(a) and (g) (pre-AIA). *See* Ex. V, Nestle SJ Br. at 33 (disclaiming reliance on other parts of § 102). Here, Nestle seeks to prohibit Oil-Dri from referencing *the only physical sample of KLMS that is available in this case*, asserting that the Court should exclude that physical sample because it has not been authenticated and is "an entirely different product than the KLMS product Purina asserts invalidates [the] Asserted Claims." R648 at 20.

Nestle's authentication argument is without merit. Oil-Dri's Marc Herpfer authenticated the sample when he testified that he located the sample (a jug with litter in it) at Oil-Dri's R&D center in its "sample repository" (Ex. W, Herpfer Dep., at 241:12-17; Herpfer Dep. Ex. 2). Any concerns about authenticity beyond this go to the weight of the evidence, not its admissibility. *See Urban v. U.S.*, 2005 U.S. Dist. LEXIS 14234, *12-13 (N.D. Ill. June 9, 2005).

Nestle's second assertion that the jug is "an entirely different product than the KLMS product" is unsupported. Nestle implies that because the jug says "Maxx Scoop" (*see* R625-97) it is not the same as the KLMS product on which it relies for its prior art claim, but KLMS advertising shows that "Maxx Scoop" was used interchangeably with "KLMS" (*see* Ex. X, Purina 8335; *see also* Nestle Exs. 29-30, R648-30, R648-31 (pre-1995 documents listing the KLMS "Brand" as "Maxx Scoop")). Nestle also admits that the jug is labeled "*Nestle* Purina" (Nestle MIL, at 20, f/n 18, emphasis in

19

original), so Nestle should be able to confirm whether this jug is the same product as KLMS, but it has chosen not to do so. Instead, Nestle's Jenkins admits he didn't check to see if the jug contained the same litter as the KLMS he extensively addresses in his report (Ex. Y, Jenkins Dep. at 22:21-23:2, 25:1-6); and he didn't ask Nestle that question (*id.,* 23:19-24:1). Oil-Dri therefore is entitled to rely on the KLMS sample to show that Nestle's asserted KLMS "prior art" product is actually a *Canadian-originating litter* that is *not the same invention as* Oil-Dri's Patent.[25]

## X.    Conclusion

For the foregoing reasons, Oil-Dri respectfully requests that the attached Proposed Order (Ex. CC) be entered.[26]

Dated:  March 1, 2019                                       Respectfully submitted,

                                                           /s/ Michael P. Mazza/
                                                           Michael P. Mazza, No. 6201609
                                                           Lynn D. Moffa, No. 6197181
                                                           Paul R. Hale, No. 6320732
                                                           Michael P. Mazza, LLC
                                                           686 Crescent Blvd.
                                                           Glen Ellyn, Illinois 60137-4281
                                                           Phone: (630) 858-5071
                                                           Fax: (630) 282-7123
                                                           Email: mazza@mazzallc.com
                                                                      lynn@mazzallc.com
                                                                      paul@mazzallc.com

---

[25] The KLMS jug also has evidentiary value for an entirely different reason. The parties' experts dispute whether the different clays in KLMS can be separated or not. Jenkins claims he can do this "rapidly" (Ex. Z, 10/29/18 Jenkins Report, ¶274) – but he failed to provide any evidence that he ever did so (*id.*), and the methodologies he suggests for doing so were rejected as unworkable by Oil-Dri's experts Johnston and Beall (*see* Ex. AA, 11/26/18 Johnston Report, ¶14; Ex. BB, 11/26/18 Beall Report, ¶16). Most tellingly, Jenkins didn't bother testing the Maxx Scoop physical sample to see if he could "rapidly" separate its different clays (Ex. Y, Jenkins Dep. at 24:11-12).

[26] In response to Nestle's MIL #4, Oil-Dri incorporates herein its arguments in support of its MIL regarding Dickinson, R654 at 9-10; *see also Eli Lilly & Co. v. Teva Pharms. U.S., Inc.*, 657 F. Supp. 2d 967, 1011 (S.D. Ind. 2009) (referencing testimony of expert allowed during trial that the expert "believed, not that Dr. Bryant had committed a fraud [in his dealings with the PTO], only that Dr. Bryant was 'mistaken' in his declaration"). Any further MILs filed by Nestle on 2/24/19 that are not addressed herein were withdrawn by Nestle on 2/28/19 (R660) as moot in light of the Court's recent summary judgment order.

Shawn M. Collins, ARDC #6195107
Robert L. Dawidiuk, ARDC #6282717
Jeffrey M. Cisowski, ARDC #6308759
THE COLLINS LAW FIRM, P.C.
1770 Park Street, Suite 200
Naperville, IL  60563
Tel:  630-527-1595
E-mail: shawn@collinslaw.com
   rdawidiuk@collinslaw.com
   jcisowski@collinslaw.com

**Attorneys for Plaintiff**
**Oil-Dri Corporation of America**

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electric Filing to all counsel of record who have consented to service by such means.

 Michael P. Mazza