# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| OIL-DRI CORP. OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 15 C 1067 |
| ) | |
| NESTLE PURINA PETCARE CO., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This patent infringement lawsuit by Oil-Dri Corporation of America ("Oil-Dri") against Nestle Purina PetCare Company ("NP") is set for trial on March 18, 2019. In this decision, the Court rules on a number of the parties' motions *in limine* and *Daubert* motions, while reserving others for further argument at the final pretrial conference set for this afternoon.

**A.     Defendant's *Daubert* motions**

NP has moved to exclude all or parts of the anticipated testimony of three of Oil-Dri's experts: Dr. G. Robert Goss, Julie Davis, and James Harrison.

Under Federal Rule of Evidence 702 and governing caselaw, including *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible if the witness is qualified, applies reliable methodology, and is rendering testimony that will assist the trier of fact. "The objective of *Daubert's* gatekeeping requirements is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, with testimony based upon professional studies and personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Assessment of the reliability of testimony involves considering a variety of factors, including:

- whether the proffered theory can be tested;
- whether it has been subjected to peer review;
- whether it has been evaluated in light of potential rates of error; and
- whether it has been accepted in the relevant scientific community;

*See, e.g., Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017); *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005); *see also* Fed. R. Evid. 702, 2000 adv. comm. notes (listing additional factors). Not all of these factors either necessarily or exclusively apply in every situation, and no single factor is dispositive. *Kumho Tire*, 526 U.S. at 141, 151-52. Rather, reliability is determined on a case-by-case basis. *C.W. v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015). It is clear, however, that "subjective belief or unsupported speculation" is inadmissible, even coming from an expert, *American Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2009), and that an opinion "that is connected to existing data only by the *ipse dixit* of the expert" is inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Court will need to hear argument at the final pretrial conference regarding Davis. The Court denies NP's motions regarding Goss and Harrison for the reasons described below.

1.  **Dr. Goss**

Dr. Goss, a chemist, performed certain testing of NP's product both before Oil-Dri filed the present lawsuit and in or about March 2017. He took NP's agglomerated granules, scraped portions from them, and examined the scrapings under a microscope. He did this in order to estimate the "MPS" (mean particle size) of the granules' clay constituents. At the time, Dr. Goss did not have access to NP's precursor clay materials. He obtained those during discovery in the case and did further testing to attempt to confirm his earlier conclusions.

NP has moved to bar testimony about the earlier testing—which NP refers to as "destructive" testing—arguing that Goss's alteration of the product changed it and is therefore inappropriate; his testing cannot be replicated; it is inherently unreliable; and it is not scientifically accepted. In response, Oil-Dri says that because Dr. Goss later obtained and tested the constituent clays, "[i]t is now unnecessary for infringement purposes for Goss to rely on his earlier testing," Pl.'s Resp. to Def.'s Mots. In Limine ("Pl.'s Resp.") at 6, but that Oil-Dri "may wish to present evidence of the post-composition testing as background information regarding the proof difficulties it encountered prior to filing this lawsuit." *Id.* The latter point is difficult to comprehend; the Court has a hard time seeing why evidence of "proof difficulties [Oil-Dri] encountered prior to filing this lawsuit" would be relevant at trial. But on the assumption that Oil-Dri can show the relevance of this evidence, the Court addresses NP's request to preclude it.

Oil-Dri makes a persuasive case that because, at the time, it did not have access to NP's constituent clays, Goss's testing was the only viable method of estimating the

MPS of those materials. The Court finds unpersuasive NP's contention that Goss's methodology was so *inherently* unreliable as to be inadmissible; this and NP's other contentions may affect the weight to be given to Dr. Goss's testimony, but they do not impact its admissibility. In this regard, as the Supreme Court stated in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. And on the question of alteration, given the nature of NP's product some form of disaggregation was necessary in order to estimate the MPS of the constituent materials, given Oil-Dri's lack of access (at the time) to those materials in their pre-agglomeration state. Nothing about Goss's methodology affects any of the Court's determinations regarding construction of claim terms.

2. **Harrison**

Harrison is an Oil-Dri employee who is offered to present testimony on issues relating to damages. Specifically, he will render an opinion on "the cost savings to [NP] for using less sodium bentonite (NaB) in its Accused Products (an average of 35% instead of 80%), based on corresponding savings in transportation cost." Pl.'s Resp., Ex. F at 2. NP says that Harrison is basing his opinion about NP's alleged cost savings "on speculation about *Oil-Dri's* hypothetical savings had it made the Accused Products." Def's Daubert Mots. and Mots. In Limine ("Def.'s Mot.") at 11. The Court does not read Harrison's testimony that way; it sees nothing in Harrison's report (and NP cites nothing) reflecting that he is speculating or relying on Oil-Dri's "hypothetical savings." Rather, he appears to have relied on publicly available data. Any differences between this data

4

and NP's actual figures—which Harrison, an Oil-Dri employee, was not permitted to see due to a protective order imposed at an earlier stage of the case—affects only the weight to be given to his testimony, not its reliability or admissibility. The Court denies NP's request to bar all or parts of Harrison's testimony.

**B.     Defendant's motions *in limine***

NP has withdrawn its motions *in limine* 3, 5, and part of 6 based on the Court's summary judgment ruling. The Court will address only the remaining motions.

### 1.     IPR proceeding

NP asks to exclude evidence regarding the *inter partes* review proceeding regarding the '019 patent, even about the existence of the proceeding. Oil-Dri objects, but it is not clear to the Court exactly what about the IPR proceeding Oil-Dri wants to introduce, and for what purpose. Oil-Dri should be prepared to answer these questions directly and succinctly at the final pretrial conference.

### 2.     NP's privilege log

The Court grants NP's motion to exclude evidence regarding (or derived from) its privilege log. Under 35 U.S.C. § 298, a party may not attempt to prove willful infringement through the alleged infringer's failure to present advice-of-counsel evidence. But citing or relying on NP's privilege log risks just that, which would be grossly unfair. Oil-Dri says that it wants to elicit, via information derived from the privilege log, "the sheer number of times that key [NP] personnel—those involved in the development of the Accused Products and in the decision to manufacture and sell the Accused Products—were engaged in discussions concerning the '019 Patent." Pl.'s Resp. at 13. Because the documents were withheld as privileged, however, Oil-Dri has

5

no legitimate way to know their contents. Thus the evidence of the number of citations on the privilege log has, at best, minimal probative value for the purpose cited by Oil-Dri. Perhaps more importantly, Oil-Dri's proposed use of this material amounts to a disguised use of NP's invocation of privilege as evidence of willfulness, which is inappropriate.[1] Thus Oil-Dri cannot use the privilege log as it proposes. *See* Fed. R. Evid. 403. If, as Oil-Dri fears, NP personnel disavow or express a failure to recall knowledge or discussions of the '019 patent, then Oil-Dri may be able to use the privilege log to refresh recollection or, possibly, for impeachment, *see* Pl.'s Resp. at 14 n.17 (citing cases), but if this happens it will have to be done carefully and under the Court's guidance to avoid the possibility of unfair prejudice to NP.

4. **Linck**

The Court will need to hear further argument regarding this motion at the final pretrial conference.

6. **Dr. Goss infringement opinions**

NP asks the Court to bar Dr. Goss from offering "his own claim interpretation"; any opinions concerning the "predetermined" claim limitation; and any opinions relying on NP's '570 patent. The Court grants the motion on the last point; indeed, the Court sees no basis for any party to make reference to the '570 patent in this case.

By contrast, the Court sees nothing inappropriate about the statement in Dr. Goss's report regarding the precursor clay issue. *See* Def.'s Mot. at 17 (citing *id.*, Ex. 24 ¶ 13).

---

[1] In a footnote, Oil-Dri seems to contend that some materials listed on the privilege log are not actually privileged, *see* Pl.'s Resp. at 13 n.15, but if so that challenge should have been raised long ago.

Matters are somewhat different, however, with regard to Dr. Goss's conclusions regarding the "predetermined" claim limitation. Claim 1 describes "a particulate non-swelling clay material having a predetermined mean particle size no greater than about 4 millimeters." The Court rejected both sides' proposed interpretations: NP argued that the term required actual measurement of the materials before mixing, and Oil-Dri argued that the term only required the particles to be capable of measurement. Instead, the Court concluded that the ordinary meaning of "predetermined" applies, specifically "decided upon in advance." Claim Construction Decision at 5.

NP argues that Dr. Goss runs afoul of the Court's ruling via several statements in his report to the effect that the MPS can be or is capable of being determined before mixing. *See* Def.'s Mot. at 18 (citing *id.*, Ex. 24 ¶¶ 15-17). There is nothing wrong with paragraph 15 of Dr. Goss's report; there he specifically adopts the Court's definition: "i.e., the MPS is decided upon in advance (i.e., prior to mixing)." *Id.*, Ex. 24 ¶ 15. In paragraphs 16 and 17, however, Dr. Goss reaches conclusions that use both the Court's definition and the one that Oil-Dri unsuccessfully advocated:

> 16. That the MPS of the non-swelling clay material in the Accused Products is less than 4mm (4000 microns), as recited in Claims 1 and 30 of the '019 Patent, *and is "predetermined" or capable of being determined* prior to mixing of the different clays, is shown by my testing . . . .
>
> 17. That the MPS of the sodium bentonite in the Accused Products is less than 2mm (2000 microns), as recited in Claims 1 and 30 of the '019 Patent, *and is "predetermined" or capable of being determined* prior to mixing of the different clays, is shown by my testing . . . .

*Id.* ¶¶ 16-17 (emphasis added). These portions of Dr. Goss's report partly rely on Oil-Dri's rejected interpretation. Dr. Goss may not use the "capable of being determined" language during his testimony. But there is no basis to exclude his infringement

7

testimony on "predetermined" claim limitation in its entirely as NP proposes.

   **7.   NP's size and wealth**

NP seeks to bar evidence or argument regarding its wealth and size. Oil-Dri says that it wants to be able to argue that NP is a big company because, it contends, this tends to make it less believable that it would have only a handful of records, or only cursory information, on various key issues. *See* Pl.'s Resp. at 16-17. NP's size, however, contributes only minimally to this proposition, and it runs the risk of unfairly prejudicing the jury (the same is true, indeed more so, regarding reference to NP as "a large multinational corporation," *see id.* at 17). The Court bars argument along these lines under Rule 403.

The Court reaches a different conclusion regarding Oil-Dri's theory that NP, which evidently saw itself as a market leader, might have been motivated to steal Oil-Dri's invention in order to recapture the leading position in the animal litter market. *See id.* at 17, point (4). The proposition that NP saw itself as a market leader—assuming Oil-Dri can elicit it via admissible evidence—has some probative value in this regard and does not run any significant risk of unfairly prejudicing NP. On the other hand, the following contention by Oil-Dri has no real probative value, so the Court excludes it:

> the fact that Oil-Dri has about the same number of animal litter patents as [NP], even though [NP] is a company about 300 times larger than it, showing that Oil-Dri was a leader in terms of such patent notwithstanding its much smaller size.

*Id.*, point (5).

Oil-Dri's last point is that a defendant's revenues, market share, and wealth are relevant factors that could influence a hypothetical negotiation over a reasonable royalty under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.

8

1970), and that NP itself relies on its size and wealth in arguing that Oil-Dri's proposed 3 percent royalty rate is too high. See Pl.'s Resp. at 17 & n.22. The Court will need to hear argument on this point at the final pretrial conference.

### 8. Johnson "new opinion and analysis"

The Court overrules NP's objection to testimony by Oil-Dri expert Clifford Johnston regarding certain corrections or modifications to his written report that were provided on the morning of his deposition. This material was produced late, but NP had an adequate opportunity to question Johnston on this material, so the late production was harmless. See Fed. R. Civ. P. 37(c)(1).

NP also asks the Court to exclude a declaration by Johnston submitted in connection with Oil-Dri's summary judgment response, well after the close of discovery. Oil-Dri seeks to justify this by arguing that this was needed to respond to material in Oil-Dri's rebuttal expert reports. See Pl.'s Resp. at 18-19. The Court will need to hear further argument on this point at the final pretrial conference.

### 9. Canadian "Maxx Scoop" sample

The Court overrules NP's request to exclude a physical sample of a "Maxx Scoop" product that Oil-Dri has relied upon. Contrary to NP's contention, Oil-Dri appears to have been able to sufficiently authenticate the sample and lay the foundation for its admission. See Pl.'s Resp. at 19. NP's other arguments may bear on the weight to be given to this evidence, but they do not undermine its admissibility.

**C. Plaintiff's motions *in limine***

### 1. Dr. Boxley and Jenkins

Oil-Dri has moved to exclude certain testimony by defense experts Dr. Chett

9

Boxley and Dennis Jenkins. NP is offering testimony by both of these witnesses on the question of infringement.

Oil-Dri first argues that certain opinions by Dr. Boxley and Jenkins contradict the Court's claim construction decision regarding the terms "predetermined" and "mean particle size." The Court will need to hear further argument on these points at the final pretrial conference.

Next, Oil-Dri says that Dr. Boxley and Jenkins are offering testimony regarding how NP sizes the clays in the accused products that contradicts testimony given by NP's Rule 30(b)(6) witness on this topic. Testimony by a 30(b)(6) witness, however, does not amount to a binding judicial admission by the entity that designated the witness. *See A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). Oil-Dri is free to offer the 30(b)(6) testimony—and the Court will, if asked, instruct the jury regarding the nature and import of such testimony—and Oil-Dri may use it to contradict NP's contentions, impeach Dr. Boxley and Jenkins, or for any other appropriate purpose. But the Court will not prohibit these witnesses from testifying or relying upon matters that contradict NP's 30(b)(6) witness. Oil-Dri contends, as part of this same argument, that NP essentially obstructed its efforts to obtain information regarding particle size and other matters pertinent to NP's manufacturing of the accused products. But none of this alters the fact that, under controlling authority in this circuit, the 30(b)(6) testimony is not a binding judicial admission.

Oil-Dri next argues that Jenkins, though not disclosed as a fact witness, bases certain of his opinions on his work for Clorox, a cat litter manufacturer, in the 1990s. In response, NP says that it seeks only to have Jenkins rely on documents that were

properly disclosed during discovery and for which a proper evidentiary foundation is laid at trial, and that in doing so, Jenkins will not testify regarding his personal knowledge of these matters but rather will use them only to show what a person of ordinary skill in the field would have known at the relevant time. See Def.'s Resp. to Pl.'s Mots. In Limine ("Def.'s Resp.") at 3-4. This seems to be an appropriate undertaking that does not improperly make Jenkins a fact witness. And Jenkins's report, as discussed by NP in its response, see id. at 4-5, abides by these limitations—which the Court will also enforce during Jenkins's testimony. There appears to be only one legitimate dispute regarding this point, concerning the timeliness of production of certain of the records in question. The parties should be prepared to address this at the final pretrial conference.

Finally, the Court overrules Oil-Dri's objection to reference by NP on prior art referenced as "Pattengill Mixture 7." This prior art consists of a description in a written publication, not a physical litter, so Oil-Dri's contentions regarding omission or nondisclosure of this during discovery lack merit. The Court also notes that this particular prior art was timely disclosed in NP's final invalidity contentions.

### 2. Dickinson

The Court will need to hear further argument at the final pretrial conference regarding Oil-Dri's motion to bar testimony by NP expert witness Q. Todd Dickinson.

### 3. NP R&D expenses

Magistrate Judge Schenkier, who supervised discovery in this case when it was assigned to District Judge Amy St. Eve, entered an order on February 22, 2018 that included the following determination:

> By 3/02/18, [NP] shall supplement its response to Interrogatory No. 17 to add any additional calculations of research and development costs, and

for each calculation of research and development cost, an explanation of how the cost was calculated, and by 3/23/18, [NP] shall produce a Rule 30(b)(6) witness to testify about the costs and their calculation. [NP] WILL NOT BE PERMITTED TO USE AT TRIAL EVIDENCE OF ANY COSTS WHICH ARE NOT DISCLOSED BY 3/02/18, OR FOR WHICH THE MANNER OF THEIR CALCULATION IS NOT DISCLOSED BY 3/02/18 . . . .

Order of Feb. 22, 2018 (dkt. no. 279). NP evidently was unable to find documentation regarding its actual R&D costs for relevant products and says those documents were lost. It intends to use, instead, estimates of what the costs likely would have been, based on other information that it timely produced. This does not run afoul of Judge Schenkier's order. In addition, the Court is unpersuaded by Oil-Dri's contention that NP did not conduct a reasonably diligent search for records of its actual R&D expenses. Oil-Dri may, if it wishes, introduce evidence regarding the fact that NP does not have actual records of its R&D expenses and may use this to argue that NP's estimates should be disregarded or given little weight. But it has not made the case for excluding the estimates.[2]

  **4. "Entire market value theory" evidence; and**

  **5. Western Aggregate and Alterlink licenses**

The Court will need to hear further argument on these motions during the final pretrial conference.

---

[2] There is nothing inappropriate, as Oil-Dri suggests, *see* Pl.'s Mots. In Limine at 14 n.23, in NP saying—assuming there is evidence to support it—that the records no longer exists due to the passage of time. But NP *may not* attempt to cast blame on Oil-Dri for this by, for example, suggesting that Oil-Dri delayed filing suit, as there is no limitations or laches defense that will be before the jury at trial.

### 6. Reputation evidence

NP may not introduce testimony, other evidence, or argument that it is a "good company," good corporate citizen, respects patent / intellectual property rights, or other similar evidence. This evidence is irrelevant, see Fed. R. Evid. 404(a)(1), and even if arguably has some probative value, it is far outweighed by the likelihood of jury confusion and unfair prejudice to Oil-Dri. Rather, the evidence is confined to matters involving the particular patents and products at issue in the case. If NP runs afoul of this limitation, it will be opening the door to at least some of the "prior bad acts" evidence cited by Oil-Dri in appendix 1 to its motions in limine.

There is nothing inappropriate, however, about NP offering testimony or other evidence that its products are high quality products. This evidence is relevant for the reasons described in NP's response to Oil-Dri's motions, see Def.'s Resp. at 14 (first paragraph), and it is not unfairly prejudicial or otherwise inappropriate under Rule 403.

### 7. Use of attorney-client privilege as a sword

Given NP's maintenance of attorney-client privilege during discovery and its decision not to rely on advice by counsel to rebut Oil-Dri's claim of willfulness, the Court precludes NP from making any reference to consultation with attorneys, opinions by attorneys, or any attorney involvement at all with respect to the patents, products, and events at issue in the trial.

### 8. Limiting infringement analysis to certain products

The Court will need to hear further argument on this motion during the final pretrial conference.

**9. Reference to the "lightweight" litigation (Case No. 16 C 9179)**

Oil-Dri asks the Court to preclude any reference to another patent infringement lawsuit regarding a different animal litter product that it instituted against NP, specifically Case No. 16 C 9179. NP claims this evidence is relevant, but it offers only a single sentence to support this: "The lightweight litter litigation is relevant to damages, particular to show the existence of an adjudicated non-infringing alternative." Def.'s Resp. at 17. NP makes no effort at all to explain this. It has forfeited the point, and in any event it is difficult to imagine any situation in which the probative value of this evidence would not be substantially outweighed by the danger for confusing the issues, wasting time on a sidetrack that would require explanation of the other lawsuit, and unfair prejudice. *See* Fed. R. Evid. 403. The Court grants Oil-Dri's motion.

Date: March 8, 2019

_____
MATTHEW F. KENNELLY
United States District Judge