**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Oil-Dri Corporation of America,

      *Plaintiff – Counterclaim Defendant,*

      v.

Nestlé Purina PetCare Company,

      *Defendant – Counterclaim Plaintiff.*

Case No. 1:15-cv-01067

Honorable Matthew F. Kennelly

**PURINA'S CORRECTED RULE 50(A)**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

# CONTENTS

I.  Introduction. ...................................................................................................................... 1

II.  Legal Standard. ................................................................................................................ 1

III.  Argument. ........................................................................................................................ 1

    A.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find that the Accused Products Infringe the Asserted Claims. ........................................................ 2

        1.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find All of the Limitations of Claim 1 are Infringed. ........................................................ 2

            a.  The Material Specifications do not provide a reasonable jury with a legally sufficient evidentiary basis to find infringement.     3

            b.  Nathan Huck's testimony concerning how Purina actually employs its "Materials Specifications" does not provide a reasonable jury with a legally sufficient evidentiary basis to find infringement. ........................... 6

            c.  Dr. Johnston's testing does not provide a reasonable jury with a legally sufficient evidentiary basis to find "predetermined mean particle sizes".... 8

            d.  The jury may not rely upon the '570 Patent to find infringement, nor would it provide a reasonable jury a legally sufficient evidentiary basis to find infringement. ............................................................................................. 9

        2.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find that the Clumping Animal Litters Meet the Particulate or Predetermined MPS Limitations of Claim 1. ........................................................................................ 11

        3.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find Infringement of the Asserted Dependent Claims. ................................................... 12

    B.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find Willful Infringement ........................................................................................................ 13

    C.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Award of Reasonable Royalty Damages. ...................................................................................... 15

    D.  A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to to Find that Oil-Dri Complied with the Statutory Requirements of § 287(a). .............................. 18

IV.  Conclusion ..................................................................................................................... 19

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510 (7th Cir. 2006)..................................9

*AstraZeneca v. Apotex*, 782 F.3d 1324 (Fed. Cir. 2015)..................................................................16

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).......................17

*Brown v. Snow*, 94 F. App'x 369 (7th Cir. 2004) ...........................................................................1

*Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347 (Fed. Cir. 2011)......................................1

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ..........................................................15

*Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014)............................................16

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group*, LLC, 879 F.3d 1332 (Fed. Cir. 2018) .......................................................................................................................................16

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) .......................................................10

*Garretson v. Clark*, 111 U.S. 120 (1884)................................................................................15, 16

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016) .....................................................13

*Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928 (7th Cir. 1995) ......................................................1

*LG Display Co. Ltd. v. Au Optronics Corp.*, 722 F.Supp.2d 466 (D. Del. 2010) ..........................17

*MiiCs & Partners, Inc. v. Funai Elec. Co.*, 2017 WL 6268072 (D. Del. Dec. 7, 2017)...............17

*Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437 (Fed. Cir. 1998)............................................18

*Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004)..................................................15

*Pactiv Corp. v. SC Johnson & Son, Inc.*, No. 98 C 2679, 2000 WL 1898839 (N.D. Ill. Nov. 29, 2000) (Kennelly, J.)...........................................................................................................................2

*PIN/NIP, Inc. v. Platte Chemical Co.*, 304 F.3d 1235 (Fed. Cir. 2002) .........................................2

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .........................................15

*United States v. Gardner*, 211 F.3d 1049 (7th Cir. 2000).............................................................9

*Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863 (N.D. Ill. 2010).............................................18

*Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546 (Fed. Cir. 1989).....................................13

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000)...........................................................................17

*Williams v. Chavez*, 248 F.3d 1162 (7th Cir. 2000).........................................................................1

**Statutes**

35 U.S.C. § 284..............................................................................................................................13

35 U.S.C. § 287(a)....................................................................................................................18, 19

<u>**No table of authorities entries found.**</u>

## I.   INTRODUCTION.

Pursuant to Fed. R. Civ. P. 50(a), Defendant Nestlé Purina PetCare Company ("Purina") hereby moves the Court for judgment as a matter of law that plaintiff Oil-Dri has failed:

1.   To prove that the Accused Products infringe any of Claims 1-4, 6, 9 & 11 (the "Asserted Claims") of U.S. Patent 5,975,019 (the "'019 Patent");

2.   To prove its claim of willful infringement;

3.   To present sufficient evidence to support the recovery of reasonable royalty damages; and

4.   To present evidence to support that it marked its patent-practicing products.

## II.   LEGAL STANDARD.

Rule 50(a) allows the Court to grant JMOL if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50 (a)(1). The court "must presume that the jury resolved all factual disputes in favor of the prevailing party, and . . . must leave those findings undisturbed as long as they are supported by substantial evidence." *Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011). "Substantial evidence requires more than a mere scintilla, . . . and [the Court] must review the record as a whole, taking into consideration evidence that both justifies and detracts from the jury's decision." *Id.*; *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995) ("Conclusory allegations by the party opposing the motion cannot defeat the motion."); *Williams v. Chavez*, 248 F.3d 1162 (7th Cir. 2000) (affirming JMOL when Plaintiff "offered no evidence to support [a] speculative and conclusory assertion); *Brown v. Snow*, 94 F. App'x 369, 372 (7th Cir. 2004) (stating that a "conclusory assertion is not enough to overcome judgment as a matter of law.").

## III.   ARGUMENT.

**A. A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find that the Accused Products Infringe the Asserted Claims.**

To prove literal infringement, a plaintiff must establish "that every claim limitation . . . be found in the accused device." *PIN/NIP, Inc. v. Platte Chemical Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002). Thus, "[f]or any given claim, 'infringement is avoided when one element . . . is absent.'" *Pactiv Corp. v. SC Johnson & Son, Inc.*, No. 98 C 2679, 2000 WL 1898839 at *2 (N.D. Ill. Nov. 29, 2000) (Kennelly, J.) (citation omitted). Oil-Dri has not presented any evidence, much less substantial evidence such that a reasonable jury would have a legally sufficient evidentiary basis to find, under the preponderance of the evidence standard, infringement of nearly all of the Accused Products. In particular, Oil-Dri failed even address any of the products individually, as the law requires.[1] .

**1. A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find All of the Limitations of Claim 1 are Infringed.**

This Court held that the Asserted Claims could be infringed by evidence that all of the limitations of claim 1 are present in the precursor materials used to manufacture Purina's clumping animal litters. *See* ECF 647 at 13 (concluding that "claim 1 describes a clumping animal litter in terms of its ingredients," and "a litter comprising those ingredients . . . may infringe"). Under the Court's constructions of "predetermined" and "mean particle size," ECF 533 at 5-8, Oil-Dri must prove that (i) Purina "decided upon in advance" the "average of a representative sample of particle sizes or groupings of particle sizes" for both the non-swelling and swelling clay ingredients and (ii) the predetermined mean particle size ("MPS") of the non-swelling clay material is greater than the predetermined MPS of the swelling clay. But Oil-Dri has failed to provide any legally

---

[1] The Accused Products are Instant Action; Small Spaces; Dual Power; Occasional Cleaning; 24/7 Performance; Active Spaces; 4-in-1 Strength; Breathe Easy; Glade® Tough Odor Solutions; Crystals Blend; Glade TOS Clear Springs; Power Blend; Fall Frolic; Spring Breeze; Summer Twist; Coastal Grove; Mountain Escape; Glade® Winter Pine; and Secret Garden.

sufficient evidence from which a reasonable jury could conclude Purina's engineered litter satisfies either requirement.

Oil-Dri's infringement theory hinges on the assumption that (i) Purina's Materials Specifications[2] describe sieve data from which an MPS can be calculated; and (ii) Purina "predetermines" mean particle sizes by implementing an "assumed particle size distribution" in its starting materials. *See, e.g.*, Trial Tr. vol. 1, 126:19-23; Trial Tr. vol. 3, Johnston, at 514:24-515:4, 517:6-9. But Oil-Dri has presented only (i) unsupported allegations that MPS can be calculated from Purina's Material Specifications; (ii) unsupported allegations that Purina implements that alleged distribution matching those specifications for its clay ingredients; (iii) inconsistent after-the-fact MPS measurements from Dr. Johnston; and (iv) an incomplete disclosure from Purina's '570 patent. As discussed below, these allegations and evidence do not provide a reasonable jury with a legally sufficient evidentiary basis to find that Purina (i) predetermines an MPS for the both swelling and non-swelling clays or (ii) predetermines the MPS for the non-swelling clay is larger than the MPS for the swelling clay.

### a. The Material Specifications do not provide a reasonable jury with a legally sufficient evidentiary basis to find infringement.

No reasonable jury could find that the Materials Specifications relied upon by Oil-Dri show a predetermined MPS of either clay ingredient. First, Oil-Dri improperly treats the granulometry data within these specifications as "assumed particle size distribution[s]," from which it claims MPS can be calculated. *See, e.g.*, Trial Tr. vol. 3, Johnston, 517:6-13; Trial Tr. vol. 2, Goss, 335:1-3 (identifying PTX-041 as a particle size distribution for swelling clay). But this understanding of the granulometry data is plainly incorrect. It is undisputed that the

---

[2] Purina's Material Specifications are defined as DX-004 (specifications for sodium bentonite powder), DX-281 (specification for Bloomfield clay fines), and DX-424 (specification for Maricopa clay fines).

granulometry data in these documents are normal percentages (a.k.a. percent in fraction), not *cumulative* percentages.[3]  Consequently, because these percentages exceed 100% when added,[4] no reasonable jury could find that they disclose a particle size distribution, which mathematically cannot exceed 100%.  Trial Tr. vol. 5, Huck, 934:18-935:3.  As a result, the MPS calculations performed by Dr. Goss and Dr. Johnston are entitled to no weight.

Both experts' calculations are further flawed.  Despite analyzing the same Materials Specifications, Dr. Goss and Dr. Johnston interpret the granulometry data inconsistently and calculate differing MPS values.[5]  Dr. Goss's calculation purportedly incorporates the PAN material, Trial Tr. vol. 2, Goss, 421:1-6, while Dr. Johnston achieves an otherwise impossible calculation by disregarding the PAN values (which if included would result in a statistical impossibility—a distribution with more than 100% of material).  *See, e.g.*, Trial Tr. vol. 3, Johnston, 531:7-532:16.[6]  Dr. Goss also forces a calculation by modifying the granulometry data for the TARGET column of DX-424, which together would otherwise exceed 100 percent.  *See* DX-222 ("Total 105").  Lastly, both experts fail to use upper and lower bounds which straddle the

---

[3] *See, e.g.*, Trial Tr. vol. 5, Huck, 934:18-935:3 (explaining that the -200 sodium bentonite granulometry in DX-004 does not refer to cumulative percentages); DX-281 (specifically identifying the only cumulative percentage value); Trial Tr. vol. 3, Johnston, 516:10-15 ("[T]his is the percent in fraction.");  Trial Tr. vol. 2, Goss, 339:20-340:10 (acknowledging that the data could refer to a "screen size fraction," i.e., a normal percent); *id.* at 430:4-7 (agreeing that "Purina employees who work with these specs would know them better than [he]").

[4] *See* DX-004 (for swelling clay, NH3-A, -B, HIGH column sum of 138.1%; NH3-C, HIGH column sum of 143.1%); DX-424 (for non-swelling clay, TARGET column sum of 105%; HIGH column sum of 172%); DX-281 (for non-swelling clay, HIGH column sum of 210.2%).

[5] *Compare* DX-222 (Goss treating HIGH data from DX-004 and DX-424 as cumulative percentages; calculating MPS for swelling clay HIGH as 40 microns and for non-swelling TARGET and HIGH as 105 and 124 microns), *with* DX-545; DX-034 (Johnston treating all data from DX-004 and DX-424 as percentages; calculating MPS for swelling clay HIGH as 55 microns and for non-swelling TARGET and HIGH as 110 and 187 microns).

[6] Dr. Johnston also admits that an "accurate determination of mean particle size" requires sieve measurements both above and below 50 weight percent.

50 percent weight mark for each of their calculations,[7] which is important for "accurate determination of mean particle size." Trial Tr. vol. 3, Johnston, 520:24-521:6.

Moreover, Dr. Johnston and Dr. Goss's calculations ignore Mr. Huck's testimony that Purina uses the non-swelling and swelling clay "pan" material to make the Accused Products. Trial Tr. vol. 5, Huck, 937:11-19; *id.* 933:23-934:7 (explaining that in DX-004 Purina requires at least 75 percent pan material, up to 100 percent). Passing material through a single sieve and into a pan provides information only on the maximum possible particle size. *See, e.g.*, *id.* 935:20-936:3. If 100 percent of the material is in the pan, all that is known "is that it's smaller than the last sieve that it had to fall through in order to get into the pan." *Id.* 934:8-15; Trial Tr. vol. 3, Johnston, 534:4-8 (agreeing for sodium bentonite that "the pan value just tells you that it is minus 200"). Mr. Huck and Dr. Johnston agree that a mean particle size cannot be determined based on a single sieve. Trial Tr. vol. 5, Huck, 936:4-6; Trial Tr. vol. 3, Johnston, at 512:4-7.

The Materials Specifications also do not provide a reasonable jury with a legally sufficient evidentiary basis to find that Purina predetermines an MPS for its non-swelling clay that is greater than the predetermined MPS of its swelling clay. Mr. Huck testified that the non-swelling clay could be significantly smaller than the single 60 mesh screen through which it passes. *See* Trial Tr. vol. 5, Huck, 936:14-20 (Q. Following the process that Purina used to make the engineered litter, could the non-swelling clay dust be a size 325 mesh? A. Certainly, sir. 325 is smaller than 60 mesh.). Dr. Johnston agreed, testifying that "[i]t's possible" to have non-swelling clay in the range of 300 to 500 mesh. 528:3-6. Mr. Huck and Dr. Johnston also testified that the swelling clay pan can consist of material slightly smaller than 200 mesh (or the equivalent 74 microns). *Compare*

---

[7] Dr. Johnston does not have a point on both sides of the 50 weight percent line for his non-swelling clay calculations of the target value and his sodium bentonite calculation of the high column. Trial Tr. vol. 3, Johnston, 521:14-17, 525:15-18. Dr. Goss does not have any calculations using points straddling the 50 weight percent line. *See* DX-222 (showing that all plotted points are located above the 50 weight percent line, i.e. % undersize larger than 50%).

Trial Tr. vol. 5, Huck, 936:21-23 (Q. Could the swelling clay used in the engineered litter be a size 230 mesh? A. Yes, sir.), *with* Trial Tr., vol. 3, Johnston, at 523:14-19 (Q. And [the pan] could have particles that are less than 50 microns? A. . . . anything less than 74 microns in size is going to be in the pan.). Thus, the absence of any particle size minimum permits the MPS of the swelling clay to be larger than the MPS of the non-swelling clay—the opposite of what claim 1 requires.

      **b.**     **Nathan Huck's testimony concerning how Purina actually employs its "Materials Specifications" does not provide a reasonable jury with a legally sufficient evidentiary basis to find infringement.**

Oil-Dri relies on Nathan Huck's testimony about how Purina uses materials specifications and other documents to show infringement. *See, e.g.,* Trial Tr. vol. 2, Goss, 337:2-339:15. It claims Mr. Huck's testimony about Purina's monitoring protocols proves Purina implements a specified particle size distribution, i.e. predetermines the MPS, for the swelling and non-swelling clay in its litter products. *See, e.g.*, *id.* 343:18-344:16; Trial Tr. vol. 5, Huck, 953:20-957:12. Based on Mr. Huck's undisputed testimony regarding Purina's manufacturing process, no reasonable jury could conclude that (i) Purina implements any alleged particle size distribution for the ingredient clays; or (ii) predetermines MPS of those clays in some other way.

For the non-swelling clay, Mr. Huck testified that Purina uses three sources of non-swelling dust—a screened, conventional litter mill, baghouses, and a dedicated, non-screened mill—only one of which involves any sieves. Trial Tr. vol. 5, Huck, 924:14-925:19, 944:9-16. And for that screened mill, Purina only sizes the non-swelling dust with a single 60-mesh sieve, *id.* 925:14-19, which undisputedly is insufficient to predetermine MPS. *Id.* 936:4-6; Trial Tr. vol. 3, Johnston, at 512:4-7. Mr. Huck also testified Purina does not use its monitoring process to predetermine the mean particle size of the non-swelling dust. Trial Tr. vol. 5, Huck, 927:19-22. He explained Purina periodically monitors the non-swelling dust it uses in its pin mixer to make sure it does not contain any rocks or big pieces. *Id.* 927:14-928:4. Mr. Huck also testified the granulometry chart in a

2006 email Oil-Dri relies on relates to that monitoring protocol. DX-424; Trial Tr. vol. 5, Huck, 929:5-930:4. He also testified it is impossible to determine a mean particle size of the non-swelling clay based on that chart. *Id.* 930:5-7. Mr. Huck also testified the email does not say anything about a predetermined mean particle size for the non-swelling clay. *Id.* 930:18-20. Similarly, Mr. Huck testified Purina does not use a 2008 Materials Specification to determine in the mean particle size of the non-swelling clay material. DX-281; Trial Tr. vol. 5, Huck, 974:9-17. He explained the specification does not say anything about a mean particle size and specifically states "[t]hese specifications are to be used as a guide and troubleshooting tool for the time being. They are not to be used for rejecting dust." *Id.* 957:4-9.

Regarding the swelling clay, Mr. Huck similarly testified Purina does not use its Materials Specifications to predetermine a mean particle size. DX-4; Trial Tr. vol. 5, Huck, 937:20-938:1. In fact, he testified a mean particle size is not calculable based on the information in those documents, referencing the statistical impossibility that would result from treating that information like a particle size distribution. *Id.* 934:18-935:3. In addition, he explained Purina does not actually test the swelling clay to see whether it could pass through the 200 mesh sieve. *Id.* 932:4-12. The mesh sizes listed on the Material Specifications only serve as tolerances for the maximum amount of material Purina would accept in each range. *Id.* 1004:6-15. Mr. Huck further explained Purina uses sodium bentonite dust aspirated from the environment and from around the coater—a practice unrelated to the Materials Specifications. *Id.* 923:2-10. Purina is not concerned about the relative mean particle sizes of the non-swelling and swelling clays because "that kind of testing and assessment of particle size distribution is not relevant when we are building a new granule up from powders." *Id.* 932:13-21; 976:2-9.

Dr. Goss's testimony to the contrary is speculative and unsupported—he admitted that he was "guessing" about how Purina uses its specifications. Trial Tr. vol. 2, Goss, 342:4-18 ("and

here I'm guessing a little bit, so they must be testing . . . ."); *id.* 344:22-345:4) (Goss: "Here I am guessing - -" The Court: "Well, then stop."). Dr. Goss also admitted Purina knows better how its own specifications work. *Id.* 430:4-7 (Q. You would agree with me that the Purina employees who work with these specs would know them better than you, correct? A. I would agree with that, yes.). Dr. Johnston similarly lacks sufficient knowledge to support Oil-Dri's contrary position. *See, e.g.*, Trial Tr. vol. 3, Johnston, 535:3-8 (explaining that he does not know what Purina does between the mine and the pin mixer).

c. **Dr. Johnston's testing does not provide a reasonable jury with a legally sufficient evidentiary basis to find "predetermined mean particle sizes"**

Oil-Dri also contends Dr. Johnston's laser diffraction and alpine jet sieve measurements of MPS support a finding of infringement. But the mean particle size limitations of Claim 1 are **_predetermined_** mean particle sizes, not actual mean particle sizes. *See, e.g.*, Trial Tr. vol. 3, Johnston, 511:9-18, 562:17-24. Dr. Johnston's after-the-fact MPS measurements alone cannot show that Purina decided upon those mean particle sizes in advance—those measured values could result without any predetermination.

And here, Dr. Johnston's testing actually confirms Purina does not predetermine (i) the MPS of either the swelling or non-swelling clays; and (ii) that the MPS of the non-swelling clay is relatively larger than the MPS of the swelling clay. Trial Tr. vol. 3, Johnston, 541:6-14. Dr. Johnston's improper calculations from Purina's Material Specifications wildly vary from the actual mean particles sizes he calculated.[8] Additionally, Dr. Johnston testified that the data in his "laser

---

[8] *See, e.g.*, Trial Tr. vol. 3, Johnston, 560:13-20 (acknowledging six differing King William MPS values ranging from 44.8 microns to 187 microns, more than 300 percent); *id.* 563:19-564:13 (acknowledging that his calculated and measured values for Bloomfield vary by more than 300 percent); *id.* 548:19-549:4 (laser diffraction MPS for sodium bentonite of 70.7 microns, yet an Alpine Jet Sieving MPS of 47.9 microns).

[diffraction] results shows that the mean particle size of the non-swelling clay was actually ***smaller*** than the mean particle size of the swelling clay.[9] *Id.* 544:4-545:11. It is axiomatic that Purina could not decide in advance that its precursor materials meet the relative MPS limitation of claim 1 where those precursor materials do not, in fact, meet that limitation. Dr. Johnston's testing, therefore, indicates Purina does not predetermine mean particle sizes for its clay ingredients, nor decide in advance upon a relatively larger non-swelling mean particle size.

Moreover, Dr. Johnston admitted his opinion relied on testing that he did not find reliable. *Id.* 502:5-503:8 ("it's using a sieve-type method . . . I don't believe it was reliable . . . [W]hen the openings become very small, the limit of a sieve-based method to determine particle size is -- there's a finite limit."). This admission shows his testimony is not credible and should be given no weight. *See Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510, 513 (7th Cir. 2006) (noting that a district court excluded a party's expert who "based his calculations on data from the wrong highway ramp"); *United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) (materials may "form the basis for the expert's testimony [when] they [a]re of a type reasonably relied on by experts in the field"). Because the only data Dr. Johnston relied upon was not trustworthy, he lacks a factually supportable basis for his opinions.

        **d.    The jury may not rely upon the '570 Patent to find infringement, nor would it provide a reasonable jury a legally sufficient evidentiary basis to find infringement.**

Oil-Dri's efforts to rely upon Purina's '570 Patent are also deficient. An infringement analysis must "compare the claims of the ['019] patent not with another patent but rather with the alleged infringing product itself, i.e., the [Tidy Cats® litters]." *Pactiv Corp. v. S.J. Johnson & Son,*

---

[9] *See, e.g.*, Trial Tr. vol. 3, Johnston, 541:6-9, 542:20-543:2 (non-swelling PS6A_4 of 71.3 microns and swelling PS1_3 of 74.6 microns would not infringe); *id.* 544:4-17, 545:6-14 (non-swelling PS6B_1 of 73.9 microns and swelling PS1_3 of 74.5 microns, PS1_4 of 74.6 microns, PS3_1 of 75 microns, or PS3_2 of 76.5 microns would not infringe); *id.* 551:1-12 (nonswelling PS6 of 44.8 microns and swelling PS1 of 47.9 microns).

*Inc.*, 2000 WL 1898839 at *3 (N.D. Ill. Nov. 29, 2000) (Kennelly, J.). Moreover, the Court has ruled that Purina's '570 patent is not relevant to the issue of infringement and instructed the jury accordingly. ECF 727; Trial Tr. vol. 4, 817:12-16 ("[E]vidence about the '570 patent is not relevant to show infringement or non-infringement.").

Even if '570 were relevant to infringement, Oil-Dri has offered no evidence connecting the accused products to any specific teachings in the patent. *See, e.g., Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1328 (Fed. Cir. 2010) ("the patent owner must compare the claims to the accused products or, if appropriate, prove that the accused products implement any relevant optional sections of the standard."). Purina's marking of the Accused Products with '570 does not supply this connection, *Frolow v. Wilson Sport. Goods Co.*, 710 F.3d 1301, 1310 (Fed. Cir. 2013) ("[M]arking is circumstantial evidence that the marked product falls within the patent claim<u>s</u> . . . ."), especially given the undisputed testimony that Purina does not use '570 as a specification for the Accused Products. *See, e.g.*, Trial Tr. vol. 4, Greene, 744:8-13, 752:9-12; Trial Tr. vol. 5, Huck, 973:22-24.

Last, the identified teachings do not evince any predetermined mean particle size. '570 makes no mention of mean particle size nor "predetermining" a mean particle size. *See generally* DX065. And according to Oil-Dri expert Dr. Goss, one could not calculate a mean particle size "with a degree of accuracy" from the teachings identified by Oil-Dri. Trial Tr. vol. 2, Goss, 352:19-353:7.[10] Thus, even if relevant, '570 would not provide a reasonable jury a legally sufficient evidentiary basis to find that Purina predetermines an MPS for the swelling or non-swelling clay

---

[10] Dr. Goss also testified that the mean particle size of a minus 10 plus 50 calcium bentonite is greater than the mean particle size of a 200-mesh sodium bentonite. Trial Tr. vol. 2 at 353:4-7). However, any discussion of a minus 10 plus 50 calcium bentonite in the '570 Patent refers to the size of the agglomerated non-swelling clay seed, not the precursor materials used to make that wet seed. PTX136 at 1:41-44. This is contrary to the Court's ruling that "claim 1 describes a clumping animal litter *in terms of its ingredients*." ECF 647 at 13 (emphasis added). The size of the agglomerated seed is therefore irrelevant to infringement.

or that Purina "predetermines" the relative MPS of either its swelling or non-swelling clay ingredients in a manner meeting the requirements of claim 1.

### 2. A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find that the Clumping Animal Litters Meet the Particulate or Predetermined MPS Limitations of Claim 1.

Purina respectfully disagrees that Claim 1 is not directed to the final composition of the claimed "clumping animal litter" and that a product may infringe the claim even if the final accused product lacks the claimed particulate swelling clay and particulate non-swelling clay. ECF 647 at 12-13. This holding creates a contradictory result: one limitation—clumping animal litter—is evaluated in terms of the final composition, yet the remaining elements are evaluated in terms of the precursor ingredients. To prove infringement, Oil-Dri must show that the accused products are a clumping animal litter comprising particulate non-swelling clay and particulate swelling clay having specific, predetermined mean particle sizes, not merely a litter manufactured from ingredients with those sizes. But because the only evidence Oil-Dri relies upon is directed to Purina's precursor ingredients, Oil-Dri has failed to present any such evidence. Indeed, this Court recognized that "[t]here is no competent evidence in the record that the composite granules resulting from Nestlé Purina's agglomeration process consist of [separate and discrete] particles." ECF 647 at 32. Without particles, Purina's products necessarily lack any "mean particle size" for its non-swelling and swelling clays, much less a "predetermined mean particle size." Purina is therefore entitled to JMOL.

There is no dispute that Claim 1's preamble reciting a "clumping animal litter" is limiting. ECF 533 at 13. This Court erred in holding that Claim 1 can read upon a product that does not have the required elements and limitations, but that its precursor ingredients could satisfy the limitations. *Id.* at 11. In so ruling, the Court sought to distinguish cases such as *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553 (Fed. Cir. 1995), *PIN/NIP, Inc.,* 304 F.3d 1235, and *Mars, Inc. v.*

*H.J. Heinz Co., L.P.,* 377 F.3d 1369 (Fed. Cir. 2004), on the grounds that unlike those cases, "claim 1 [of the '019] does not describe a 'composition' or 'mixture.'" ECF 647 at 11. The Court instead relied on *Norian Corp. v. Stryker Corp.,* 432 F.3d 1356 (Fed. Cir. 2005), which held that a specific element in a claim, a "solution," could be defined "in terms of the components put into it." *Id.* (quoting *Norian Corp.*, 432 F.3d at 1362). To the contrary, the court in *Norian* simply construed the proper scope of the claim limitation "a sodium phosphate" to require "a single type of sodium phosphate" and did not hold and does not support that a product claim requiring specific discrete elements can cover a product entirely lacking such elements if its precursor ingredients, but not the ultimate product, could independently satisfy such claim elements. *Norian*, 432 F.3d at 1362 (simply construing the meaning and scope of the claimed solution in a conventional manner).

In contrast here, nothing (e.g. the claim, specification, evidence before the Court, nor the law) supports that a product that completely lacks the specific claimed elements and limitations can be met if precursor ingredients could each independently satisfy a claim element.

In holding that claim 1 can cover a clumping animal litter if the accused clumping animal litter itself does not meet the limitations because its premanufactured ingredients could each independently meet a limitation, the Court stated that "use of the word 'predetermined' in claim 1 resolves any remaining concerns that the term 'particulate' might be short-changed by this reading." ECF 647 at 12. That claim 1 recites and requires particulate swelling and non-swelling clay having "predetermined" relative mean particle sizes in no way supports or requires the interpretation that the claim is describing precursor ingredients – indeed, it is simply indicating that the sizes of the required separate particulates in the claimed clumping litter must be "decided upon in advance" (as construed by the Court). ECF 533 at 5-6.

> **3.     A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find Infringement of the Asserted Dependent Claims.**

Because a reasonably jury would not have a legally sufficient evidentiary basis to find infringement of claim 1, it necessarily follows that a jury would not be able to find infringement of any of the asserted dependent claims. *Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989) (it is "axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed.").

Separately, a reasonable jury would not have a legally sufficient evidentiary basis to find that the Accused Products meet the limitations of dependent claim 4. To meet this limitation, Oil-Dri relied solely on Dr. Johnston's improper calculations from Purina's material specifications. Trial Tr. vol. 3, Johnston, 505:1-506:12; *see also supra* Part III(A)(1)(a).

### B. A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Find Willful Infringement.

Enhanced damages under 35 U.S.C. § 284 "are not to be meted out in a typical infringement case." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). Rather, willful infringement serves as a "sanction for egregious infringement" under the standard expressed by the Supreme Court in *Halo*. *Id.*. Here, Oil-Dri has not advanced sufficient facts for a reasonable jury to have a legally sufficient evidentiary basis to find Purina acted in a manner that was "willful, wanton, malicious bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate" with respect to the asserted patent, as required by *Halo*. Oil-Dri did not show that Purina is one "who intentionally infringes another's patents—with no doubts about its validity or any notion of a defense—for no other purpose other than to steal the patentee's business." *Id.* at 1936 (Breyer, J., Kennedy, J., and Alito, J. concurring). Thus, it failed to provide sufficient evidence to support its claim of willful infringement.

First, Purina's good faith belief of non-infringement is enough to defeat a claim of willful infringement. *Id.* at 1933 ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct."). The undisputed evidence shows Purina began

independent development of its Engineered Litter years before Purina became aware of the '019 Patent. Trial Tr. vol. 4, Greene, 736:17-19 (Q. As of February 27th, 1997, had you conceived and reduced to practice your invention for engineered litter? A. Yes.); *see also id.* 747:17-25.

Oil-Dri presented no evidence that anyone involved with the Accused Products believed they infringed the '019 Patent. In fact, the only evidence adduced at trial shows exactly the opposite. The inventor of Purina's engineered litter testified he believed the engineered litter did not infringe. *Id.* at Greene, 784:14-19 ("[T]here were questions about whether there might be any interference of issue with the patent . . . I've come to remember that there were discussions about that, whether there would be any issue, and my position was no, there wouldn't be."); *see also* Raymond Dep. at 77:16-78:6 (with respect to Kitty Litter Maxx Scoop, "we were already producing something that would have met what the . . . Goss patent was doing").[11]

Second, Oil-Dri did not and cannot prove Purina copied what is described in the '019 patent. Mr. Greene testified that "in conceiving and developing Tidy Cats litter," he did not "copy any invention from Oil-Dri's '019 patent." Trial Tr. vol. 4, Greene, 747:17-25. Indeed, Purina could not have copied any Oil-Dri's product because Oil-Dri admits it did not have any patent-practicing product on the market until at least 2011. Trial Tr. vol. 1, Jaffee, 216:4-21. And it is undisputed that Purina did not learn about the '019 Patent until November 2001, by which time Purina had been developing its Engineered Litter for over four years, and was already conducting field studies of the Accused Products. Trial Tr. vol. 4, Greene, 780:11-12 (Q. No, when did you learn of the '019 patent? A. Sometime in 2001); *id.* 783:21-25 (Q. Did you know about the Oil-

---

[11] Purina's good faith belief is supported by the fact that Oil-Dri knew of and analyzed Purina's accused products in 2005, and yet elected not to question any alleged infringement for nearly a decade (until March of 2014). DX 557; Trial Tr. vol. 1, Jaffee, 219:3-5 (Q. Oil-Dri first learned about Purina's engineered litter, the Tidy Cats product, when it hit the market in 2005, right? A. Correct.); *id.* at 184:13-18 (identifying the March 2014 letter alleging infringement).

Dri patent, the '019 patent by November 9th of 2001? A. Yes. I believe that's correct. That was when we were fielding home-use tests); *id.* 748:12-18 ("['019] patent didn't issue until almost three years after we had sent our memo to Dave Anderson").

Third, pre-suit knowledge of the patent alone is not enough to show infringement is egregious, deliberate, wanton, or otherwise characteristic of the type of infringement that warrants the court exercising its discretion to impose the punitive sanction of enhanced damages. *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004) ("[K]nowledge of asserted patent, without more, is insufficient to support a conclusion of willfulness."). Purina did not deliberately avoid the '019 patent. It cited the '019 patent in its patent application for engineered litter. DX-65. Mr. Greene testified it did so because the '019 patent "dealt with an animal litter." Trial Tr. vol. 4, Greene, 747:5-8; *see also id.* 743:9-17, 744:14-20, 745:13-746:15, 747:5-748:18. As demonstrated above, Purina independently developed the Accused Products, obtained numerous patents on those products, and did not act in a manner supporting a finding of willful infringement. Thus, a reasonable jury would not have a legally sufficient evidentiary basis to find that Purina willfully infringed the '019 Patent.

### C. A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to Award of Reasonable Royalty Damages.

The Supreme Court has long held that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product. *Garretson v. Clark*, 111 U.S. 120, 121 (1884). To be admissible, expert testimony opining on a reasonable royalty must "sufficiently [tie the expert testimony on damages] to the facts of the case. If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)) (alteration in original). To sufficiently tie the damages testimony to the facts of the case, there must be a comprehensive justification of the royalty rate in addition

to the royalty base. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group*, LLC, 879 F.3d 1332, 1350 (Fed. Cir. 2018).

Indeed, *AstraZeneca* emphasizes that the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the *patented feature and unpatented features*, and such evidence must be reliable and tangible, and *not conjectural or speculative*." *AstraZeneca v. Apotex*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) (emphasis added) (quoting *Garretson v. Clark*, 111 U.S. at 121). Moreover, even when the entire market value rule does not apply and "the claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone." *Id.* at 1338 (emphasis added); (citing *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention.")).

The claimed particle size features of the '019 patent do not drive demand for any product. Oil-Dri's expert, Ms. Davis, admitted consumers do not buy litter for reasons "related specifically to the mean particle size." Trial Tr. vol. 3, Davis, 654:21-23. Instead, features independent of the '019 patent are important to consumers and form the basis for demand—features Ms. Davis failed to exclude in determining her reasonable royalty. Ms. Davis admitted she did not account for the Tidy Cats brand equity that existed before the accused products were released. *Id.* 660:3-6. Yet, it is undisputed that brand-strength and marketing are important drivers of consumer demand. Trial Tr. vol. 1, Jaffee, 209:17-23 (Q. Now branding is important because some consumers purchase the same brand repeatedly, right? A. Correct.); Trial Tr. vol. 2, Mak, 453:2-21 (Q. Based on your experience in marketing, would you agree that a company's brand helps sell litter? A. Yes . . . Q.

As a person involved in marketing, I'm sure you'd agree that marketing helps sell litter products; is that fair? A. Yes.).

Ms. Davis also agreed the Tidy Cats brand equity contributed to the success of the accused products. Trial Tr. vol. 3, Davis, 659:4-11. Ms. Davis attempted to account for some of Purina's ongoing marketing efforts but did not properly account for historical and established "brand name, advertising and good sales efforts, all of which contribute to patent profitability." *LG Display Co. Ltd. v. Au Optronics Corp.*, 722 F.Supp.2d 466, 473 (D. Del. 2010); *MiiCs & Partners, Inc. v. Funai Elec. Co.*, 2017 WL 6268072 at *3 (D. Del. Dec. 7, 2017) (finding expert testimony unreliable where the expert failed to provide "reliable and tangible evidence tending to apportion patented and unpatented features"). Similarly, Ms. Davis failed to account for several unclaimed conventional features, such as color, fragrance, and packaging, in determining her reasonable royalty. Trial Tr. vol. 3, Davis, 663:6-25.[12] Ms. Davis also improperly relies on a supply agreement, rather than a comparable license, to inform her opinion on splitting profits.

Oil-Dri has presented no evidence concerning the correct legal standard—what a reasonable royalty would be for the incremental value that the patented invention adds to the end product—and judgment as a matter of law should be granted in Purina's favor. Alternatively, because Ms. Davis' testimony should have been excluded, judgment as a matter of law is warranted. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 454-56 (2000) (permitting a court of

---

[12] Nor did Oil-Dri present evidence of damages consistent with its infringement theory, which relies only on the precursor ingredients used to manufacture Purina's clumping animal litter. Oil-Dri seeks damages based on a royalty for Purina's final product, as sold to the consumer. Any damages awarded to Oil-Dri must be consistent with marginal value provided by its predetermined MPS invention, not the entire final product sold to the consumer.

appeals to render judgment as a matter of law when inadmissible expert testimony was erroneously admitted and the properly admitted evidence was insufficient to support the verdict).

**D.    A Reasonable Jury Would Not Have a Legally Sufficient Evidentiary Basis to to Find that Oil-Dri Complied with the Statutory Requirements of § 287(a).**

If a patentee fails to mark any patent-practicing article, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice." 35 U.S.C. § 287(a).

The burden is on Oil-Dri to plead and prove at trial "that it has complied with the statutory requirements of § 287(a). *Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863, 868 (N.D. Ill. 2010) (citing *Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998)). Oil-Dri has failed to meet this burden. Oil-Dri contends that all of its Cat's Pride Fresh & Light ("CPFL") cat litters, except for "All Day Odor Control," are covered by the '019 Patent. Trial Tr. vol. 2, Mak, 455:7-15; 457:4-8. However, at trial, Oil-Dri only provided evidence that the 2011 CPFL 15lb. jug, the 2012 CPFL 15lb. jug, the 2013 CPFL 15lb. jug, the 2014 CPFL 15lb. jug, and the 2015 CPFL 15 lb. jug for a certain type of Fresh & Light litter were marked with the '019 Patent pursuant to § 287(a). PX 178; Trial Tr. vol. 2, Mak, 448:10-451:20. Oil-Dri presented testimony that other CPFL products were marked—for example, CPFL Fragrance-Free and CPFL All Day Odor Control—but provided no evidence to corroborate that self-serving testimony. *Id.* 455:1-457:16. In addition, Oil-Dri provided no corroborating evidence that could support its assertions of Internet marking of CPFL in 2016 (the referenced website is nowhere in the record). *Id.* 451:21-452:4.

This is insufficient to meet the requirements of § 287(a). *See Von Holdt*, 714 F. Supp. 2d at 872 ("Even if the court assumes that the plaintiffs satisfied this 'reasonable effort' requirement with regards to [some products], the evidence by itself fails to show that 'substantially all' of their

products were marked."). Because Oil-Dri has failed to carry its burden to present evidence that would provide a reasonable jury with a legally sufficient evidentiary basis to find that it complied with § 287(a), Oil-Dri can only recover damages occurring after actual notice to Purina of its alleged infringement. It is undisputed that Oil-Dri did not provide such notice to Purina until March 19, 2014. DX 557; Trial Tr. vol. 1, Jaffee, 184:13-18. Oil-Dri can only recover damages for any infringement occurring between March 19, 2014 and the August 19, 2017 expiration of the '019 Patent.

## IV.     CONCLUSION

Under Federal Rule of Civil Procedure 50(a), Purina respectfully requests entry of judgment as a matter of law with respect to the issues discussed herein, and on all claims that can be maintained only with a favorable finding for Oil-Dri on the issue, including but not limited to its claims for infringement of all Asserted Claims of the '019 Patent.

Dated: March 25, 2019                                   Respectfully submitted

By: */s/ Michael J. Abernathy*
Michael J. Abernathy
Jason C. White
Sanjay K. Murthy
Margaret McGreal
Maria E. Doukas
Brittany A. Washington
Michael Sikora
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, Suite 500
Chicago, Illinois 60601
Telephone: (312) 324-1000
mike.abernathy@morganlewis.com
jason.white@morganlewis.com
sanjay.murthy@morganlewis.com
margaret.mcgreal@morganlewis.com
maria.doukas@morganlewis.com
brittany.washington@morganlewis.com
michael.sikora@morganlewis.com

David A. Roodman (ARDC No. 6205845)

Nick E. Williamson, *Pro Hac Vice*
Emma G. Harty, *Pro Hac Vice*
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: (314) 259-2000
daroodman@bclplaw.com
nick.williamson@bclplaw.com
emma.harty@bcllplaw.com

***ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIM-PLAINTIFF
NESTLÉ PURINA PETCARE COMPANY***

## **CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of the foregoing document via the Court's CM/ECF system pursuant to L.R. 5.9 on March 25, 2019.

*/s/ Michael J. Abernathy*
Michael J. Abernathy